Case No. 16-08083

# In the United States Court of Appeals
## for the Tenth Circuit

_____

WESTERN WATERSHEDS PROJECT; NATIONAL PRESS
PHOTOGRAPHERS ASSOCIATION; NATURAL RESOURCES DEFENSE
COUNCIL, INC.,

*Plaintiffs-Appellants,*

v.

PETER K. MICHAEL, in his official capacity as, Attorney General of Wyoming;
TODD PARFITT, in his capacity as Director of the Wyoming, Department of
Environment Quality; PATRICK J. LEBRUN, in his official capacity as County
Attorney of Fremont County; JOSHUA SMITH, in his official capacity as County
Attorney of Lincoln County, Wyoming; CLAY KAINER, in his official capacity
as County and Prosecuting Attorney of Sublette County, Wyoming,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court for the District of Wyoming
Judge Scott W. Skavdahl, Case No. 2:15-cv-00169-SWS

_____

## APPELLANTS'  APPENDIX
_____-_____

David S. Muraskin
Public Justice, P.C.
1620 L St. NW, Suite 630
Washington, DC 20036
(202) 861-5245
dmuraskin@publicjustice.net
*Counsel for Western Watersheds Project
and National Press Photographers Association*
            *(additional counsel listed on inside cover)*

Leslie A. Brueckner
Public Justice, P.C.
555 12th St., Suite 1230
Oakland, CA 94607
(510) 622-8205
lbrueckner@publicjustice.net
*Counsel for Western Watersheds
Project and National Press
Photographers Association*


Justin Marceau
University of Denver Sturm College
of Law
(for identification purposes only)
2255 East Evans Ave.
Denver, CO 80208
(303) 871-6000
jmarceau@law.du.edu
*Counsel for Western Watersheds
Project and National Press
Photographers Association*

Deepak Gupta,
Gupta Wessler PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
deepak@guptawessler.com
*Counsel for National Press
Photographers Association*

Michael E. Wall,
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
(415) 875-6100
mwall@nrdc.org
*Counsel for Natural Resources
Defense Council, Inc.*


Margaret Hsieh,
Natural Resources Defense Council
40 West 20th Street
New York, NY 10011
(212) 727-2700
mhsieh@nrdc.org
*Counsel for Natural Resources
Defense Council, Inc.*


Reed Zars
Attorney at Law
910 Kearney Street
Laramie, WY 82070
(307) 745-7979
reed@zarslaw.com
*Counsel for Plaintiffs*

# APPENDIX

# TABLE OF CONTENTS

Docket. ...................................................................................A1

First Order, Granting In Part And Denying In Part Defendants'
      Motion To Dismiss........................................................A13

First Amended Complaint ....................................................A51

Kainer Answer.....................................................................A112

Lebrun and Smith Answer...................................................A115

Second Order, Granting Motion To Dismiss........................A144

Notice of Appeal ................................................................. A170

Wyo. Stat. §6-3-414 (2016)..................................................A174

Legislative Amendments to Wyo. Stat. §6-3-414.................. A177

Wyo. Stat. Ann. §40-27-101 (2016).......................................A179

Legislative Amendments to Wyo. Stat. §40-27-101 ............. A182

APPEAL,TERMED

# U.S. District Court
## District of Wyoming (Cheyenne)
## CIVIL DOCKET FOR CASE #: 2:15-cv-00169-SWS

| | |
|---|---|
| Western Watersheds Project et al v. Attorney General et al | Date Filed: 09/29/2015 |
| Assigned to: Honorable Scott W Skavdahl | Date Terminated: 07/06/2016 |
| Referred to: Honorable Kelly H Rankin | Jury Demand: None |
| Case in other court: USCA 10th Circuit, 16-08083 | Nature of Suit: 950 Constitutional - State Statute |
| Cause: 42:1981 Civil Rights | Jurisdiction: Federal Question |

**Plaintiff**

| | | |
|---|---|---|
| **Western Watersheds Project** | represented by | **David S Muraskin**<br>PUBLIC JUSTICE PC<br>1620 L Street, NW<br>Suite 630<br>Washington, DC 20036<br>202/861-5245<br>Fax: 202/232-7203<br>Email: dmuraskin@publicjustice.net<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Reed Zars**<br>910 Kearney Street<br>Laramie, WY 82070<br>307/745-7979<br>Fax: 307/745-7999<br>Email: reed@zarslaw.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Justin F Marceau**<br>UNIVERSITY OF DENVER STURM COLLEGE OF LAW<br>2255 E Evans Ave<br>Denver, CO 80208<br>303/871-6449<br>Email: jmarceau@law.du.edu<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Justin R Pidot**<br>UNIVERSITY OF DENVER STURM COLLEGE OF LAW<br>2255 East Evans Ave |

[A1]

Denver, CO 80208
303/871-6168
Fax: 303/871-6711
Email: jpidot@law.du.edu
*TERMINATED: 07/15/2016*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leslie A Brueckner**
PUBLIC JUSTIC PC
555 12th Street
Suite 1230
Oakland, CA 94607
510/622-8205
Email: lbrueckner@publicjustice.net
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

| | | |
|---|---|---|
| **National Press Photographers Association** | represented by | **Reed Zars** |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Deepak Gupta**
GUPTA WESSLER PLLC
1735 20th Street NW
Washington, DC 20009
202/888-1741
Email: deepak@guptawessler.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

| | | |
|---|---|---|
| **National Resources Defense Council Inc** | represented by | **Margaret T Hsieh** |

NATURAL RESOURCES DEFENSE
COUNCIL INC
40 West 20th Street, Floor 11
New York, NY 10011
212/727-4652
Fax: 212/727-1773
Email: mhsieh@nrdc.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Reed Zars**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

[A2]

**Michael E Wall**
NATURAL RESOURCES DEFENSE
COUNCIL
111 Sutter Street
20th Floor
San Francisco, CA 94104
415/875-6100
Fax: 415/875-6161
Email: mwall@nrdc.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**People for the Ethical Treatment of Animals Inc**              represented by   **Reed Zars**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Strugar**
Law Office of Matthew Strugar
2108 Cove Avenue
Los Angeles, CA 90039
323/696-2299
Email: matthewstrugar@gmail.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Center for Food Safety**                           represented by   **Reed Zars**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cristina R Stella**
CENTER FOR FOOD SAFETY
303 Sacramento St
2nd Floor
San Francisco, CA 94111
415/826-2770
Fax: 415/826-0507
Email: cstella@centerforfoodsafety.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Paige M Tomaselli**
CENTER FOR FOOD SAFETY
303 Sacramento St
2nd Floor
San Francisco, CA 94111
415/826-2770
Fax: 415/826-0507
Email: ptomaselli@centerforfoodsafety.org

[A3]

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Animal Legal Defense Fund**                  represented by  **Justin F Marceau**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *PRO HAC VICE*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Reed Zars**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*


V.

**Defendant**

**Wyoming Attorney General**                   represented by  **Erik Edward Petersen**
*in his official capacity*                                     WYOMING ATTORNEY GENERAL'S
*also known as*                                                OFFICE
Peter K Michael                                                2320 Capitol Avenue
                                                               Cheyenne, WY 82002
                                                               307/777-3539
                                                               Fax: 307/777-3542
                                                               Email: erik.petersen@wyo.gov
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **James C Kaste**
                                                               Wyoming Attorney General's Office
                                                               2320 Capitol Avenue
                                                               Cheyenne, WY 82002
                                                               307/777-6946
                                                               Fax: 307/777-3542
                                                               Email: james.kaste@wyo.gov
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

**Defendant**

**Wyoming Department of Environmental**        represented by  **Erik Edward Petersen**
**Quality Director**                                           (See above for address)
*in his official capacity*                                     *LEAD ATTORNEY*
*also known as*                                                *ATTORNEY TO BE NOTICED*
Todd Parfitt
                                                               **James C Kaste**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

[A4]

**Defendant**

**Fremont County Attorney**                represented by    **Richard Rideout**
*in his official capacity*                                    LAW OFFICES OF RICHARD RIDEOUT
*also known as*                                               211 West 19th Street, Suite 100
Patrick LeBrun                                                P O Box 389
                                                             Cheyenne, WY 82003-0389
                                                             307/632-1901
                                                             Email: rsrideout@qwestoffice.net
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Defendant**

**Lincoln County Attorney**                represented by    **Richard Rideout**
*in his official capacity*                                    (See above for address)
*also known as*                                               *LEAD ATTORNEY*
Joshua Smith                                                  *ATTORNEY TO BE NOTICED*

**Defendant**

**Sublette County Attorney**               represented by    **Matt Gaffney**
*in his official capacity*                                    SUBLETTE COUNTY ATTORNEY'S
*also known as*                                               OFFICE
Clay Kainer                                                   17 South Fremont Avenue
                                                             PO Box 1010
                                                             Pinedale, WY 82941
                                                             307/367-2300
                                                             Fax: 307/367-2025
                                                             Email: matt.gaffney@sublettewyo.com
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Defendant**

**Wyoming Governor**                       represented by    **Erik Edward Petersen**
*in his official capacity*                                    (See above for address)
*TERMINATED: 12/28/2015*                                      *TERMINATED: 12/28/2015*
*also known as*                                               *LEAD ATTORNEY*
Matt Mead                                                     *ATTORNEY TO BE NOTICED*

                                                             **James C Kaste**
                                                             (See above for address)
                                                             *TERMINATED: 12/28/2015*
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/29/2015 | 1 | COMPLAINT (6 summons(es) issued) ( Filing fee $400 receipt #CHY022812.), filed by National Press Photographers Association, People for the Ethical Treatment of Animals Inc, Center for Food Safety, Western Watersheds Project, National Resources Defense Council Inc. (Attachments: # 1 Civil Cover Sheet, # 2 Consent Form) (Court Staff, skl) (Entered: 09/29/2015) |

[A5]

| 09/29/2015 | 2 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Matthew Struger to appear pro hac vice; Paid In full Receipt # CHY022813; filed by Plaintiff People for the Ethical Treatment of Animals Inc. (Attachments: # 1 Affidavit, # 2 Proposed Order) (Court Staff, skl) (Entered: 09/29/2015) |
| --- | --- | --- |
| 09/29/2015 | 3 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Michael E. Wall to appear pro hac vice; Paid in full Receipt # CHY022813; filed by Plaintiff National Resources Defense Council Inc. (Attachments: # 1 Affidavit, # 2 Proposed Order)(Court Staff, skl) (Entered: 09/29/2015) |
| 09/29/2015 | 4 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Justin R. Pidot to appear pro hac vice; Paid in Full Receipt # CHY022813; filed by Plaintiff Western Watersheds Project. (Attachments: # 1 Affidavit, # 2 Proposed Order)(Court Staff, skl) (Entered: 09/29/2015) |
| 09/29/2015 | 5 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Justin F Marceau to appear pro hac vice; Paid in Full Receipt # CHY022813; filed by Plaintiff Western Watersheds Project. (Attachments: # 1 Affidavit, # 2 Proposed Order)(Court Staff, skl) (Entered: 09/29/2015) |
| 09/29/2015 | 6 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Deepak Gupta to appear pro hac vice; Paid in Full receipt # CHY022813; filed by Plaintiff National Press Photographers Association. (Attachments: # 1 Affidavit, # 2 Proposed Order)(Court Staff, skl) (Entered: 09/29/2015) |
| 09/29/2015 | 7 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Paige M Tomaselli to appear pro hac vice; Paid in full receipt #CHY022813; filed by Plaintiff Center for Food Safety. (Attachments: # 1 Affidavit, # 2 Proposed Order)(Court Staff, skl) (Entered: 09/29/2015) |
| 09/29/2015 | 8 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Leslie A Brueckner to appear pro hac vice; Paid in Full Receipt # CHY022813; filed by Plaintiff Western Watersheds Project. (Attachments: # 1 Affidavit, # 2 Proposed Order)(Court Staff, skl) (Entered: 09/29/2015) |
| 09/29/2015 | 9 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Cristina R Stella to appear pro hac vice; Paid in Full Receipt # CHY022813; filed by Plaintiff Center for Food Safety. (Attachments: # 1 Affidavit, # 2 Proposed Order)(Court Staff, skl) (Entered: 09/29/2015) |
| 09/29/2015 | 10 | ORDER by the Honorable Kelly H Rankin granting 2 Motion to appear pro hac vice admitting Matthew Strugar for People for the Ethical Treatment of Animals Inc. (Court Staff, sal) (Entered: 09/29/2015) |
| 09/29/2015 | 11 | ORDER by the Honorable Kelly H Rankin granting 3 Motion to appear pro hac vice admitting Michael E Wall for National Resources Defense Council Inc (Court Staff, sal) (Entered: 09/29/2015) |
| 09/29/2015 | 12 | ORDER by the Honorable Kelly H Rankin granting 4 Motion to appear pro hac vice admitting Justin Pidot for Western Watersheds Project (Court Staff, sal) (Entered: 09/29/2015) |
| 09/29/2015 | 13 | ORDER by the Honorable Kelly H Rankin granting 5 Motion to appear pro hac vice admitting Justin F Marceau for Western Watersheds Project (Court Staff, sal) (Entered: 09/29/2015) |

[A6]

| 09/29/2015 | 14 | ORDER by the Honorable Kelly H Rankin granting 6 Motion to appear pro hac vice admitting Deepak Gupta for National Press Photographers Association (Court Staff, sal) (Entered: 09/30/2015) |
| 09/29/2015 | 15 | ORDER by the Honorable Kelly H Rankin granting 7 Motion to appear pro hac vice admitting Paige M Tomaselli for Center for Food Safety (Court Staff, sal) (Entered: 09/30/2015) |
| 09/29/2015 | 16 | ORDER by the Honorable Kelly H Rankin granting 8 Motion to appear pro hac vice admitting Leslie A Brueckner for Western Watsheds Project (Court Staff, sal) (Entered: 09/30/2015) |
| 09/29/2015 | 17 | ORDER by the Honorable Kelly H Rankin granting 9 Motion to appear pro hac vice admitting Cristina R Stella for Center for Food Safety (Court Staff, sal) (Entered: 09/30/2015) |
| 09/30/2015 | 18 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Margaret Hsieh to appear pro hac vice; Check not tendered; filed by Plaintiffs Center for Food Safety, National Press Photographers Association, National Resources Defense Council Inc, People for the Ethical Treatment of Animals Inc, Western Watsheds Project. (Zars, Reed) (Entered: 09/30/2015) |
| 10/01/2015 | 19 | ORDER by the Honorable Kelly H Rankin granting 18 Motion to appear pro hac vice admitting Margaret T Hsieh for National Resources Defense Council Inc (Court Staff, sal) (Entered: 10/01/2015) |
| 10/07/2015 | 20 | ACCEPTANCE OF SERVICE filed by National Press Photographers Association, People for the Ethical Treatment of Animals Inc, Center for Food Safety, Western Watsheds Project, National Resources Defense Council Inc. All Defendants. (Zars, Reed) (Entered: 10/07/2015) |
| 10/07/2015 | 21 | SUMMONS Returned Executed by National Press Photographers Association, People for the Ethical Treatment of Animals Inc, Center for Food Safety, Western Watsheds Project, National Resources Defense Council Inc. Wyoming Attorney General served on 9/29/2015, answer due on 10/20/2015 (Court Staff, stbd) (Entered: 10/07/2015) |
| 10/07/2015 | 22 | SUMMONS Returned Executed by National Press Photographers Association, People for the Ethical Treatment of Animals Inc, Center for Food Safety, Western Watsheds Project, National Resources Defense Council Inc. Director of the Wyoming Department of Environmental Quality served on 9/29/2015, answer due on 10/20/2015 (Court Staff, stbd) (Entered: 10/07/2015) (Court Staff, stbd) (Entered: 10/07/2015) |
| 10/07/2015 | 23 | SUMMONS Returned Executed by National Press Photographers Association, People for the Ethical Treatment of Animals Inc, Center for Food Safety, Western Watsheds Project, National Resources Defense Council Inc. Wyoming Governor served 9/29/2015, answer due 10/20/2015. (Court Staff, stbd) (Entered: 10/07/2015) |
| 10/14/2015 | 24 | NOTICE of Attorney Appearance by Richard Rideout on behalf of Fremont County Attorney, Lincoln County Attorney (Rideout, Richard) (Entered: 10/14/2015) |
| 10/19/2015 | 25 | NOTICE of Attorney Appearance by Matthew Gaffney on behalf of Sublette County Attorney (Gaffney, Matthew) (Entered: 10/19/2015) |
| 10/20/2015 | 26 | ANSWER to 1 Complaint, with Affirmative Defenses, by Sublette County Attorney. (Gaffney, Matt) (Entered: 10/20/2015) |

[A7]

| 10/20/2015 | 27 | NOTICE of Attorney Appearance by James C Kaste on behalf of Wyoming Attorney General, Wyoming Department of Environmental Quality Director, Wyoming Governor (Kaste, James) (Entered: 10/20/2015) |
|---|---|---|
| 10/20/2015 | 28 | MOTION to Dismiss, filed by Defendants Wyoming Attorney General, Wyoming Department of Environmental Quality Director, Wyoming Governor. (Attachments: # 1 Memorandum in Support)(Kaste, James) (Entered: 10/20/2015) |
| 10/20/2015 | 29 | NOTICE of Attorney Appearance by Erik Edward Petersen on behalf of Wyoming Attorney General, Wyoming Department of Environmental Quality Director, Wyoming Governor (Petersen, Erik) (Entered: 10/20/2015) |
| 10/21/2015 | 30 | ANSWER to 1 Complaint, with Affirmative Defenses, by Lincoln County Attorney, Fremont County Attorney. (Rideout, Richard) (Entered: 10/21/2015) |
| 10/28/2015 | 31 | NON-PUBLIC DOCUMENT pursuant to the Judicial Conference Policy on Privacy and Public Access - First MOTION for Extension of Time (Dispositive) filed by Plaintiffs Center for Food Safety, National Press Photographers Association, National Resources Defense Council Inc, People for the Ethical Treatment of Animals Inc, Western Watersheds Project. (Attachments: # 1 Proposed Order)(Pidot, Justin) (Entered: 10/28/2015) |
| 10/29/2015 | 32 | ORDER by the Honorable Scott W Skavdahl granting 31 Motion for Extension of Time. Plaintiff's Response to the Motion to Dismiss is due November 10, 2015. (Court Staff, sds) (Entered: 10/29/2015) |
| 11/10/2015 | 33 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for David S. Muraskin to appear pro hac vice; Check tendered; filed by Plaintiffs Center for Food Safety, National Press Photographers Association, National Resources Defense Council Inc, People for the Ethical Treatment of Animals Inc, Western Watersheds Project. (Zars, Reed) (Entered: 11/10/2015) |
| 11/10/2015 | 34 | RESPONSE in Opposition re 28 Motion to Dismiss filed by Plaintiffs Center for Food Safety, National Press Photographers Association, National Resources Defense Council Inc, People for the Ethical Treatment of Animals Inc, Western Watersheds Project. (Pidot, Justin) (Entered: 11/10/2015) |
| 11/12/2015 | 35 | ORDER Granting 33 Motion to Appear Pro Hac Vice admitting David S. Muraskin for Western Watersheds Project by the Honorable Kelly H. Rankin.(Court Staff, szr) (Entered: 11/12/2015) |
| 11/12/2015 | 36 | NOTICE of Hearing on 28 MOTION to Dismiss, **Motion Hearing set for 12/11/2015 09:00 AM in Casper Courtroom No. 2 (Room No. 204) before Honorable Scott W Skavdahl.** (Court Staff, stbd) (Main Document 36 replaced due to docketing error/NEF regenerated on 11/13/2015) (Court Staff, stbd). (Entered: 11/12/2015) |
| 11/23/2015 | 37 | NOTICE by Plaintiffs Center for Food Safety, National Press Photographers Association, National Resources Defense Council Inc, People for the Ethical Treatment of Animals Inc, Western Watersheds Project re 36 Notice of Hearing on Motion, *Motion to Excuse Attorney Zars from Attending Hearing* (Zars, Reed) (Entered: 11/23/2015) |
| 11/24/2015 | 38 | ORDER GRANTING MOTION TO EXCUSE ATTORNEY REED ZARS FROM APPEARING AT DECEMBER 11, 2015 HEARING. (Court Staff, stbd) (Entered: 11/24/2015) |

[A8]

| 12/11/2015 | 39 | MINUTES for proceedings held before Honorable Scott W Skavdahl: Motion Hearing held on 12/11/2015. The Court heard argument and took the matter under advisement. (Court Reporter Anne Bowline.) (Court Staff, sds) (Entered: 12/11/2015) |
|------------|----|------------------------------------------------------------------------------|
| 12/28/2015 | 40 | ORDER by the Honorable Scott W Skavdahl granting in part and denying in part Defendants' 28 Motion to Dismiss. Plaintiffs' complaint and response wholly fails to justify the inclusion of the Governor as a party to this proceeding and he will be dismissed. Similarly, there is no viable preemption issue and Plaintiffs' assertion to the contrary lacks legal or factual support to state a plausible claim. However, the same cannot be said for Plaintiffs' claims under the Free Speech and Petition Clause under the First Amendment and the Equal Protection Clause under the Fourteenth Amendment. As set forth above, this Court has serious concerns and questions as to the Constitutionality of various provisions of these trespass statutes. Accordingly, Defendants' Motion to Dismiss these claims is denied.(Court Staff, sds) (Entered: 12/28/2015) |
| 01/07/2016 | 41 | ANSWER to 1 Complaint, with Affirmative Defenses, by Wyoming Attorney General, Wyoming Department of Environmental Quality Director. (Petersen, Erik) (Entered: 01/07/2016) |
| 01/07/2016 | 42 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion to Dismiss held on 12/11/2015 before Judge Scott W. Skavdahl. To purchase a copy of this transcript, please contact Court Reporter Anne Bowline, phone (307) 235-3376 or email anne@professionalreporting.com. A party must file a Notice of Intent to Request Redaction within 7 business days. If a party fails to request redaction, the unredacted transcript attached to this entry will be made available electronically without redaction.. Notice of Intent to Redact due 1/14/2016. Notice of Redaction Request due 1/28/2016. Redacted Transcript Deadline set for 2/8/2016. Release of Transcript Restriction set for 4/6/2016. (Bowline, Anne) (Entered: 01/07/2016) |
| 01/07/2016 | 43 | NOTICE of Change of Address by Erik Edward Petersen, attorney on behalf of Wyoming Attorney General, Wyoming Department of Environmental Quality Director (Petersen, Erik) (Entered: 01/07/2016) |
| 01/08/2016 | 44 | NOTICE of Initial Pretrial Conference: **Initial Pretrial Conference set for 2/17/2016 08:30 AM in Judge Rankin Chambers (Room No. 2204) before Honorable Kelly H. Rankin. All parties should appear by telephone, with Plaintiffs' counsel initiating the call, through a conference call operator, and connecting to the Court at 307/433-2180. Parties are advised to have their calendars on hand to assist with scheduling.** (Court Staff, szf) (Entered: 01/08/2016) |
| 02/09/2016 | 45 | REPORT of Rule 26(f) Planning Meeting filed by Plaintiffs Center for Food Safety, National Press Photographers Association, National Resources Defense Council Inc, People for the Ethical Treatment of Animals Inc, Western Watersheds Project. (Zars, Reed) (Entered: 02/09/2016) |
| 02/17/2016 | 46 | INITIAL PRETRIAL ORDER by the Honorable Kelly H. Rankin. Motions filing deadline 4/28/2016. Motion response deadline 5/19/2016. **Dispositive Motions Hearing set for 6/16/2016 01:00 PM in Casper Courtroom No. 1 (Room No. 106) before Honorable Scott W Skavdahl.** Discovery due by 2/24/2016. **Final Pretrial Conference set for 7/7/2016 01:00 PM in Judge Skavdahl Chambers (Room No. 210) before Honorable Scott W Skavdahl. Bench Trial (5 Days/Stacked #3) set for 7/25/2016 09:30 AM in Casper Courtroom No. 1 (Room No. 106) before Honorable Scott W. Skavdahl.**(Court Staff, szf) (Entered: 02/17/2016) |

[A9]

| 02/23/2016 | 47 | MOTION REFERRED TO Judge Kelly H Rankin. Stipulated MOTION for Extension of Time (Non-Dispositive) *re Discovery Cutoff Date* filed by Defendants Wyoming Attorney General, Wyoming Department of Environmental Quality Director. (Attachments: # 1 Proposed Order)(Petersen, Erik) (Entered: 02/23/2016) |
| --- | --- | --- |
| 02/24/2016 | 48 | ORDER by the Honorable Kelly H. Rankin GRANTING 47 Motion for Extension of Time. Discovery is extended until 3/10/2016. (Court Staff, smp) (Entered: 02/24/2016) |
| 03/14/2016 | 49 | Joint NOTICE REGARDING EXISTING DEADLINES by Defendants Wyoming Attorney General, Wyoming Department of Environmental Quality Director (Petersen, Erik) Modified text on 3/14/2016 (Court Staff, stbd). (Entered: 03/14/2016) |
| 03/24/2016 | 50 | MOTION REFERRED TO Judge Kelly H Rankin. Stipulated MOTION for Extension of Time (Non-Dispositive) *Re Case Management Deadlines* filed by Plaintiffs Center for Food Safety, National Press Photographers Association, National Resources Defense Council Inc, People for the Ethical Treatment of Animals Inc, Western Watersheds Project. (Attachments: # 1 Proposed Order)(Pidot, Justin) (Entered: 03/24/2016) |
| 03/25/2016 | 51 | ORDER by the Honorable Kelly H. Rankin GRANTING 50 Motion for Extension of Time. Plaintiffs will file an amended complaint on or before 4/5/2016. Defendants will file a responsive pleading to the amended complaint on or before 5/3/2016. Plaintiffs will file any response to a motion to dismiss on or before 5/24/2016. Written discovery is extended until 4/19/2016. (Court Staff, smp) (Entered: 03/25/2016) |
| 04/05/2016 | 52 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION to Amend/Correct 1 Complaint, filed by Plaintiffs Center for Food Safety, National Press Photographers Association, National Resources Defense Council Inc, People for the Ethical Treatment of Animals Inc, Western Watersheds Project. (Attachments: # 1 Exhibit First Amended Complaint)(Zars, Reed) (Entered: 04/05/2016) |
| 04/07/2016 | 53 | ORDER by the Honorable Kelly H. Rankin GRANTING 52 Motion to Amend/Correct 1 Complaint. (Court Staff, smp) (Entered: 04/07/2016) |
| 04/11/2016 | 54 | AMENDED COMPLAINT, filed by National Press Photographers Association, People for the Ethical Treatment of Animals Inc, Center for Food Safety, Western Watersheds Project, Animal Legal Defense Fund, National Resources Defense Council Inc. (Court Staff, stbd) (Entered: 04/11/2016) |
| 04/21/2016 | 55 | ANSWER to 54 Amended Complaint, with Affirmative Defenses, by Sublette County Attorney. (Gaffney, Matt) (Entered: 04/21/2016) |
| 04/28/2016 | 56 | MOTION REFERRED TO Judge Kelly H Rankin. STIPULATED MOTION ALTER DEADLINES filed by Defendants Wyoming Attorney General, Wyoming Department of Environmental Quality Director. (Attachments: # 1 Proposed Order)(Petersen, Erik) Modified text on 4/28/2016 (Court Staff, stbd). (Entered: 04/28/2016) |
| 04/28/2016 | 57 | ORDER by the Honorable Kelly H. Rankin granting 56 STIPULATED MOTION TO ALTER DEADLINES. The Court hereby vacates all deadlines in this case that are not contained within the Court's Order of March 25, 2016. (Court Staff, smp) (Entered: 04/28/2016) |
| 05/03/2016 | 58 | MOTION to Dismiss *Plaintiffs' Amended Complaint* filed by Defendants Wyoming Attorney General, Wyoming Department of Environmental Quality Director. (Attachments: # 1 Memorandum in Support of Motion to Dismiss)(Petersen, Erik) (Entered: 05/03/2016) |

[A10]

| | | |
|---|---|---|
| 05/03/2016 | 59 | ANSWER to 54 Amended Complaint, with Affirmative Defenses, by Fremont County Attorney, Lincoln County Attorney. (Rideout, Richard) (Entered: 05/03/2016) |
| 05/24/2016 | 60 | MEMORANDUM in Opposition to 58 MOTION to Dismiss *Plaintiffs' Amended Complaint* filed by Plaintiffs Animal Legal Defense Fund, Center for Food Safety, National Press Photographers Association, National Resources Defense Council Inc, People for the Ethical Treatment of Animals Inc, Western Watersheds Project. (Pidot, Justin) (Entered: 05/24/2016) |
| 05/24/2016 | 61 | ORDER REQUIRING REPLY TO 60 Memorandum in Opposition to Motion, filed by Center for Food Safety, National Resources Defense Council Inc, Western Watersheds Project, Animal Legal Defense Fund, National Press Photographers Association, People for the Ethical Treatment of Animals Inc by the Honorable Scott W Skavdahl. IT IS ORDERED that Defendants Michael and Parfitt shall submit a reply to Plaintiffs' Memorandum in Opposition to Motion to Dismiss (ECF No. 60) by Tuesday, May 31, 2016. (Court Staff, sdf) (Entered: 05/24/2016) |
| 05/26/2016 | 62 | NOTICE of Change of Address by Reed Zars, attorney on behalf of Animal Legal Defense Fund, Center for Food Safety, National Press Photographers Association, National Resources Defense Council Inc, People for the Ethical Treatment of Animals Inc, Western Watersheds Project (Zars, Reed) (Entered: 05/26/2016) |
| 05/31/2016 | 63 | REPLY BRIEF re 58 Motion to Dismiss filed by Defendants Wyoming Attorney General, Wyoming Department of Environmental Quality Director. (Petersen, Erik) (Entered: 05/31/2016) |
| 07/06/2016 | 64 | ORDER GRANTING 58 MOTION TO DISMISS by the Honorable Scott W Skavdahl. (Court Staff, stbd) Modified text on 7/13/2016 (Court Staff, sjlg). (Entered: 07/06/2016) |
| 07/06/2016 | 65 | JUDGMENT in favor of Defendant against Plaintiff by the Honorable Scott W Skavdahl. (Attachments: # 1 Bill of Costs)(Court Staff, stbd) (Entered: 07/06/2016) |
| 07/11/2016 | 66 | NOTICE of Change of Address by Matthew Strugar, attorney on behalf of People for the Ethical Treatment of Animals Inc (Strugar, Matthew) (Entered: 07/11/2016) |
| 07/15/2016 | 67 | NOTICE by Plaintiffs National Press Photographers Association, Western Watersheds Project *of withdrawal of counsel* (Pidot, Justin) (Entered: 07/15/2016) |
| 08/02/2016 | 68 | NOTICE OF APPEAL as to 64 Order on Motion to Dismiss, 65 Judgment filed by Plaintiff Western Watersheds Project, National Press Photographers Association, and Natural Resources Defense Council, Inc. (Zars, Reed) Modified filer on 8/2/2016 (Court Staff, sdf). (Entered: 08/02/2016) |
| 08/02/2016 | 69 | USCA Appeal Fees received $ 505 receipt number CHY024861 re 68 Notice of Appeal, filed by Western Watersheds Project (Court Staff, sdf) (Entered: 08/03/2016) |
| 08/03/2016 | 70 | Preliminary Record of appeal sent to USCA and counsel re 68 Notice of Appeal, **The procedures and appeals packet may be obtained from our website at www.wyd.uscourts.gov** (Attachments: # 1 Preliminary Record on Appeal Including Notice of Appeal, # 2 Docket Sheet) (Court Staff, sdf) (Entered: 08/03/2016) |
| 08/03/2016 | 71 | Appeal Number **16-8083** received from USCA for 68 Notice of Appeal, filed by Western Watersheds Project. Civil case docketed. Preliminary record filed. Docketing statement due 08/17/2016 for National Press Photographers Association, Natural Resource Defense Council and Western Watersheds Project. Transcript order form due 08/17/2016 for Leslie A. Brueckner, Justin F. Marceau, David Samuel Muraskin, |

| | | |
|---|---|---|
| | | Michael E. Wall and Reed Zars. Notice of appearance due on 08/17/2016 for Clay Kainer, Patrick Jon LeBrun, Peter K. Michael, National Press Photographers Association, Natural Resource Defense Council, Joshua Smith and Western Watersheds Project [16-8083] (Court Staff, sdf) (Entered: 08/03/2016) |
| 08/17/2016 | 72 | TRANSCRIPT REQUEST (No Transcripts Necessary) by Plaintiffs National Press Photographers Association, Western Watersheds Project re 68 Notice of Appeal. (Court Staff, sdf) (Entered: 08/17/2016) |
| 08/17/2016 | 73 | (TEXT-ONLY) APPEAL MINUTE ORDER from USCA as to 68 Notice of Appeal filed by Western Watersheds Project. **Record on appeal/Notice due 9/12/2016.** (Court Staff, sdf) Modified text on 8/19/2016 (Court Staff, sjc). (Entered: 08/17/2016) |
| 09/02/2016 | 74 | Transcript Letter transmitted to USCA re 68 Notice of Appeal. No transcripts have been ordered for this appeal. For purpose of appeal, the record is now ready. (Court Staff, sdf) (Entered: 09/02/2016) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/19/2016 13:59:06 | | |
| **PACER Login:** | Public_Justice:2646250:4464021 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:15-cv-00169-SWS |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

[A12]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

**FILED**
**U.S. DISTRICT COURT**
**DISTRICT OF WYOMING**
**2015 DEC 28  PM 4 53**
**STEPHAN HARRIS, CLERK**
**CASPER**

|  |  |
|---|---|
| WESTERN WATERSHEDS PROJECT; NATIONAL PRESS PHOTOGRAPHERS ASSOCATION; NATURAL RESROUCES DEFENSE COUNCIL, INC., PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.; and CENTER FOR FOOD SAFETY,<br><br>Plaintiffs,<br><br>vs.<br><br>PETER K. MICHAEL, in his official capacity as Attorney General of Wyoming; TODD PARFITT, in his official capacity as Director of the Wyoming Department of Environmental Quality; PATRICK J. LEBRUN, in his official capacity as County Attorney of Fremont County, Wyoming; JOSHUA SMITH, in his official capacity as County Attorney of Lincoln County, Wyoming; CLAY KAINER, in his official capacity as County and Prosecuting Attorney of Sublette County, Wyoming; MATTHEW MEAD, in his official capacity as Governor of Wyoming,<br><br>Defendants. | Case No.  15-CV-0169-SWS |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION TO DISMISS**

This matter comes before the Court upon a Motion to Dismiss, filed by Defendants

Peter Michael, Todd Parfitt, and Matthew Mead (hereinafter State Defendants), in their

official capacities. (ECF No. 28). Having considered the motion, response, oral

[A13]

arguments, and all other relevant pleadings, the Court **GRANTS** in part and **DENIES** in part State Defendants' Motion to Dismiss.

## BACKGROUND

Plaintiffs Western Watersheds Project (Western Watersheds), National Press Photographers Association (NPPA), National Resource Defense Council (NRDC), People for the Ethical Treatment of Animals (PETA), and, Center for Food Safety (CFS), are interest groups aimed at protecting and advocating for animals, wildlife, and the environment. (ECF No. 1, ¶¶ 17-35). Plaintiffs filed this action September 29, 2015, challenging the constitutionality of two statutes (hereinafter trespass statutes) passed by the Wyoming legislature earlier in 2015. Plaintiffs assert these trespass statutes unconstitutionally prevent them from collecting and submitting data relating to land and land use to governmental agencies, as they have done in the past in efforts to protect and advocate for animals and the environment.

One of the statutes is a criminal statute, Wyo. Stat. § 6-3-414, entitled "Trespassing to unlawfully collect resource data; unlawful collection of resource data." The other is a civil statute, Wyo. Stat. § 40-27-101, entitled "Trespass to unlawfully collect resource data; unlawful collection of resource data."[1] These trespass statutes are in large part identical, with one imposing criminal liability and the other imposing civil.

---

[1] The civil statute was originally codified at §40-26-101. The statute has now been recodified at § 40-27-101. The rest of this order will refer to the statute as recodified.

There are two proscriptive subsections of each statute, one pertaining to "open land," and the other "private open lands." Under the first, a person is subjected to either criminal or civil liability "if he:

> (i) Enters onto **open land** for the purpose of collecting resource data; and
> (ii) Does not have:
>> (A) An ownership interest in the real property or statutory, contractual or other legal authorization to enter or access the land to collect resource data; or
>> (B) Written or verbal permission of the owner, lessee or agent of the owner to enter or access the land to collect the specified resource data."

Wyo. Stat. §§ 6-3-414(a); 40-27-101(a) (emphasis added).

Under the second subsection, a person is subjected to either criminal or civil liability "if he enters onto **private open land** and collects resource data without:

> (i) An ownership interest in the real property or, statutory, contractual or other legal authorization to enter the private land to collect the specified resource data; or
> (ii) Written or verbal permission of the owner, lessee or agent of the owner to enter the land to collect the specified resource data."

Wyo. Stat. §§ 6-3-414(b); 40-27-101(b) (emphasis added).

Various terms used within the statutes have unique definitions, distinct from their common meanings.[2] "Open land" is defined as land outside the exterior boundaries of

---

[2] Only the criminal statute, Wyo. Stat. § 6-3-414, provides definitions. However, the parties seem to agree the definitions were intended to apply to both statutes. The Court agrees. "In the absence of a state court case interpreting the relevant state law, federal courts must predict how the state court would interpret the statute in light of existing state court opinions, comparable statutes, and decisions from other jurisdictions." *United States v. Harmon*, 742 F.3d 451, 456 (10th Cir. 2014). "All statutes must be construed in *pari materia* and, in ascertaining the meaning of a given law, all statutes relating to the same subject or having the same general purpose must be considered and construed in harmony." *Cheyenne Newspapers, Inc. v. Building Code Bd. of Appeals of City of Cheyenne*, 2010 WY 2, ¶9, 222 P.3d 158, 162 (Wyo. 2010) (citation omitted). Here, both statutes relate to "trespass to unlawfully collect resource data," and contain identical language as to the proscribed conduct. Wyo. Stat. §§ 6-3-414(a)(i)-(ii), (b)(i)-(ii); 40-27-101(a)(i)-(ii), (b)(i)-(ii). Also, the civil statute cross-references the criminal statute. Wyo. Stat. § 40-27-101(d). For these reasons, the Court finds the Wyoming legislature likely intended the definitions included in the criminal statute to apply to the civil statute as well.

[A15]

any incorporated city, town, approved subdivision or development. Wyo. Stat. § 6-3-414(d)(ii). "Resource data" is defined as "data relating to land or land use, including but not limited to data regarding agriculture, minerals, geology, history, cultural artifacts, archeology, air, water, soil, conservation, habitat, vegetation or animal species." Wyo. Stat. § 6-3-414(d)(iv). "Resource data" does not include data: "(A) For surveying to determine property boundaries or the location of survey monuments; (B) Used by a state or local government entity to assess property values; or (C) Collected or intended to be collected by a peace officer while engaged in the lawful performance of his official duties." Wyo. Stat. § 6-3-414(d)(iv). "'Collect' means to take a sample of material, acquire, gather, photograph or otherwise preserve information in any form from open land **which is submitted or intended to be submitted** to any agency of the state or federal government." Wyo. Stat. § 6-3-414(d)(i) (emphasis added).

Incorporating these definitions into the plain language of the trespass statutes, a person is criminally or civilly liable if he or she: (1) enters open land to collect resource data without an ownership interest, authorization, or permission; (2) somehow records or preserves data about the land or land use; and (3) intends to submit or actually submits such data to a governmental agency. This final element is most crucial to the constitutional analyses below. The trespass statutes do not punish one who simply enters land without permission or authorization for any other purpose, or one who intends to communicate collected resource data to anyone other than a governmental agency.

The scope of the trespass statutes remains somewhat unclear at this point, particularly with respect to the sections of the statutes relating to "open lands." Members

4

of the public have a right to be upon various "open lands" for various purposes. For example, citizens have the right to drive on I-25, or hike and picnic on state and BLM lands. At oral arguments, State Defendants opined if one has a right to be upon land, one has the necessary "legal authorization" to gather or preserve resource data and submit it to governmental agencies. Hr'g. Tr. Oral Argument at 8:21-9:13. However, a plain reading of the trespass statutes does not support State Defendants' interpretation.

The relevant statutory sections require "legal authorization to enter or access the land *to collect resource data*." Wyo. Stat. §§ 6-3-414(a)(ii)(A); 40-27-101(a)(ii)(A) (emphasis added). State Defendants' interpretation would render the emphasized portion meaningless. A statute should not be construed in a way that renders phrases meaningless, redundant, or superfluous. *Rake v. Wade*, 508 U.S. 464, 471-72 (1993). As written, and giving each phrase of these provisions meaning, the trespass statutes seem to require authorization not only to enter or access lands, but also to "collect resource data."

The general rights of the public to be upon various public lands do not include specific authorization to collect resource data,[3] and certainly not how that phrase is defined by the trespass statutes. Consistent with a plain reading of the trespass statutes, where that legal authorization to collect "specified resource data" does not exist, members of the public must obtain written or verbal permission from the owners of public lands, or their lessees or agents. Wyo. Stat. §§ 6-3-414(a)(ii)(B); 40-27-

---

[3] For example, the State of Wyoming extends to the public the privilege of using legally accessible state lands for casual recreational day uses, "such as horseback riding, photography, wildlife and bird observation, hiking, rock hunting, and other recreational day use." Office of Land and Land Invs., Bd. of Land Comm'rs R. and Regs., Ch. 13 §§ 2, 4. The BLM regulations permit "casual use" upon BLM lands, meaning any short term non-commercial activity which does not cause appreciable damage or disturbance to the public lands, their resources or improvements, and which is not prohibited by closure of the lands to such activities." 43 C.F.R. § 2920.0-5(k).

101(a)(ii)(B). If this Court were to accept the State Defendants' position, the permission provision of the statute would also be superfluous, as no permission would be required.

Under the criminal trespass statute, a first time offender faces imprisonment for not more than one (1) year and a fine of not more than one thousand dollars ($1,000), or both. Wyo. Stat. § 6-3-414(c)(i). A repeat offender faces imprisonment for not less than ten (10) days and not more than one (1) year, and a fine of not more than five thousand dollars ($5,000), or both. Wyo. Stat. § 6-3-414(c)(ii). Under the civil statute, a defendant is liable to the owner or lessee of land for "all consequential and economic damages proximately caused by the trespass," as well as litigation costs. Wyo. Stat. § 40-27-101(c).

In addition to potential imprisonment and monetary liability, the trespass statutes prohibit the use of resource data collected in violation of the statutes in any civil, criminal, or administrative proceeding, other than to prosecute a person under either statute. Wyo. Stat. §§ 6-3-414(e); 40-27-101(d); (e). Also, any data in possession of any Wyoming governmental entity which was collected in violation of the statutes must be expunged by the entity. Wyo. Stat. §§ 6-3-414(f); 40-27-101(f).

Plaintiffs assert the characterization of the statutes as "trespass statutes" is a misnomer. They believe the trespass statutes are meant to thwart their efforts to inform and influence governmental agency decisions. Plaintiffs bring four causes of action, arguing the trespass statutes: (1) violate the Petition Clause of the First Amendment; (2) violate the Free Speech Clause of the First Amendment; (3) are preempted by federal laws; and (4) violate the Equal Protection Clause of the Fourteenth Amendment.

6

State Defendants filed the present Motion to Dismiss (ECF No. 28), asserting: (1) Plaintiffs lack standing to challenge the civil trespass statute; (2) Plaintiffs fail to state a claim under F.R.C.P. Rule 12(b)(6) for each cause of action; and (3) the Governor is an improper defendant.

## DISCUSSION

### I.    Governor Matthew Mead is an Improper Defendant

State Defendants assert the Governor is an improper defendant, as he has no enforcement authority under the trespass statutes. (ECF No. 28-1, pp. 23-24). Plaintiffs argue the Governor is a proper defendant because he would be involved in the expungement of data as required by the statutes because of his duties under Wyo. Stat. § 9-1-224. (ECF No. 34, p. 25). The Governor is not a proper party.

Any claim against a government official in his "official" capacity is, in actuality, a claim against the official's office, as the official is simply an agent of the government entity for which he works. *Brown v. Montoya*, 662 F.3d 1152, 1161 (10th Cir. 2011) (citing *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71(1989)). A state, and its agencies, have immunity from suit under the Eleventh Amendment, and thus cannot be sued in federal court by a private individual, unless: "(1) the state consents to suit; (2) Congress expressly abrogates the states' immunity; or (3) the citizen sues a state official pursuant to *Ex Parte Young*, 209 U.S. 123 (1908)." *Opala v. Watt*, 454 F.3d 1154, 1157 (10th Cir. 2006) *cert. denied*, 549 U.S. 1078 (2006).

Under *Ex Parte Young*, a plaintiff may sue a state official in his official capacity to enjoin alleged ongoing violations of federal law. *Crowe & Dunlevy, P.C. v. Stidham*, 640

7

[A19]

F.3d 1140, 1154 (10th Cir. 2011). The official need not have a "special connection" to the allegedly unconstitutional statute. *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 760 (10th Cir. 2010). Rather, the official must have "a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Id.* (internal citation and quotation marks omitted).

Here, the Governor's involvement in the enforcement of the trespass statutes is attenuated at best. The Wyoming legislature enacted Wyo. Stat. § 9-1-224 in 2012, providing "[t]he governor's office may supervise the collection of baseline scientific assessment data on public lands which may impact agricultural, mineral, geological, historical or environmental resources." Wyo. Stat. § 9-1-224(a). "The governor's office shall provide for a repository for all data collected. . . ." Wyo. Stat. § 9-1-224(a). At oral arguments, State Defendants explained the Governor's role in creating an information repository was essentially to disperse funds to the University of Wyoming, where the repository is housed and maintained. Hr'g. Tr. 55:16-56:16. The Governor's role since dispersing funds has been virtually nonexistent. Hr'g. Tr. 56:17-19. In any event, it is the "governor's office" charged with maintaining the repository, not necessarily the Governor himself. Hr'g. Tr. 55:11-15.

Even accepting, for argument's sake, the Governor is actively involved in monitoring or expunging data in the repository, his role would only be triggered *after* a court found a violation of one or both of the trespass statutes. Nothing gives the Governor authority to expunge data based upon a mere suspicion it was collected in violation of the trespass statutes. The Governor's duties are ministerial. He has no direct control over the

8

enforcement of the statutes and any expungement would only be in response to a court finding under the statutes.

In sum, Plaintiffs fail to identify a particular duty of the Governor to enforce the trespass statutes. Any purported connection is far too tenuous and arbitrary to justify naming Governor Mead as a defendant in this case.

## II.    <u>Standing</u>

State Defendants assert Plaintiffs lack standing to challenge the civil trespass statute, Wyo. Stat. § 40-27-101. (ECF No. 28-1, pp. 6-9). They argue any injury to Plaintiffs arising from this statute is attenuated and dependent upon the decisions of third parties. On the other side, Plaintiffs argue they do in fact have standing, as the civil statute chills their First Amendment activity by posing a real and credible threat of liability.

### A.  Standard of Review

On a motion to dismiss for lack of standing, the Court must accept as true all material allegations of the complaint, and construe the complaint in favor of the complaining party. *Initiative and Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006) (en banc) (citing *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). The Court "should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011).

### B.  Discussion

9

To establish standing, a plaintiff must demonstrate an injury "'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Intern. USA*, 133 S. Ct. 1138, 1147 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)). The threatened injury must be certainly impending and not merely some speculative or attenuated future injury. *Id*. (citing *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Here, State Defendants assert Plaintiffs' alleged injury arising out of the civil trespass statute is too speculative to convey standing. They claim any future injury to Plaintiffs is dependent upon the independent decision of a third party landowner to exercise his rights under the statute. Because no civil action is currently pending or threatened against the Plaintiffs, State Defendants argue Plaintiffs' injury is not certainly impending and is merely speculative.

The absence of a pending lawsuit brought by a third party does not automatically render Plaintiffs' injury speculative or attenuated. The Supreme Court has clearly held a plaintiff need not "expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Similarly, the Tenth Circuit recognizes standing when a plaintiff reasonably refrains from engaging in First Amendment activity due to a credible threat of liability under a *civil* statute. *Initiative Referendum Inst.*, 450 F.3d at 1089.

The *Initiative Referendum Institute* court provided three criteria to evaluate the credibility and objectivity of the "chill" of First Amendment activity purportedly caused

10

by the threat of enforcement of a civil statute. *Id*. The court found if a plaintiff could

satisfy these criteria, it would provide "roughly the same level of concreteness and

particularity that our precedents have demanded in cases involving the threat of criminal

prosecution." *Id*. Under this analysis, Plaintiffs must provide:

> (1) evidence that in the past they have engaged in the type of speech
> affected by the challenged government action; (2) affidavits or testimony
> stating a present desire, though no specific plans, to engage in such speech;
> and (3) a plausible claim that they presently have no intention to do so
> *because of* a credible threat that the statute will be enforced.

*Id*. (emphasis in original).

Here, Plaintiffs state they and/or their members have collected resource data from

open lands in Wyoming and reported such data to governmental agencies in the past.

(ECF No. 1, ¶¶64-65(a)-(j)). They assert this activity is protected speech or expression

under the First Amendment.[4] Engaging in this activity now exposes Plaintiffs and their

members to civil liability under the statute. Wyo. Stat. §40-27-101. Therefore, Plaintiffs

satisfy the first criterion.

Plaintiffs' complaint includes general desires to engage in data collection in the

future, as well as specific examples of recent scenarios wherein they wished to engage in

certain data collection activities, but refrained. (ECF No. 1, ¶70(a)-(e)). Therefore,

Plaintiffs satisfy the second criterion.

Under the third criterion, Plaintiffs must demonstrate they have refrained from

engaging in constitutionally protected activity *because of* a credible threat that the statute

---

[4] State Defendants do not seem to contest Plaintiffs' assertion that submitting data to governmental agencies is protected expressive activity. As will be discussed below, State Defendants focus their argument on whether the challenged statutes are content neutral. They do not argue submitting resource data is unprotected speech. (ECF No. 28-1. pp. 13-16).

will be enforced, exposing Plaintiffs to real consequences. *Initiative and Referendum Inst.*, 450 F.3d at 1088. Plaintiffs cannot rely upon a subjective belief that the statute will be enforced against them, causing some speculative injury. *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972).

State Defendants assert Plaintiffs face no credible threat of injury, but merely speculate that a third party landowner will elect to sue Plaintiffs under the civil statute. According to State Defendants, for a "chill" to be credible and objective, a statute must be "regulatory, proscriptive, or compulsory in nature," and "mandate" or "direct" rather than "authorize" government action. (ECF No. 28-1, pp. 7-9). State Defendants rely upon a string of governmental surveillance cases to support their arguments. *Tatum*, 408 U.S. 1; *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375 (1984); *Clapper*, 133 S. Ct. 1138.

State Defendants' arguments are unpersuasive for multiple reasons. First, the facts of this case are starkly different than those in the surveillance cases cited by State Defendants. The surveillance cases involved the Executive branch's authority to monitor communications and collect intelligence. The plaintiffs in those cases feared they would be targeted for surveillance, and argued such surveillance infringed upon their Fourth Amendment freedoms. In those cases, there were no "clear guiding principles" to determine who would be targeted for monitoring, i.e., no proscriptive or regulatory language. *Tatum*, 408 U.S. at 13-14; *United Presbyterian*, 738 F.2d at 1380 ("[N]o part of the challenged scheme imposes or even relates to any direct governmental constraint upon the plaintiffs. . . ."); *Clapper*, 133 S. Ct. at 1149 ("[R]espondents can only speculate

12

[A24]

as to how the Attorney General and Director of the National Intelligence will exercise their discretion in determining which communications to target."). If persons were targeted for surveillance, the challenged authorizing laws or policies did not indicate whether those persons were to be punished, or how any information obtained from surveillance could be used. There was no clear identification under the scheme who might be monitored or when.

Here, although it may contain some ambiguities, the civil statute *does* contain "guiding principles" which "prohibit" certain conduct. "A person commits a civil trespass" if he enters "open land" or "private open land," without an ownership interest, legal authorization, or permission from the landowner or lessee, for the purposes of "collecting" "resource data." Wyo. Stat. § 40-27-101(a)-(b). The only "speculation" of injury here is whether a landowner will bring suit. Unlike the surveillance cases, the Plaintiffs' conduct triggers the application of the statute. State Defendants correctly point out the Supreme Court has "been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Clapper*, 133 S. Ct. at 1150. However, State Defendants admit the statutes at issue here were "in response to complaints from aggrieved landowners throughout Wyoming." (ECF No. 28-1, p. 1). It is not "guesswork" to conclude that if Plaintiffs engage in complained-of activities, the complaining landowners will likely use the avenue of relief provided to them by the legislature.

Further, aside from fear of being targeted for surveillance, the plaintiffs in the surveillance cases failed to identify any separate injury or ensuing action. *Tatum*, 408

13

U.S. at 13-14; *United Presbyterian*, 738 F.2d at 1380 (finding plaintiffs had "not adequately averred that any **specific action** [wa]s threatened or even contemplated against them.") (emphasis added); *Clapper*, 133 S. Ct. at 1149-50 ("[E]ven if respondents could demonstrate that the targeting of their foreign contacts is imminent, respondents can only speculate as to whether the government will seek to use the [authorized] surveillance."). Whether or not some injury would result depended upon the desires and decisions of the government. The trigger of potential injury was not the conduct of the plaintiffs, but rather the decisions of the government to monitor them or take action. Here, the injury, an identifiable civil action, is triggered by the Plaintiffs' decisions to engage in the proscribed conduct. Wyo. Stat. § 40-27-101(c).

Moreover, the State is a potential plaintiff under the civil statute, as it owns "open lands" under Wyo. Stat. § 40-27-101(a). Plaintiffs have engaged in, and wish to continue engaging in, data collection on state lands. (E.g. ECF No. 1, ¶70.b. ("Western Watersheds has routinely monitored water quality of waterways on state and federal land.")). At oral arguments, State Defendants attempted to characterize the department within the Wyoming government charged with pursing civil actions on behalf of the state as a third party, separate and distinct from Wyoming legislature which enacted the law. Hr'g. Tr. 5:10-19. Even accepting that distinction, the Court finds Plaintiffs' fear that the State of Wyoming would seek civil penalties to be credible and not speculative.

The Wyoming legislature could not possibly have intended the civil statute to be invoked only by private citizens. Were that the case, only subsection (b) pertaining to "private open lands" would be necessary, rendering subsection (a) pertaining to "open

14

[A26]

lands," pointless. Such a construction would violate "the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative." *Mountain States Tel. Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 249 (1985) (internal citation and quotation marks omitted). The inclusion of the "open land" provision, subsection (a), indicates the Wyoming legislature intended the State of Wyoming and other governmental landowners to pursue civil damages. Given the context, it is not speculative for Plaintiffs to believe the State would pursue this newly authorized relief.

Finally, and perhaps most important, the Supreme Court is clear one need not subject himself to criminal prosecution under a statute in order to challenge its constitutionality. *Steffel*, 415 U.S. at 459. The proscriptive portions of the criminal and civil trespass statutes contain identical language. Wyo. Stat. §§ 40-27-101(a)(i)-(ii), (b)(i)-(ii); 6-3-414(a)(i)-(ii), (b)(i)-(ii). The Court cannot imagine, and State Defendants have not provided, any scenario wherein an individual could violate the civil trespass statute without violating the criminal trespass statute. Hr'g. Tr. 5:25-6:16. To violate one is to violate the other. Thus, under State Defendants' argument, the Plaintiffs would need to violate the *criminal* statute, risk criminal prosecution, and then await a civil action and raise unconstitutionality as a defense. The law does not require Plaintiffs to take such risks. In fact,

> Public policy should encourage a person aggrieved by laws he considers unconstitutional to seek declaratory judgment against the arm of the state entrusted with the state's enforcement power, all the while complying with the challenged law, rather than to deliberately break the law and take his chances in the ensuing suit or prosecution.

15

[A27]

*Mobil Oil Corp. v. Attorney General of the Commonwealth of Virginia*, 940 F.2d 73, 75

(4th Cir. 1991) (holding plaintiff had standing to challenge a statute which authorized the

attorney general to bring a civil action on behalf of the state); *see also Bland v. Fessler*,

88 F.3d 729, 737 (9th Cir. 1996) (holding plaintiff had standing to challenge a civil

statute that imposed civil fines where the attorney general failed to disavow

enforcement); *Arizona Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002,

1006-07 (9th Cir. 2003) (finding political action committee had standing to challenge

state statute which imposed civil penalties for violations); *Ostergren v. McDonnell*, 2008

WL 3895593 at * 4-5 (E.D. Va. Aug. 22, 2008) (finding plaintiff had standing to bring

First Amendment pre-enforcement challenge of a civil penalty statute).

    For these reasons, the Court finds Plaintiffs satisfy the third *Initiative Referendum*

*Institute* criterion by sufficiently demonstrated a credible threat, reasonably causing them

to refrain from constitutionally protected activities. 450 F.3d at 1089. Having satisfied all

three criteria, the Court finds Plaintiffs have established standing to challenge the civil

trespass statute.

**III.**    **Failure to State a Claim under F.R.C.P. 12(b)(6)**

    State Defendants move to dismiss each of Plaintiffs' four causes of action,

claiming Plaintiffs have failed to state a claim upon which relief may be granted under

F.R.C.P. 12(b)(6). (ECF No. 28-1, pp. 10-23).

    *A. Standard of Review*

    Under F.R.C.P. 12(b)(6), the Court must accept as true all well-pleaded facts in the

complaint, and draw all reasonable inferences therefrom in the light most favorable to the

plaintiffs. *Leverington v. City of Colorado Springs*, 643 F.3d 719, 723 (10th Cir. 2011) (citation omitted). The Court should disregard any conclusory statements or conclusions of law. *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). The "complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* The Tenth Circuit has stated plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Okla. Ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kansas Penn*, 656 F.3d at 1215.

### B. Preemption

Plaintiffs assert the trespass statutes are preempted by various federal environmental statutes and their implementing regulations.[5] (ECF No. 1, ¶¶113-135). Any claim of federal preemption should be resolved before considering substantive constitutional issues. *Philadelphia v. New Jersey*, 430 U.S. 141, 141-42 (1977).

---

[5] Plaintiffs argue the trespass statutes are preempted by: the Clean Water Act (CWA), 33 U.S.C. §§ 1251-1388; the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370, the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544; Federal Land Policy and Management Act (FLMPA), 43 U.S.C. §§ 1701-1787; and the National Forest Management Act (NFMA), 16 U.S.C. §§ 1600-1687.

The Supremacy Clause provides that "the Laws of the United States" (as well as

treaties and the Constitution itself) "shall be the supreme Law of the Land . . . any Thing

in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art.

VI, cl. 2. Congress may preempt or invalidate a state law by enacting federal legislation.[6]

*Oneok, Inc. v. Learjet, Inc.*, --U.S.--, 135 S. Ct. 1591, 1594 (2015). Federal law preempts

state or local law in three situations:

> (1) express preemption, which occurs when the language of the federal
> statute reveals an express congressional intent to preempt state law ...; (2)
> field preemption, which occurs when the federal scheme of regulation is so
> pervasive that Congress must have intended to leave no room for a State to
> supplement it; and (3) conflict preemption, which occurs either when
> compliance with both the federal and state laws is a physical impossibility,
> or when the state law stands as an obstacle to the accomplishment and
> execution of the full purposes and objectives of Congress.

*Southwestern Bell Wireless Inc. v. Johnson Cnty Bd. of Cnty. Com'rs*, 199 F.3d 1185,

1190 (10th Cir. 1999) (internal citations and quotation marks omitted).

Plaintiffs present two conflict preemption arguments. First, Plaintiffs assert the

trespass statutes are preempted because the Wyoming Department of Environmental

Quality (WDEQ) cannot possibly comply with its obligations under the Clean Water Act

(CWA) and the trespass statutes. (ECF No. 1, ¶118-124). Second, Plaintiffs argue the

trespass statutes conflict with federal law by frustrating the purpose of public

participation provisions found within various federal land use and environmental statutes

and regulations. (ECF No. 1, ¶125-135).

---

[6] Federal regulations have preemptive effect equal to federal statutes. *Fidelity Federal Sav. And Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).

18

There is a strong presumption against federal preemption of state law, particularly in cases where Congress is legislating "in a field in which the States have traditionally occupied." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Courts should not assume the historic police powers of the states are superseded by federal law unless that was the clear and manifest purpose of Congress. *Arizona v. U.S.*, 132 S. Ct. 2492, 2501 (2012) (citations omitted). The presumption against preemption dictates a state law must do "major damage" to "clear and substantial federal interests before the Supremacy Clause will demand the state law surrender to a federal law." *Hillman v. Maretta*, 133 S. Ct. 1943, 1950 (2013) (internal citations and quotation marks omitted).

In this case, the state statutes at issue concern trespass and property rights. Regulation of issues such as trespass falls within the traditional role of the state. *Nicodemus v. Union Pacific Corp.*, 318 F.3d 1231, 1238 (10th Cir. 2003). The federal statutes relied upon by Plaintiffs involve environmental and land use regulation. "Environmental regulation is a field that the states have traditionally occupied." *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 694 (6th Cir. 2015) (citing *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960)). Thus, in the context of the state and federal laws at issue, there is a strong presumption against federal preemption. Plaintiffs have not overcome it.

Plaintiffs first argue under the CWA, the WDEQ is obligated to assemble and consider all available data relating to water-quality, including data submitted by the public. (ECF No. 34, p. 23 (citing 40 C.F.R. § 130.7(b)(5))). Because the trespass statutes prohibit WDEQ from considering resource data collected in violation of the statutes,

19

Wyo. Stat. §§ 6-3-414(e); 40-27-101(d),(e), Plaintiffs assert WDEQ cannot comply with both state and federal law. (ECF No. 34, p. 23). Thus, Plaintiffs assert the state law must cede to federal law.

40 C.F.R. § 130.7(b)(5) requires the state to consider "readily available water-quality data and information." "Readily available" data includes data and information relating to "[w]aters for which water quality problems have been reported by local, state, or federal agencies; members of the public, or academic institutions." 40 C.F.R. § 130.7(b)(5)(iii). 40 C.F.R. § 130.7(b)(6) requires states to document their reasoning whether to list or not list waters under the regulation, providing "a rationale for any decision to not use any existing or readily available data and information . . . as described in § 130.7(b)(5)." Thus, Congress seemed to predict circumstances where a state would not consider "readily available data." It seems reasonable that a state could explain in its documentation why it elected to not consider data submitted in violation of a state trespassing law.

Furthermore, Plaintiffs do not indicate what would happen if the WDEQ failed to comply with this regulation. Under the CWA, states have the opportunity to implement their own water quality standard and implementation plans, granted such plans are approved by the Administrator of the Act. 33. U.S.C. § 1313. To the extent an initial plan, or any changes made to such plans, are disapproved by the Administrator and the state declines to amend its plan or changes, the Administrator of the Act will take over and publish regulations for water quality within that state. See 33 U.S.C. § 1313(b); (c)(4); (d)(2). Thus, a state's incentive to comply with data collection and water quality

20

standard implementation requirements under the CWA is to maintain primacy over its waters' regulation. The state may elect not to serve this role, thus ceding the authority to the federal government. If Wyoming believes its state interests are better served by implementing and enforcing a state law potentially revoking its primacy under the CWA, it is Wyoming's prerogative to make that choice.

The Court does not mean to say WDEQ's decision not to consider all submitted data would in fact warrant or result in revocation of Wyoming's primacy under the CWA. The Court simply notes under Plaintiffs' first preemption argument, WDEQ has the discretion to consider readily available data without violating federal law. Thus, the trespass statutes are not preempted by 40 C.F.R. § 130.7(b)(5).

In their second preemption argument, Plaintiffs assert the various provisions within the federal land and environmental statutes soliciting and permitting public participation are frustrated by the trespass statutes' prohibition of data submission. Conflict preemption requires that the state or local action stand "as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). The state law must "thwart [ ] the federal policy in some material way." *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 489 (10th Cir. 1998) (citations omitted, alteration in original).

The Court does not find the trespass statutes stand as an obstacle to the full purposes of these various public participation provisions. The trespass statutes do not completely ban the submission of data to federal agencies. They may require a person to have an interest in the property, legal authorization, or permission to gather and submit

21

data. Nothing prevents members of the public from seeking such authorization or permission from the landowner, i.e., the state or federal government. If the federal government is soliciting such data and information from the public, surely it will give citizens permission to collect such data on federal lands. This permission requirement may add a step to the process of public participation, but does not do "major damage" to the federal laws.

Of course, it is possible the public may never obtain permission to collect resource data on some private, state, or local lands not open to the public, particularly if the data is critical of the land use. Even so, the trespass statutes do not conflict with the purposes of the federal statutes and regulations. Courts are not to assume the historic police powers of the states are superseded by federal law unless that was the clear and manifest purpose of Congress. *Arizona v. U.S.*, 132 S. Ct. at 2501 (citations omitted). The public participation provisions cited by the Plaintiffs do not indicate a "clear and manifest purpose of Congress" to supplant the State's ability to regulate and protect private property rights or access to state and local lands not already open to the public. The federal public participation provisions do not permit or encourage the public to participate and submit data by whatever means necessary, and certainly do not authorize trespass. In light of the strong presumption against preemption, the Court finds the trespass statutes do not conflict with the various public participation provisions under federal law as cited by Plaintiffs.

### C.  Free Speech Clause

22

[A34]

Although Plaintiffs provide multiple arguments to support their Free Speech claim, State Defendants argue none state a claim for relief. First, Plaintiffs assert the statutes restrict core political speech. (ECF No. 1, ¶103). Second, Plaintiffs assert the statutes are unconstitutionally overbroad. (ECF No. 1, ¶106). Third, Plaintiffs assert the trespass statutes unconstitutionally discriminate based upon the content of speech. (ECF No. 1, ¶107). Finally, Plaintiffs assert the statutes unconstitutionally discriminate against speech based on viewpoint. (ECF No. 1, ¶108). The Court will first analyze the overbreadth argument, and then turn to the core political speech, content, and viewpoint discrimination arguments.

      1.  Overbreadth

Plaintiffs argue even if the statutes did not impermissibly restrict speech, the statutes are unconstitutionally overbroad. (ECF No. 34, pp. 18-20). To assert a facial overbreadth claim, a plaintiff must demonstrate that the challenged law (1) "could never be applied in a valid manner," or (2) that even though it may be validly applied to some, "it nevertheless is so broad that it may inhibit the constitutionally protected speech of third parties." *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 11 (1988) (citations omitted). For purposes of this argument, Plaintiffs stipulate the statutes could be applied in a valid manner to some, but nevertheless are so broad as to inhibit other protected speech of third parties. "The 'mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.'" *United States v. Williams*, 553 U.S. 285, 301 (2008) (quoting *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800

23

(1984)). The court must find "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *N.Y. State Club Ass'n, Inc.*, 487 U.S. at 11 (citation omitted). The claimant bears the burden of demonstrating the law's application to protected speech is substantially overbroad, not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications. *Virginia v. Hicks*, 539 U.S. 113, 119-120 (2003) (citations omitted).

Here, Plaintiffs provide three examples to support their overbreadth argument: a child submitting a photo from her neighbor's property; a passerby who reports the coordinates of a fire, and; the hiker who reports illegal activities occurring on private property. (ECF No. 1, ¶¶82-83). First, Plaintiffs do not assert any real danger that the speech in the hypotheticals will be compromised. A reasonable person is not likely to resist reporting an emergency because of the potential application of the trespass statutes. Second, although these examples may demonstrate some impermissible applications of the statutes, they do not demonstrate substantial overbreadth when compared to the entire scope of potential instances of protected speech arising from entry of land. The Court finds Plaintiffs have fallen far short of demonstrating substantial overbreadth of the statutes.

　　　2. Restriction of Speech

Plaintiffs assert the trespass statutes impermissibly restrict speech protected by the First Amendment by discriminating based up the content and viewpoint of the speech. They also assert the submission of data to governmental agencies is core political speech.

24

State Defendants argue the trespass statutes do not regulate speech based upon content or viewpoint, but rather regulate "secondary effects" of speech.

### a. Free Speech Analysis Framework

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" *Reed v. Town of Gilbert, Ariz.*, --U.S.--, 135 S. Ct. 2218, 2226 (2015) (quoting U.S. Const. amdt. 1). The government may not restrict expression based upon its message, ideas, subject matter, or content. *Id.* The Court analyzes a First Amendment challenge in three stages. *See Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985). First, the Court considers whether the conduct or speech is protected speech under the First Amendment. *Clark v. Cmty for Creative Non-Violence*, 468 U.S 288, 293 (1984). If the conduct or speech is protected, the Court then determines which First Amendment standard or standards apply, based upon the forum of the expression. *See Cornelius*, 473 U.S. at 797. Third, the Court considers whether the restriction of speech survives the applicable standard of scrutiny. *Id.*

The Supreme Court has identified three potential fora of protected speech: (1) the traditional public forum; (2) the public forum created by governmental designation; and (3) the nonpublic forum. *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998) (citation omitted). In the case of a traditional public forum or designated public forum, the court considers whether the restriction is content-based or content-neutral. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983).

For a nonpublic forum, the court considers whether the restriction is viewpoint-based or viewpoint-neutral. *Cornelius*, 473 U.S. at 806.

"Deciding whether a particular regulation is content based or content neutral is not always a simple task. . . . As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642-43 (1994). A regulation is content-based on its face if it draws distinctions based upon the messages conveyed by the speech. *Reed*, 135 S. Ct. at 2227. A facially content-neutral regulation of speech is not content-based simply because of incidental effects on some speakers or messages. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). However, a facially content-neutral statute is content-based if it cannot be justified without reference to the content, or if it was adopted because the government disagreed with the message conveyed. *Reed*, 135 S. Ct. at 2227 (citing *Ward*, 491 U.S. at 791)).

In some instances, when considering whether a restriction is content-based, courts look to whether the restriction aims to regulate some conduct or effect distinct from the speech itself. *See e.g., City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986) (applying intermediate scrutiny to a zoning ordinance aimed at controlling the "secondary effects" of speech, rather than content of speech); *Bartnicki v. Vopper*, 532 U.S. 514, 526 (2001) ("The statute does not distinguish based on the content of the intercepted conversations, nor is it justified by reference to the content of those conversations. Rather, the communications at issue are singled out by virtue of the fact that they were illegally intercepted—by virtue of the source, rather than the subject matter.").

26

Content-neutral restrictions of speech in a traditional public forum or designated

forum are subject to intermediate scrutiny. *Clark*, 468 U.S. at 292. Restrictions aimed at

conduct or effects are also subject to intermediate scrutiny. *See City of Renton*, 475 U.S.

41; *Bartnicki*, 532 U.S. 514. Under intermediate scrutiny, a restriction must be narrowly

tailored to serve a significant governmental interest, leaving open ample alternative

channels for communication of the information. *Id.* On the other hand, content-based

restrictions are presumptively invalid and are subject to strict scrutiny, passing

constitutional muster only if they are the least restrictive means to further a compelling

interest. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000).

Restrictions of a nonpublic forum may discriminate based on subject matter and

speaker identity, so long as the distinctions drawn are reasonable in light of the purpose

served by the forum and are viewpoint-neutral. *Perry Educ. Ass'n*, 460 U.S. at 49. "[A]

speaker may be excluded from a nonpublic forum if he wishes to address a topic not

encompassed with the purpose of the forum, or if he is not a member of the class of

speakers for whose especial benefit the forum was created." *Cornelius*, 473 U.S. at 806

(citations omitted). The speaker may not be excluded, however, based solely upon the

"point of view he espouses on an otherwise includible subject." *Id.* It is not enough that a

restriction appear viewpoint-neutral: the facially viewpoint-neutral restriction may not

simply be a façade for viewpoint discrimination. *Boy Scouts of America v. Wyman*, 335

F.3d 80, 93 (2d Cir. 2003) (citing *Cornelius*, 473 U.S. at 811-13). The exclusion cannot

be motivated by a desire to suppress a particular point of view. *Cornelius*, 473 U.S. at

812. A facially viewpoint-neutral restriction is "viewpoint discriminatory only if its

27

purpose is to impose a differential adverse impact upon a particular viewpoint." *Boy Scouts of America*, 335 F.3d at 94 (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992)).

A viewpoint-based restriction, like a content-based restriction, is subject to strict scrutiny, passing constitutional muster only if it is the least restrictive means to further a compelling interest. *McCullen v. Coakley*, 134 S. Ct. 2518, 2530 (2014). A viewpoint-neutral restriction must be reasonable, although not necessarily the most reasonable or the only reasonable limitation. *Cornelius*, 473 U.S. at 808. The restriction does not have to be narrowly tailored to a compelling governmental interest, as the First Amendment does not demand unrestricted access to a nonpublic forum simply because that forum may be the most efficient means of delivering the speaker's message. *Id.* at 809.

The Supreme Court has carved out a heightened protection for what it considers to be "core political speech." Core political speech involves interactive communication concerning political change. *Buckley v. American Constitutional Law Found., Inc.*, 525 U.S. 182, 186 (1999) (citing *Meyer v. Grant*, 486 U.S. 414, 422 (1988)). "When a law burdens core political speech, we apply 'exacting scrutiny,' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995).

b.  *Analysis*

Here, the parties seem to agree the challenged trespass statutes restrict protected speech under the First Amendment. The parties do not clearly identify which forum is at issue, and dispute whether exacting, strict, or intermediate scrutiny applies. The Court

28

does not need to determine at this stage in the proceedings which forum or level of scrutiny applies, as Plaintiffs state a plausible claim under even the most lenient scrutiny.

Accepting State Defendants position that the trespass statutes are content-neutral restrictions, aimed at secondary effects of the speech, the statutes must still withstand intermediate scrutiny. *City of Renton*, 475 U.S. 41. Intermediate scrutiny requires the statutes to be narrowly tailored to serve a significant governmental interest, leaving open ample alternative channels for communication of the information. *Clark*, 468 U.S. at 292. To be narrowly tailored, a law must not burden substantially more speech than is necessary to further the government's legitimate interests. *Ward*, 491 U.S. at 799. Under intermediate scrutiny, the law need not be the least restrictive alternative. *United States v. Albertini*, 472 U.S. 675, 689 (1985). A statute is narrowly tailored if it promotes a substantial governmental interest that would be achieved less effectively absent the regulation. *Id.*

State Defendants assert the trespass statutes are a response to the complaints from constituents about persistent trespassers entering their land for purposes of collecting resource data to submit to state and federal land-use agencies. (ECF No. 28-1, p. 22). They assert the statutes seek to prevent illegal trespass. (ECF No. 28-1, p. 14). "[R]educing crime is a substantial government interest." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 435 (2002). Protecting individual privacy is also a legitimate governmental interest justifying time, place, and manner regulations. *Carey v. Brown*, 447 U.S. 455, 470 (1980). Therefore, State Defendants have identified a legitimate government interest. The question then becomes whether the statutes are narrowly

29

tailored, or burden substantially more speech than is necessary to further the government's interests. *Ward*, 491 U.S. at 799.

First, as to the subsections of the trespass statutes pertaining to public open lands, Wyo. Stat. §§ 6-3-414(a); 40-27-101(a), State Defendants provide no explanation as to how prohibiting data collection upon, or access to, public open lands prevents illegal trespass. The public has a right to enter and use various public lands, including state lands. For example, the State of Wyoming extends to the public the privilege of using legally accessible state lands for casual recreational day uses, "such as horseback riding, photography, wildlife and bird observation, hiking, rock hunting, and other recreational day use." Office of Land and Land Invs., Bd. of Land Comm'rs R. and Regs., Ch. 13 §§ 2, 4. The BLM regulations permit "casual use" upon BLM lands, meaning any short term non-commercial activity which does not cause appreciable damage or disturbance to the public lands, their resources or improvements, and which is not prohibited by closure of the lands to such activities." 43 C.F.R. § 2920.0-5(k). Deterring people from collecting resource data on public lands does nothing to deter people from trespassing. The Court, however, does not reach through this motion to dismiss, the ultimate question of whether the state interests to prevent illegal trespass justify the restrictions on speech.

Second, although the subsections of the trespass statutes pertaining to private open lands may facially serve the legitimate governmental interests of preventing crime and protecting citizen's privacy, at this stage of the proceedings, Plaintiffs have sufficiently called the viewpoint neutrality of the statutes into doubt. As stated above, regardless of the forum, a facially neutral law motivated by a desire to suppress certain content or a

30

particular point of view is impermissible. *Reed*, 135 S. Ct. at 2227 (citing *Ward*, 491 U.S.

at 791)). [T]he government's purpose is the controlling consideration. . . ." *Ward*, 491

U.S. at 791.

Although courts should be careful not to second guess the wisdom of legislative

action, the legislature cannot restrict speech simply because it disagrees with the content

or viewpoint. *Reed*, 135 S. Ct. at 2227. When a law purports to protect an interest already

protected by existing law, courts have reason to be suspicious of the legislature's actual

intent. *U.S. Dept. of Agriculture v. Moreno*, 413 U.S. 528, 536-37 (1973).

Here, the purported interest is the prevention of illegal trespass. The fact existing

laws already seek to address conduct proscribed by a challenged law "casts considerable

doubt upon the proposition" that the challenged law was intended to prevent that very

sort of conduct. *Id.* A landowner already has avenues of redress against trespassers. Wyo.

Stat. § 6-3-303; *Edgecomb v. Lower Valley Power and Light, Inc.*, 922 P.2d 850, 859

(Wyo. 1996) (adopting the definition of trespass under Restatement (Second) Of Torts ch.

7 at 275 (1965)). The Court is aware the new trespass statutes are not identical to the

existing trespass laws of Wyoming. For example, the new trespass statutes apply only to

certain types of trespassers. Also, the new criminal trespass statute increases

punishment,[7] requires a lesser mens rea,[8] and prohibits the admission of,[9] and requires the

---

[7] Compare Wyo. Stat. §§ 6-3-303(b) ("Criminal trespass is a misdemeanor punishable by imprisonment for not more than six (6) months, a fine of not more than seven hundred fifty dollars ($750.00), or both.") with 6-3-414(c) (imposing imprisonment for not more than one (1) year, a fine not more than one thousand dollars ($1,000.00), or both" for first time offenders and "imprisonment for not less than ten (10) days nor more than one (1) year, a fine of not more than five thousand dollars ($5,000.00), or both" for repeat offenders).
[8] Compare Wyo. Stat. §§ 6-3-303(a) (requiring person to enter or remain on land of another, "knowing" he is not authorized) with 6-3-414(a)-(b) (including no specified mens rea as to the entry of land).

31

expungement of,[10] data collected in violation of the statute. Wyo. Stat. § 6-3-414. The civil trespass statute contains similar prohibitions of admission and expungement provisions, not part of a common law trespass action. Wyo. Stat. § 40-27-101(d), (e), (f). Even though the new statutes do not address trespass in the exact manner as existing trespass laws, the Court finds Plaintiffs have cast doubt that the trespass statutes were passed to merely prevent trespass.

Furthermore, the damages provision under the civil trespass statute appears to identify a desire to suppress particular content or viewpoint of speech. "A person who trespasses to unlawfully collect resource data or a person who unlawfully collects resource data under this section shall be liable in a civil action by the owner or lessee of the land for all consequential and economic damages proximately caused by the trespass." Wyo. Stat. § 40-27-101(c). If a person were to collect and report data evidencing improper land use, or violations of environmental laws or regulations, he would be liable for the consequential damages resulting from reporting the data to a governmental agency. On the other hand, if a person collects and submits data favorable to a landowner or lessee, there is no identifiable consequential injury to the landowner, and therefore no liability under the statute. Thus, the civil statute, although perhaps facially neutral, appears to simply be a façade for content or viewpoint discrimination. *Boy Scouts of America*, 335 F.3d at 93 (citing *Cornelius*, 473 U.S. at 811-13).

---

[9] Wyo. Stat. § 6-3-414(e) ("No resource data collected in violation of this section is admissible in evidence in any civil, criminal or administrative proceeding, other than a prosecution for violation of this section or a civil action against the violator.").
[10] Wyo. Stat. § 6-3-414(f) ("Resource data collected in violation of this section in the possession of any governmental entity as defined by W.S. 1-39-103(a)(i) shall be expunged by the entity from all files and data bases, and it shall not be considered in determining any agency action.").

### c.  Conclusion

Based upon the foregoing, the Court concludes that Plaintiffs complaint sets forth a plausible claim for relief under the Free Speech Clause.

### D.  Petition Clause

Plaintiffs assert the statutes impermissibly punish individuals for exercising their right to petition the government. (ECF No. 1, ¶¶71-75, 89-99). State Defendants argue Plaintiffs' Petition Clause and Free Speech Clause claims should be analyzed together. (ECF No. 28-1, p. 12). "Although the right to petition and the right to free speech are separate guarantees, they are related and generally subject to the same constitutional analysis." *Wayte v. United States*, 470 U.S. 598, 611, n. 11 (1985) (citation omitted). When a plaintiff fails to demonstrate how government action burdens his right to petition and right to free speech differently, the court views such claims as essentially the same. *See id*. Plaintiffs assert their Petition Clause claim should be analyzed separately from their Free Speech Clause claim. (ECF No. 34, pp. 9-10). If the Court were to accept State Defendants' argument, it would still find Plaintiffs have stated a claim for relief, having determined Plaintiffs state a claim for relief under the Free Speech Clause. Therefore, the Court finds, without deciding at this point whether a separate analysis is required, Plaintiffs sufficiently state a claim for their first cause of action under the Petition Clause.

### E.  Equal Protection

Plaintiffs argue the trespass statutes violate the Equal Protection Clause of the Fourteenth Amendment by only targeting those entering open land seeking to collect resource data rather than entering land for other purposes. (ECF No. 1, ¶¶ 137-138).

33

Plaintiffs also argue the trespass statutes discriminate against only those seeking to communicate with the government rather than communicate in another forum. (ECF No. 1, ¶¶ 137-138). Plaintiffs assert the trespass statutes violate the Equal Protection Clause because they are based upon animus toward particular groups and viewpoints. (ECF No. 34, p. 21).

"The Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, 517 U.S. 620, 631 (1996) (citations omitted). Under traditional equal protection analysis, a legislative classification "will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *Id.* at 632. The law must be "narrow enough in scope and grounded in a sufficient factual context" for the court "to ascertain some relation between the classification and the purpose served." *Id.* at 632-33.

Judicial review in an equal protection analysis "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). "A classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity." *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993). A classification is not impermissible simply because it "is not made with mathematical nicety or because in practice it results in some inequality." *Id.* (citations omitted). The law will fail rational basis only when it "rests on

34

grounds wholly irrelevant to the achievement of the State's objective." *Holt Civic Club v. Tuscaloosa*, 439 U.S. 60, 71 (1978) (citation omitted). The Court is not bound by the parties' arguments as to what legitimate state interests the classification seeks to further; rather the Court is obligated to seek out other conceivable reasons for validating a state policy. *Teigen v. Renfrow*, 511 F.3d 1072, 1084 (10th Cir. 2007) (citations omitted).

Laws which burden a fundamental right or target a suspect class are subject to strict scrutiny. *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 313 n. 3 (1976). Free speech is a recognized fundamental right. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 336, n. 1 (1995). Strict scrutiny requires laws to be suitably tailored to serve a compelling state interest. *Reno v. Flores*, 507 U.S. 292, 302 (1993).

> A provision subject to strict scrutiny "cannot rest upon a generalized assertion as to the classification's relevance to its goals." *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989). "The purpose of the narrow tailoring requirement is to ensure that the means chosen fit the compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate." *Grutter v. Bollinger*, 539 U.S. 306, 333 (2003) (quotation omitted). Only "the most exact connection between justification and classification" survives. *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) (quotation omitted).

*Kitchen v. Herbert*, 755 F.3d 1193, 1218-19 (10th Cir. 2014).

In this case, Plaintiffs' complaint contains sufficient factual allegations demonstrating the trespass statutes burden the Free Speech rights of those seeking to submit resource data to governmental agencies. As such, the trespass statutes must withstand strict scrutiny. State Defendants do not argue the trespass survive this level of scrutiny. They make no effort to identify an "exact connection between" the justification of preventing trespass, and the differential treatment of those who seek to communicate

35

with governmental agencies. *Gratz*, 539 U.S. at 270. In any event, Plaintiffs have included sufficient factual allegations to assert a "possibility that the motive for the classification was illegitimate." *Grutter*, 539 U.S. at 333. Therefore, Plaintiffs sufficiently state a plausible claim the trespass statutes impermissibly burden a fundamental right, stating an Equal Protection claim.

To the extent Plaintiffs assert the trespass statutes burden non-fundamental rights, requiring only a rational basis analysis, the Court still finds Plaintiffs state a claim, at least for portions of the trespass statutes. A law fails rational basis only when it "rests on grounds wholly irrelevant to the achievement of the State's objective." *Holt Civic Club*, 439 U.S. at 71. The non-private "open land" provisions of the trespass statutes, Wyo. Stat. §§ 6-3-414(a); 40-27-101(a), are "wholly irrelevant" the State Defendants' purported governmental interest of preventing trespass. As discussed above in the Free Speech analysis, the public enjoys various privileges to use various state and federal lands. The public's privileges do not include the specific authority to go upon these lands to collect resource data and submit that data to governmental agencies, however. The trespass statutes require an ownership interest, permission, or "legal authorization to enter or access the land to collect resource data." Wyo. Stat. §§ 6-3-414(a)(ii)(A),(B); 40-27-101(a)(ii)(A),(B). Having the right to access the land is not enough to remove the threat of criminal and civil liability under the trespass statutes. The trespass statutes prevent activity on lands even where the public would not be trespassing. Therefore, the non-private open land provisions of the trespass statutes do not prevent trespass.

36

Even though the non-private open land provisions do not prevent trespass, the Court is obligated to seek out other conceivable reasons for validating a state policy. *Teigen*, 511 F.3d at 1084. At this stage, the Court finds it difficult to conceive a permissible rationale for preventing the collection of resource data on lands which the public has the right to be upon. Nothing indicates this activity is more disruptive, destructive, or problematic than other uses.

State Defendants assert the trespass statutes are a response to the complaints from constituents about persistent trespassers entering their land for purposes of collecting resource data to submit to State and federal land-use agencies. (ECF No. 28-1, p. 22). State Defendants seek to justify the differential treatment of trespassers who collect resource data by arguing a person is more likely to trespass if he or she seeks to "collect" "resource data" than if he or she trespasses for other purposes. However, as in *Moreno*, this activity is already prohibited by existing trespassing laws. *See supra*, p. 31-32. "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Moreno*, 413 U.S. at 534.

At this stage of the proceedings, the Court finds Plaintiffs' complaint provides sufficient factual allegations to state a plausible cause of action under the Equal Protection Clause.

## CONCLUSION

As set for the above, Plaintiffs' complaint and response wholly fails to justify the inclusion of the Governor as a party to this proceeding and he will be dismissed.

37

Similarly, there is no viable preemption issue and Plaintiffs' assertion to the contrary

lacks legal or factual support to state a plausible claim. However, the same cannot be said

for Plaintiffs' claims under the Free Speech and Petition Clause under the First

Amendment and the Equal Protection Clause under the Fourteenth Amendment. As set

forth above, this Court has serious concerns and questions as to the Constitutionality of

various provisions of these trespass statutes. Accordingly, Defendants' Motion to Dismiss

these claims is denied.

 THEREFORE, IT IS HEREBY ORDERED that State Defendants' Motion to

Dismiss (ECF No. 28) is hereby GRANTED IN PART and DENIED IN PART.

Dated this _28th_ day of December, 2015.


    Scott W. Skavdahl
    United States District Judge

38

[A50]

Reed Zars
Wyo. Bar No. 6-3224
Attorney at Law
910 Kearney Street
Laramie, WY 82070
(307) 745-7979
reed@zarslaw.com

*Attorney for Plaintiffs*

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2016 APR 11  AM 11: 46

STEPHAN HARRIS, CLERK
CASPER

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT; NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION; NATURAL RESOURCES DEFENSE COUNCIL, INC.; PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS; CENTER FOR FOOD SAFETY; and ANIMAL LEGAL DEFENSE FUND, | ) ) ) ) ) ) ) | Civil No. 15-CV-169-SWS **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| *Plaintiffs* | ) ) ) | |
| v. | ) ) | |
| PETER K. MICHAEL, in his official capacity as Attorney General of Wyoming; TODD PARFITT, in his capacity as Director of the Wyoming Department of Environment Quality; PATRICK J. LEBRUN, in his official capacity as County Attorney of Fremont County; JOSHUA SMITH, in his official capacity as County Attorney of Lincoln County, Wyoming; CLAY KAINER, in his official capacity as County and Prosecuting Attorney of Sublette County, Wyoming; | ) ) ) ) ) ) ) ) ) ) ) | |
| *Defendants.* | ) ) ) ) | |

1.      In 2015, the Wyoming Legislature passed two unconstitutional bills, codified at Wyoming Statute § 6-3-414 and § 40-27-101 (the "Data Censorship Laws" or "Laws"), to prevent individuals and organizations from discovering harmful practices and conditions on federal, state, and private property, and communicating evidence of those practices and conditions to the appropriate federal and state authorities.

2.      On September 29, 2015, Plaintiffs filed a lawsuit challenging the Data Censorship Laws, and on December 28, 2015, the Court denied in part State Defendants' motion to dismiss that lawsuit, explaining that "this Court has serious concerns and questions as to the Constitutionality of various provisions of these trespass statutes." Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, Document No. 40 at 38 (December 28, 2015) (hereinafter "Motion to Dismiss Order").

3.      In the wake of the Court's Order, the Wyoming Legislature amended the Laws. Nonetheless, as revised, the Laws still retain the invidious effect and purpose of selectively punishing individuals who collect truthful information about certain subjects related to the environment and agricultural practices. Significantly, collection of "resource data" remains a necessary element of the so-called "trespass" offenses created by the Laws; there is no liability under the Laws unless a person collects such data.

4.      The Data Censorship Laws, as amended, continue to impose criminal and civil liability on persons who collect resource data from private land without specific permission to enter that land and, independently and specifically, to collect that specific

1

data. The Laws also continue to impose criminal and civil liability on persons who collect resource data from public land (or private land with permission), if those persons cross private land, knowingly or not, without specific permission to cross that land. The resource data that trigger liability under the Laws can still relate to a host of issues of significant public concern, such as samples of polluted water, pictures of illegal mining activities, or video recordings of animal abuse. As revised, the Laws still forbid government officials from considering, and require them to expunge, such resource data that persons acquire from private land in violation of the Laws and communicate to the officials.

5.     The Data Censorship Laws suppress and punish expressive activity in violation of the Free Speech Clause of the First Amendment. The Laws also burden fundamental rights and target groups and individuals that hold beliefs unpopular with the Wyoming Legislature, in violation of the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs are compelled to challenge these Laws because the Laws target Plaintiffs' and their members' constitutionally protected activities.

6.     Although the Data Censorship Laws are clothed in the language of anti-trespass statutes, they have little to do with preventing trespass, behavior already sanctioned by Wyoming's traditional trespass laws. *Compare* Wyo. Stat. §§ 6-3-414, 40-27-101, *with* Wyo. Stat. § 6-3-303 (preexisting criminal trespass statute), *and R.O. Corp. v. John H. Bell Iron Mountain Ranch Co.*, 781 P.2d 910, 912 (Wyo. 1989) (discussing common-

2

law trespass claim). Although the Laws condition liability, in part, on entry onto private

land, their primary focus is to prevent the collection and communication of resource

data. Unlike traditional trespass law, the Data Censorship Laws punish even *authorized*

entry onto private land, if the entrant does not have specific permission to collect

resource data. Wyo. Stat. §§ 6-3-414(a), 40-27-101(a). They also penalize *mistaken* entry

onto private land, although Wyoming's existing trespass statute does not, so long as the

entrant intends to gather resource data. *Cf.* Wyo. Stat. § 6-3-303. And they punish

individuals who even cross private land if, and only if, those individuals subsequently

collect resource data on public land or other private land—even if that data collection is

authorized. Wyo. State. §§ 6-3-414(c), 40-27-101(c). Thus, the Laws do not punish

individuals for unauthorized entry onto private land *per se.* They instead single out for

punishment people who collect resource data, thereby suppressing intended speech

based on those data.

      7.    The Wyoming Legislature was not coy about its purposes in enacting the

Data Censorship Laws. The Laws were originally enacted after Wyoming livestock

interests sued Western Watersheds Project ("Western Watersheds"), a plaintiff in this

case, for allegedly trespassing while collecting water quality samples primarily on

public land. Western Watersheds had collected data that revealed potentially unlawful

water pollution as well as federal grazing permit violations. Relying on Western

Watersheds' data, the Wyoming Department of Environmental Quality ("DEQ") had in

3

2012 included three streams on a list of water bodies that violate state water quality standards. In response, and at the urging of the livestock industry, the Wyoming Legislature enacted the Data Censorship Laws in 2015 for the specific purpose of deterring and punishing persons who gather such environmental data without express authorization for communication to the government. Subsequently, in 2016, the Wyoming legislature amended the Data Censorship Laws to effectuate the same purpose.

8.     Wyoming's adoption of the original Data Censorship Laws in 2015 was motivated in significant part by the Wyoming Legislature's animus toward groups that, during the legislative debates, various legislators referred to as "activists," "extremists," "nefarious," and "evil." One senator referred to the "incident" that prompted the legislation as an "attack on property rights" by "a group of people that don't necessarily see [things] the same way." The Legislature's decision to amend the Laws the way it did, rather than revoke them, shows that this unlawful sentiment continues to infect the Laws. The Legislature's decision to single out for punishment groups whose views the Legislature dislikes violates the Equal Protection Clause of the Fourteenth Amendment.

9.     The Data Censorship Laws target collection of information based both on content (the information must concern resource data) and viewpoint (the information is objectionable to the landowner). The First Amendment's Speech Clause does not permit the government to regulate speech, including the collection of information for the

4

purpose of communication, based on the subject of the communication, *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015); *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667 (2011), let alone "based on hostility . . . towards the underlying message expressed," *R.A.V. v. St. Paul*, 505 U.S. 377, 386 (1992). Yet that is what Wyoming has done.

10.    The Data Censorship Laws not only obstruct the ability of individuals to collect and communicate such resource data, they also require government agencies to ignore—and in some cases, to expunge—resource data that a member of the public or the media has collected without express authorization. The Laws are thus designed to require government agencies to truncate public involvement and to act in ignorance.

11.    Wyoming's Data Censorship Laws are aimed directly at Plaintiffs, and place Plaintiffs and their members in jeopardy for carrying out activities critical to protecting public health, the environment, and animal welfare, as well as to informing public debate and governmental decisions about issues of considerable public concern. Plaintiffs and their members collect and publicly report data on environmental conditions and misconduct, animal cruelty and abuse, and land use and misuse. Plaintiffs wish to continue such data collection and public reporting—it is important to the goals of the organizations. The Laws are designed to deter Plaintiffs from doing so.

12.    The Data Censorship Laws have an expansive sweep. The Laws apply to all people and implicate all Wyoming lands. While an individual must enter or cross private property to face liability under the Data Censorship Laws, once such an entry or

5

[A56]

crossing has occurred—whether intentional or inadvertent—the Laws target only individuals who collect or intend to collect resource data. The Laws seek to punish these individuals for collecting or intending to collect data on either private or public property, applying with full force to unfenced prairie and forests, unmarked property boundaries, and publicly built and maintained roads that imperceptibly cross private property.

13.    Wyoming is a big state, and much of it is federal and state public land. Property lines are frequently unmarked. As the U.S. Court of Appeals for the Tenth Circuit recently recognized, there are areas in Wyoming that are "a jumble of federal, private, and state land," where there are "no fences, cattle, notice of private property, or other postings." *Wyoming v. Livingston*, 443 F.3d 1211, 1215 (10th Cir. 2006). In some instances, it has been necessary to conduct a physical survey to determine where a public right-of-way ends and private land begins. *Id.* at 1216, 1229.

14.    Many of the roads built and maintained by government agencies, including the U.S. Bureau of Land Management ("BLM"), the U.S. Forest Service ("Forest Service"), and Wyoming local governments cross small segments of private property. These roads appear on publicly available maps, are often marked with government route numbers, and contain no indication that they cross private property. Nonetheless, it is difficult to determine whether the government has formally obtained a right of way for many of these roads. The government itself often does not know, and

6

in some situations, government officials provide incorrect information that the public may use a road. An individual who acts based on such incorrect or incomplete information would nonetheless be subject to liability under the Data Censorship Laws.

15.     Plaintiffs cannot take the risk that they will be prosecuted or sued under the Data Censorship Laws for collecting and reporting data that they justifiably believe they can lawfully collect. Because the Laws are unconstitutional both facially and as applied to Plaintiffs, Plaintiffs respectfully ask this Court to declare the Laws void and to enjoin their enforcement.

### Jurisdiction and Venue

16.     This action is brought pursuant to 42 U.S.C. § 1983 for violations of the U.S. Constitution, including the Free Speech Clause of the First Amendment and the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment.

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343. This Court may award Plaintiffs declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, under 42 U.S.C. § 1983, and this Court's inherent equitable jurisdiction.

18.     Venue is proper in the U.S. District Court for the District of Wyoming pursuant to 28 U.S.C. § 1391(b). Each of the Defendants resides in this judicial district. This action challenges the constitutionality of statutes enacted in, and that (if valid) would apply in, this judicial district.

7

<u>**Plaintiffs**</u>

<u>**Western Watersheds Project**</u>

19.     Western Watersheds is a non-profit conservation group, founded to
protect and restore western watersheds and wildlife through education, public policy,
and litigation. Western Watersheds has approximately ninety members in Wyoming,
with field offices in Wyoming and in other states. Western Watersheds works to
improve public lands management throughout the western United States, with a
primary focus on the negative impacts of livestock grazing on 250 million acres of
western public lands, including negative impacts to ecological, biological, cultural,
historic, archeological, and scenic resources.

20.     Western Watersheds undertakes investigative work, such as collection of
water samples, to document harms from livestock grazing on public lands. Western
Watersheds was sued for allegedly trespassing to collect such data in Fremont, Sublette,
and Lincoln Counties. Some investigatory work that the group has undertaken in the
past, and would like to undertake in the future, would be unlawful under Wyoming
Statute § 6-3-414 and § 40-27-101, although it is not unlawful under pre-existing
Wyoming trespass law. Western Watersheds, its staff, and its members would continue
this work but for fear of criminal and civil liability under the Data Censorship Laws and
for fear that the Laws would render their efforts futile by prohibiting government
agencies from considering data they collect and submit to those agencies.

21.     For approximately ten years before enactment of the Data Censorship

Laws, Western Watersheds collected water quality data on streams throughout

Wyoming. Western Watersheds submitted such data to the DEQ for the purposes of

listing impaired waters under the Clean Water Act. Western Watersheds' data collection

included measurements of *e. coli*, pH, turbidity, dissolved oxygen and conductivity.

Western Watersheds' data collection activities uncovered high levels of *e. coli*

contamination related to livestock grazing on public lands. Western Watersheds

recorded the location of the water samples it obtained using Global Positioning System

("GPS") coordinates. Federal law requires the DEQ to review the water quality of

Wyoming waterways every two years and to solicit public input as part of its review.

The DEQ considered comments from Western Watersheds during several of its

biannual reviews of water quality within the state, including during its 2014 review.

22.     For approximately thirteen years before enactment of the Data Censorship

Laws, Western Watersheds collected a wide range of resource data related to the BLM's

implementation of the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701-

1787. For example, Western Watersheds collected data related to: compliance with

permit terms and conditions, trespass of livestock on public lands, failure of private

persons to comply with range improvement cooperative agreements, and upland and

riparian utilization and impacts monitoring. Western Watersheds identified the location

of the data it collected using GPS coordinates, and photographs taken by staff or

9

volunteers include geographic location information. Western Watersheds communicated such data to the BLM to inform that agency's rangeland program administration, Rangeland Health Determinations, and permit renewal analysis processes. The BLM accepts such public comments pursuant to its obligations under the Federal Land Policy and Management Act and the National Environmental Policy Act, 42 U.S.C. § 4321.

23.    For approximately thirteen years before enactment of the Data Censorship Laws, Western Watersheds collected a wide range of resource data related to the Forest Service's implementation of the National Forest Management Act, 16 U.S.C. §§ 1600-1687. For example, Western Watersheds collected data related to: compliance with permit terms and conditions, trespass of livestock on public lands, failure of private persons to comply with range improvement maintenance requirements, and upland and riparian utilization and impacts monitoring. Western Watersheds identified the location of the data it collected using GPS coordinates, and photographs taken by staff or volunteers include geographic location information. Western Watersheds submitted such data to the Forest Service to inform that agency's rangeland program administration and permit renewal analysis processes. The Forest Service accepts such public comments pursuant to its obligations under the National Forest Management Act and the National Environmental Policy Act.

10

24.    Western Watersheds publicizes the data it has obtained in Wyoming about water quality, environmental conditions, grazing permit violations and other matters of public concern. It does so by sending email updates to its members, press releases to media organizations, and publicizing such information on its website.

25.    Since the Data Censorship Laws went into effect, however, Western Watersheds has had to cease its efforts to collect resource data at many locations within Wyoming for fear of collecting it while unknowingly crossing private land, subjecting the organization, its staff, and its volunteers, to criminal prosecution and civil liability. This fear exists because many roads built and maintained by the BLM, Forest Service, and Wyoming counties, cross small portions of private land at unmarked locations. Publicly available maps indicate that these roads are public and members of the public routinely use these roads to access public lands for hunting, fishing, sightseeing, camping, and other activities. Nonetheless, in many locations, the governmental entity that built and maintains these roads has not formally acquired a right of way over the private land. In some instances, the governmental agency does not realize that the road it has built and maintained crosses private land; in other cases, the governmental agency incorrectly believes that it has acquired such a right of way; and in yet other cases, the governmental agency may have acquired such a right of way but failed to record that right of way.

11

26.     Even if Western Watersheds had the staff time and financial resources to conduct title searches for every parcel of land crossed by a publicly built and maintained road or to communicate with the relevant government agency about all such crossings, it would not be able to protect itself from the Data Censorship Laws because the relevant government agencies often have incomplete or inaccurate information. In one instance, Western Watersheds received an email from a BLM official unequivocally stating that a public right of way existed across a private parcel of land for a particular road built and maintained by the BLM, but definitive evidence of that right of way has been difficult to locate. In another instance, Western Watersheds conducted a title search of a second private parcel and obtained a copy of an easement that specifically authorized public access. In a trespass lawsuit filed against Western Watersheds, the landowners of both parcels contested the public's right to use the relevant roads. One argued that the BLM was mistaken about the existence of an easement and the other argued that the easement exists at a location different from the road. In both cases, Western Watersheds would be liable under the Laws if the landowners are correct.

27.     Some of Western Watersheds' monitoring activities, including monitoring compliance with permit and range improvement cooperative agreements, also require it to come into close proximity with the boundaries between private and public land. Such boundaries are unmarked, and conducting such monitoring necessarily creates a risk of

12

inadvertently crossing the unmarked property boundary. Since Wyoming enacted the

Data Censorship Laws, Western Watersheds has had to cease a significant amount of

resource data collection for fear of unknowingly crossing private land and being subject

to criminal prosecution and civil liability. This has significantly impeded Western

Watersheds' ability to communicate its data and viewpoints to the BLM and the Forest

Service.

   28.    The Data Censorship Laws have specifically impaired Western

Watersheds' ability to participate in the BLM's upcoming process to consider renewing

grazing permits in the Granite Mountain Common allotment and Slate Creek allotment.

The Data Censorship Laws have also specifically impaired Western Watersheds' ability

to participate in the Forest Service's upcoming process to consider renewing grazing

permits in the Upper Green allotment and Upper Gros Venture allotment. And the Data

Censorship Laws have specifically impaired Western Watersheds' ability to collect

water samples as part of the DEQ's upcoming biannual review of water quality within

Wyoming.

   29.    In every instance that Western Watersheds submits data to the DEQ, the

BLM, or the Forest Service, Western Watersheds risks the possibility that the very same

data it submitted could be used against the organization in the only proceedings in

which the Data Censorship Laws allow the data to be used: a criminal prosecution

under Wyoming Statute § 6-3-414 and a civil lawsuit under Wyoming Statute § 40-27-

13

101. Western Watersheds is precluded from collecting this data until such time as the Data Censorship Laws are vacated.

30.     Western Watersheds has been, and continues to be, injured by the Data Censorship Laws because the Laws prevent Western Watersheds from carrying out plans to enter public lands in Wyoming that are near private lands or for which the roads accessing such public lands might cross private lands. But for the threat of criminal prosecution and civil liability under these Laws, Western Watersheds would follow through with its plans to collect such data. Only if these Laws are struck down and enforcement against Western Watersheds enjoined will the Laws' injurious effect on Western Watersheds be redressed.

31.     Any activity undertaken by Western Watersheds that would result in potential liability under the civil Data Censorship Law would also result in potential liability under the criminal Data Censorship Law. Because the two laws are coextensive in their application, Western Watersheds has standing to challenge both laws. *See* Motion to Dismiss Order at 15. As the Court explained, there is no "scenario wherein an individual could violate the civil trespass statute without violating the criminal trespass statute." *Id.*

**National Press Photographers Association**

32.     Plaintiff National Press Photographers Association ("NPPA") is a non-profit organization that represents journalists who photograph and record subjects of

14

public interest, including the environment, food safety, and land use activities. Some of the photographic equipment NPPA's members use records the geographic location of images that are captured. Although NPPA members desire to continue taking and disseminating photographs and video recordings considered to be "resource data" under the Laws on lands in Wyoming, due to the impossible nature of determining where public land ends and private property begins, and whether the public has a formal right to use roads built and maintained by the government but that cross private property at unmarked locations, the Laws have caused NPPA members to decline assignments photographing and recording in Wyoming.

33.    NPPA members have been, and continue to be, injured by the Data Censorship Laws because those Laws prevent NPPA members from entering public land in Wyoming to take photographs or video recordings without first obtaining prior written or verbal permission from an assortment of private landowners, any of whose unmarked property an unwary person may unknowingly cross, for the purpose of taking photographs of private or public lands. But for the threat of criminal prosecution and civil liability under the Laws, NPPA members would follow through with their plans to collect such data. Only if these Laws are struck down will their injuries to NPPA members be redressed. Only if enforcement of the Data Censorship Laws is enjoined will the Laws' injuries to NPPA members be redressed.

15

**Natural Resources Defense Council**

34.     Plaintiff Natural Resource Defense Council, Inc. ("NRDC") is a not-for-
profit membership corporation founded in 1970 and organized under the laws of the
State of New York. NRDC maintains offices in New York, NY; Washington, DC;
Chicago, IL; San Francisco and Santa Monica, CA; Bozeman, MT; and Beijing, China.
NRDC has about 300,000 members throughout the country, including hundreds of
members in Wyoming. NRDC's mission is to "safeguard the Earth: its people, its plants
and animals, and the natural systems on which all life depends."

35.     In carrying out its mission, NRDC gathers and otherwise preserves
information about the use and condition of natural resources, including the use and
condition of public and private lands in Wyoming. For example, NRDC: (a) seeks to
protect Wyoming wildlife, including the greater sage grouse, bison, wolves, and other
species, by encouraging better management of public lands and stronger
implementation of federal and state laws; (b) evaluates and urges government agencies
to more adequately address adverse impacts of livestock grazing on public lands; (c)
works to understand and limit damage to the environment and health from energy
resource development, including coal mining, uranium mining, and oil and gas
development in Wyoming; and (d) has investigated, and advocates for the mitigation
of, the impacts of climate change on Wyoming species. NRDC uses information on land
and land use to inform and persuade government agencies in its investigations and

16

advocacy, as well as in communicating with the broader public. NRDC has in the past collected information from unmarked lands in Wyoming that would constitute "resource data" within the meaning of the Data Censorship Laws. NRDC wishes to continue engaging in these activities. However, NRDC has forgone future collection of such data in Wyoming for fear of unknowingly crossing private lands and being subjected to criminal prosecution and civil liability.

36.    For example, over the past decade or so, NRDC has engaged in substantial work to protect whitebark pine, a species endemic to Wyoming. NRDC petitioned the U.S. Fish and Wildlife Service to list whitebark pine under the Endangered Species Act, and jointly funded a study of whitebark pine that included ground surveys on land in Wyoming. The Fish and Wildlife Service considered this study and determined that the listing of the whitebark pine was warranted. Until the passage of the Data Censorship Laws, NRDC's webpage continued to ask citizen scientists to "tak[e] photographs of whitebark pine on the landscape, and record[] the location where the photograph was taken"; "[r]ecord[] written observations of the whitebark pine you see"; and "[c]ount[] Clark's nutcrackers and red squirrels, and record[] any observations of bear signs in whitebark forests," to "extend our knowledge base and . . . help formulate recommendations for managers to focus their conservation and restoration efforts." NRDC removed this request for citizen scientists' help from its website only after Wyoming's enactment of the Data Censorship Laws, and did so in direct response to

17

those Laws, which subject individuals engaging in such citizen science to potential civil and criminal liability if they inadvertently collect data from private land or cross private land to reach other land, including public land, on which they collect data.

37.     After enactment of the original Data Censorship Laws, NRDC staff canceled a planned investigatory visit to lands in Wyoming related to NRDC's participation in a contested proceeding before the U.S. Environmental Protection Agency. NRDC canceled the investigatory visit in part because, although NRDC had authority to enter the land from an entity that claimed the right to grant access, due to the complex nature of the ownership interest involved, it was unclear who had authority to grant consent to enter, and visiting the site to collect resource data could have violated the Data Censorship Statutes.

38.     Before enactment of the Data Censorship Laws, NRDC began a project to monitor air quality on lands in Wyoming and Montana near oil and gas development sites. NRDC staff visited potential air-quality monitoring locations in both states, and collected resource data to support future monitoring work at those locations. The GPS location of any air-quality monitoring location is an essential component of the data that NRDC wishes to collect. NRDC now wishes and intends to deploy air-quality monitoring equipment in both Wyoming and Montana to collect data concerning air quality on lands near oil and gas development sites. NRDC would make the data it collects public, and would submit the data to appropriate state and/or federal

18

regulators, as appropriate, to encourage stronger protections for public health and the

environment. NRDC wished and intended to undertake this air-quality monitoring

effort beginning in the fall of 2015 in both states, but only continued with this air-

quality monitoring work in Montana. Due to the near impossibility of accurately

determining where pubic land ends and private property begins on unmarked lands,

and the difficulty of determining whether the public has formal access to roads built

and maintained by the government that may cross private lands, the Wyoming Data

Censorship Laws have deterred NRDC from pressing forward with its data collection

effort in Wyoming.

     39.    NRDC has been, and continues to be, injured by the Data Censorship

Laws because the Laws thwart NRDC's intent to collect resource data on land in

Wyoming. But for the threat of criminal prosecution and civil liability under the Data

Censorship Laws, NRDC would have followed through on its ongoing efforts to collect

such data in Wyoming. Only if these Laws are struck down, and enforcement against

NRDC, its staff, and its members is enjoined, will the Laws' injurious effects on NRDC

and NRDC's staff and members be redressed.

**People for the Ethical Treatment of Animals**

     40.    Plaintiff People for the Ethical Treatment of Animals, Inc. ("PETA") is a

Virginia nonstock corporation and animal protection charity. PETA has members in

Wyoming. PETA is dedicated to protecting animals from abuse, neglect, and cruelty,

19

and undertakes these efforts through public education, undercover investigations, research, animal rescue, legislation, special events, celebrity involvement, protest campaigns, and lawsuits to enforce laws enacted to protect animals. PETA, its staff, and its members have conducted dozens of investigations in the United States over the past three decades, exposing illegal animal abuse and turning the results of each investigation over to appropriate law enforcement and/or regulatory authorities. PETA's investigations involve entering agricultural facilities located outside of incorporated cities, towns, and subdivisions, to take audio and video recordings regarding agriculture and animal species. As recently as 2014, a PETA investigator entered private, unincorporated land in Campbell, Carbon, Crook, Fremont, Johnson, Sweetwater, and Weston Counties in Wyoming to film workers cruelly kicking and stomping sheep and standing on sheep's heads and necks. PETA gathered this "resource data," falling within the definition given in Wyoming Statute § 6-3-414(e)(iv), and submitted the information to the Wyoming Livestock Board.

41.    Investigators whom PETA hires track the GPS coordinates of the locations at which they are working each day to accurately identify the locations at which animal abuse or other inhumane treatment occurs. Recording such data is an essential part of conducting investigations because undercover investigators are often sent to multiple locations each day. The cameras and video recording devices used by investigators

20

hired by PETA sometimes embed geographical location information in the images
captured.

42.     PETA continues to conduct these investigations to expose further illegal
conduct in states other than Wyoming. Although PETA wishes to undertake additional
investigations in Wyoming as well, the threat of criminal prosecution under Wyoming
Statute § 6-3-414 and civil liability under Wyoming Statute § 40-27-101 has stymied
PETA's plans to do so. PETA uses investigations to support its litigation and outreach,
and these Laws directly impede PETA's efforts by reducing or eliminating the ability of
PETA and its members to conduct such investigations. The Laws impair PETA's ability
to carry out its core mission, and have forced PETA to divert resources to educate the
public regarding the Laws and to oppose the Laws. The resources spent opposing these
Laws have diminished PETA's resources for its more traditional, core educational goals.
The Laws' injuries to PETA will be redressed only if the Laws are struck down and if
their enforcement against PETA, its staff, and its members is enjoined.

### Center for Food Safety

43.     Plaintiff Center for Food Safety ("CFS") is a national non-profit
organization with over 950 members in Wyoming. CFS is dedicated to empowering
people, supporting farmers, and protecting the earth from the harmful impacts of
industrial agriculture. CFS utilizes regulatory actions, citizen engagement, legislation,
and, when necessary, litigation, to promote transparency and accountability in

21

industrial agriculture. To accomplish its ends, CFS disseminates to government

agencies, legislatures, its members, and the general public a wide array of informational

materials addressing the harmful effects of industrial agriculture. These materials—

which are distributed in Wyoming and elsewhere—include news articles, scientific and

policy reports, books, legal briefs, press releases, action alerts, and fact sheets.

44.    CFS works to reduce water and air pollution from animal factories such as

those in Park, Goshen, Laramie, Platte, and Albany Counties in Wyoming. CFS

members are concerned about and investigate the environmental, human health, and

food safety impacts of agricultural facilities on public lands, such as *E.*

*coli* contamination of recreational waterways and streams. CFS members are also

concerned about the lack of information in Wyoming related to public land use, and as

such, have made efforts to document public land boundaries, including with

geographical coordinates. CFS members have been forced to stop these efforts for fear

of criminal prosecution or civil liability.

45.    CFS relies on and uses information obtained by whistleblowers, such as

undercover investigations of industrial agriculture operations, like those conducted by

Plaintiffs, for the informational, legal, and advocacy materials it develops and

distributes. For example, in 2014 CFS utilized information from numerous undercover

investigations at egg-production facilities that employ battery cages to formulate and

substantiate its arguments in an amicus brief in support of California's ban on the sale

22

of eggs from such facilities. The brief demonstrated the association between foodborne illness and the use of battery cages, as revealed by undercover investigations that documented unsanitary and inhumane conditions in battery cage facilities. CFS cited to the same investigations in letters to members of the Massachusetts state senate urging them to support legislation to prevent farm animal cruelty. In 2015, CFS utilized information from undercover investigations of veal calf facilities in formulating administrative comments to the United States Department of Agriculture ("USDA") Food Safety & Inspection Service ("FSIS"), urging the agency to amend requirements for the disposition of non-ambulatory disabled veal calves under the Humane Methods of Slaughter Act ("HMSA"). Most recently, CFS has used information from undercover investigations at the Hallmark/Westland slaughter plant in a letter to FSIS in support of a petition to improve enforcement of the HMSA. At the time of the cited investigation, Hallmark was the second-largest supplier of beef to the USDA Agricultural Marketing Service, which purchases beef for distribution to the public under various social services programs. Based on the information revealed by the investigations, FSIS amended its HMSA regulations.

46.    CFS will be hindered in carrying out its mission by being denied access to information revealed by water quality sampling, undercover investigations, and whistleblowers that it would use to inform its members, the public, and the government about food safety and animal welfare issues associated with animal factories, including

23

violations of federal law for which CFS could take legal action. CFS would like to and

plans to continue to rely on resource data in its advocacy.

**Animal Legal Defense Fund**

47.     Plaintiff Animal Legal Defense Funds ("ALDF") is a national 501(c)(3)

non-profit animal protection organization founded in 1979 that uses education, public

outreach, investigations, legislation, and litigation to protect the lives and advance the

interests of animals, including those animals who are raised for food, used in

biomedical research, exhibited to the public, or bred as pets. ALDF's work is supported

by more than 110,000 members across the country. Among the materials that ALDF

produces to advance its work are a quarterly publication, *The Animals' Advocate,* articles,

press releases, reports, and a blog.

48.     ALDF and its agents have conducted undercover investigations at animal

facilities around the country. ALDF wishes to continue to conduct such investigations,

including in Wyoming, but it has been deterred from doing so for fear of criminal and

civil liability under the Data Censorship Laws.

49.     Among the methods ALDF employs in its undercover investigations is

having an ALDF-employee obtain employment with an organization that ALDF

believes is engaged in the unethical or illegal treatment of animals. In non-public areas

of an organization, the investigator then collects information and/or makes recordings

regarding the organization's conduct. ALDF investigators may also be instructed to

24

leave recording devices unattended to capture images and sound over a longer duration, such as to document the severity of repetitive pathological stereotypies in captive wild animals, or the length of time for which a sick or injured animal goes without veterinary care. ALDF investigators regularly record the GPS coordinates of the locations of their investigations. In order to advance its mission, ALDF releases the evidence uncovered during its investigations to the public.

50.     ALDF is interested in conducting undercover investigations in Wyoming and has an investigative team capable of doing so. ALDF has recruited specific investigators who are ready, willing, and able to conduct undercover investigations at animal facilities, including those in Wyoming. ALDF has refrained from taking steps to conduct an investigation in Wyoming for fear of criminal liability for itself and its agents. In other words, the Data Censorship Laws have chilled ALDF's ability to engage in constitutionally protected advocacy.

51.     Moreover, ALDF's core mission of improving the lives of animals is fundamentally impaired by the Laws. ALDF uses investigations to support its litigation and outreach, and the Data Censorship Laws directly impede these efforts by diminishing the supply of such investigations. Because the Data Censorship Laws impede ALDF's access to evidence of animal cruelty, they frustrate ALDF's mission of using the legal system to advance the interests of animals.

52.    Further still, ALDF relies on the information gathered through its own and other organizations' undercover investigations, like those conducted by Plaintiff PETA, for the materials that it produces. Indeed, ALDF has specific and definite plans to produce additional materials building on and citing to the information generated through undercover investigations and independent whistleblowers. However, because of the Data Censorship Laws' chilling effect on such investigations, and the public distribution of information gathered, on which ADLF relies to carry out its mission, the Data Censorship Laws have prevented and will prevent ADLF from engaging in its desired forms of speech. Moreover, ALDF fears that simply its use of information from such whistleblowers could subject it to liability under the Data Censorship Laws.

53.    To combat these frustrations of its mission, ALDF has diverted significant resources to prevent the spread of unconstitutional laws like and including the one enacted in Wyoming. ALDF was active in the legislative campaign to prevent the passage of the Data Censorship Laws. These expenditures to counteract the unconstitutional violations of various persons' civil rights constitute a harmful diversion of ALDF's very limited resources and a loss to the organization, because those resources would otherwise be better spent furthering ALDF's core mission of directly protecting the lives and advancing the interests of animals through the legal system. ALDF, however, is obligated to divert its resources to prevent the harm that "Ag-Gag" laws, like and including the one enacted in Wyoming, pose to ALDF's core mission.

26

**Defendants**

54.     Defendant PETER K. MICHAEL is Attorney General of Wyoming, and is sued in that official capacity. The Attorney General of Wyoming oversees the enforcement of Wyoming's criminal laws, represents Wyoming counties in criminal prosecutions upon the failure of any district or county attorney to do so, and has the duty to represent the State in criminal cases before the Wyoming Supreme Court.

55.     Defendant TODD PARFITT is Director of the Wyoming Department of Environment Quality, and is sued in his official capacity. The Data Censorship Laws purport to impose on Director Parfitt a duty to "not consider[]" data collected and reported in violation of those Laws, and to "expunge[] such data from the files and data bases of the Wyoming Department of Environmental Quality. Wyo. Stat. § 6-3-414(f), (g); *id.* § 40-27-101(f), (g).

56.     Defendant PATRICK J. LEBRUN is County Attorney of Fremont County, Wyoming, and is sued in his official capacity. As County Attorney, Mr. Lebrun is authorized to prosecute alleged violations of Wyoming Statute § 6-3-414 in Fremont County. *See* Wyo. Stat. § 18-3-302.

57.     Defendant JOSHUA SMITH is County Attorney of Lincoln County, Wyoming, and is sued in his official capacity. As County Attorney, Mr. Smith is authorized to prosecute alleged violations of Wyoming Statute § 6-3-414 in Lincoln County.

58.    Defendant CLAY KAINER is County & Prosecuting Attorney of Sublette
County, Wyoming, and is sued in his official capacity. As County and Prosecuting
Attorney, Mr. Kainer is authorized to prosecute alleged violations of Wyoming Statute
§ 6-3-414 in Sublette County. *See* Wyo. Stat. § 18-3-302.

<u>**The Criminal Data Censorship Law**</u>

59.    Wyoming Statute § 6-3-414 is entitled "Trespassing to unlawfully collect
resource data; unlawful collection of resource data." This Statute criminalizes activities
to collect, or undertaken with the intent to collect, information from private land about
land or land use unless a person who collects or intends to collect such information has
explicit permission both to enter that private land and explicit permission to collect the
specific information. The Law also criminalizes the collection of information from *any*
land, both public and private—even if permission for the collection is explicitly
granted—if a person simply crosses other private land without permission en route to
collecting such information.

60.    The criminal statute's first subsection, Wyoming Statute § 6-3-414(a),
creates the crime of "trespassing to unlawfully collect resource data from private land,"
which it defines as follows:

> A person is guilty of trespassing to unlawfully collect resource data
> from private land if he:
>
>     (i) Enters onto private land for the purpose of collecting
>     resource data; and

28

(ii) Does not have:

    (A) An ownership interest in the real property or, statutory, contractual or other legal authorization to enter the private land to collect the specified resource data; or

    (B) Written or verbal permission of the owner, lessee or agent of the owner to enter the private land to collect the specified resource data.

61.    The new criminal statute's second subsection, Wyoming Statute § 6-3-414(b), creates the crime of "unlawfully collecting resource data," which it defines as follows:

    A person is guilty of unlawfully collecting resource data if he enters onto private land and collects resource data from private land without:

    (ii) Written or verbal permission of the owner, lessee or agent of the owner to enter the private land to collect the specified resource data.[1]

62.    The new criminal statute's third subsection, Wyoming Statute § 6-3-414(c), creates the crime of "trespassing to access adjacent or proximate land," which it defines as follows:

---

[1] Pursuant to Senate Enrolled Act No. 55. § 6-3-414(b) does not appear to have a paragraph (i). Both § 6-3-414(a) and (c), which create two other criminal offenses, contain a paragraph (i) that exempts individuals from liability if they have "statutory, contractual or other legal authorization to enter the private land to collect the specified resource data." It is unclear whether this paragraph was intentionally omitted from § 6-3-414(b), and the significance of the omission is unclear.

29

A person is guilty of trespassing to access adjacent or proximate land if he:

> (i) Crosses private to access adjacent or proximate land where he collects resource data; and

> (ii) Does not have:

>> (A) An ownership interest in the real property or, statutory, contractual or other legal authorization to cross the private land; or

>> (B) Written or verbal permission of the owner, lessee or agent of the owner to enter the private land.

63.     Wyoming Statute § 6-3-414(d) provides that, if a person commits any of the new crimes under subsection (a), (b) or (c), he is subject to imprisonment for up to one year, a fine of up to $1000, or both. On conviction of the crimes created in (a), (b), or (c), a person is subject to imprisonment of not less than ten days and up to one year, and a fine of up to $5000, or both, if that person has previously been convicted under subsections (a) or (B).[2] *See id.* § 6-3-414(d)(ii). By contrast, the general crime of trespass under Wyoming law is punishable only by imprisonment of up to six months, a fine of not more than $750, or both. *See* Wyo. Stat. § 6-3-303(b).

64.     Wyoming Statute § 6-3-414(e)(i) defines "[c]ollect" to mean "take a sample of material, acquire, gather, photograph, or otherwise preserve information in any form

---

[2] Wyoming Statute § 6-3-414(d)(ii) sets forth penalties for those previously convicted under the Data Censorship Laws. Although it imposes heightened penalties for those previously convicted under § 6-3-414(a) and § 6-3-414(b), it does not impose heightened penalties for those previously convicted under § 6-3-414(c) for the crime of "trespassing to access adjacent or proximate land."

30

and the recording of a legal description or geographical coordinates of the location of the collection."

65.     Subject to three specified exceptions, Wyoming Statute § 6-3-414(e)(iv) defines "[r]esource data" as all "data relating to land or land use, including but not limited to data regarding agriculture, minerals, geology, history, cultural artifacts, archeology, air, water, soil, conservation, habitat, vegetation, or animal species."

66.     Three kinds of data are excluded from Wyoming Statute § 6-3-414's definition of "[r]esource data." The exclusions encompass: (a) data "[f]or surveying to determine property boundaries of the location of survey monuments"; (b) data "[u]sed by a state or local governmental entity to assess property values"; and (c) data "[c]ollected or intended to be collected by a peace officer while engaged in the lawful performance of his official duties." Wyo. Stat. § 6-3-414(e)(iv). Data concerning land or land use that is *reported* by a private person *to* a peace officer or another official is not itself excluded from the definition of "resource data" under Wyoming Statute § 6-3-414(e)(iv). Data concerning land or land use that is collected by a government official who is not a "peace officer" is likewise not excluded from the definition of "resource data," unless it falls within one of the other two exemptions. Wyo. Stat. § 6-3-414(e)(iv).

67.     Wyoming Statute § 6-3-414(f) provides: "No resource data collected on private land in violation of this section is admissible in evidence in any civil, criminal or administrative proceeding, other than a prosecution for violation of this section or a

31

civil action against the violator." This provision purports to generally prohibit

government agencies from considering data that could allow those agencies to make

better informed, more accurate, and more scientifically sound decisions—even if, but

for the Data Censorship Laws, use of that data would be lawful. This provision does not

exempt federal government agencies from its ambit.

68.     Wyoming Statute § 6-3-414(g) provides that "[r]esource data collected on

private land in violation of this section in the possession of any governmental entity as

defined by W.S. 1-39-103(a)(i) shall be expunged by the entity from all files and data

bases, and it shall not be considered in determining any agency action." The term

"governmental entity" is defined in Wyoming Statute § 1-39-103(a)(i) to include the

state of Wyoming, the University of Wyoming, and any local government. Wyo. Stat.

§ 1-39-103(a)(i).

<u>**The Civil Data Censorship Law**</u>

69.     The Wyoming Legislature also amended the civil statute entitled

"Trespass to Unlawfully Collect Resource Data; unlawful collection of resource data."

This civil Data Censorship Law is codified at Wyoming Statute § 40-27-101. This Law

allows a landowner to bring a civil action against a person who collects or intends to

collect information from private land about land or land use unless that person has both

explicit permission to enter that private land and explicit permission to collect the

specific information. The Law also allows a landowner to bring a civil action against a

32

person who collects information about land or land use from any land, whether public

or private, if that person crossed the landowner's land prior to collecting such

information from the other land.

     70.    The civil statute's first subsection, Wyoming Statute § 40-27-101(a), creates

a new unlawful act, "civil trespass to unlawfully collect resource data from private

land," defined as follows:

> A person commits a civil trespass to unlawfully collect resource
> data from private land if he:
>
> > (i) Enters onto private land for the purpose of collecting
> > resource data; and
>
> > (ii) Does not have:
>
> > > (A) An ownership interest in the real property or, statutory,
> > > contractual or other legal authorization to enter the private land
> > > to collect the specified resource data; or
>
> > > (B) Written or verbal permission of the owner, lessee or
> > > agent of the owner to enter the private land to collect the
> > > specified resource data.

     71.    The statute's second subsection, Wyoming Statute § 40-27-101(b), creates a

second new unlawful act, "civil trespass of unlawfully collecting resource data,"

defined as follows:

> A person commits a civil trespass of unlawfully collecting resource data if
> he enters onto private land and collects resource data from private land
> without:

(ii) Written or verbal permission of the owner, lessee or agent of the owner to enter the private land to collect the specified resource data.[3]

72.     The statute's third subsection, Wyoming Statute § 40-27-101(c), creates a

third unlawful act of "civil trespass to access adjacent or proximate land," defined as

follows:

> A person commits a civil trespass to access adjacent or proximate land if he:
>
> > (i) Crosses private land to access adjacent or proximate land where he collects resource data; and
> >
> > (ii) Does not have:
> >
> > > (A) An ownership interest in the real property or, statutory, contractual or other legal authorization to cross the private land; or
> > >
> > > (B) Written or verbal permission of the owner, lessee or agent of the owner to enter the private land to collect the specified resource data.

73.     Wyoming Statute § 40-27-101(d) provides that a person liable under

subsections (a), (b), or (c)

> shall be liable in a civil action by the owner or lessee of the land for all consequential and economic damages proximately caused by the trespass. In a civil action brought under this section, in addition to damages, a successful

---

[3] Pursuant to Senate Enrolled Act 52, § 40-27-101 does not appear to have a paragraph (ii) in § 40-27-101(b). Both § 40-27-101 (a) and (c), which create other civil causes of action, contain a paragraph (i) that exempts individuals from liability if they have "statutory, contractual or other legal authorization to enter the private land to collect the specified resource data." It is unclear whether this paragraph was intentionally omitted from § 40-27-101(b), and the significance of the omission is unclear.

34

claimant shall be awarded litigation costs. For purposes of this subsection, "litigation cost" shall include, but is not limited to, court costs, expert witness fees, other witness fees, costs associated with depositions and discovery, reasonable attorney fees and the reasonably necessary costs of identifying the trespasser, of obtaining effective service of process on the trespasser and of successfully effecting the collection of any judgment against the trespasser.

74.    Wyoming Statute § 40-27-101(f)[4] provides that "[r]esource data unlawfully collected on private land under this section is not admissible in evidence in any civil, criminal, or administrative proceeding, other than a civil action for trespassing under this section or a criminal prosecution for trespassing under W.S. 6-3-414." This provision purports to generally prohibit government agencies from considering data that could allow those agencies to make better informed, more accurate, and more scientifically sound decisions—even if, but for the Data Censorship Laws, use of those data would be lawful. This provision does not exempt federal government agencies from its ambit.

75.    Wyoming Statute § 40-27-101(g) provides that "[r]esource data unlawfully collected on private land under this section in the possession of any governmental entity as defined by W.S. 1-39-103(a)(i) shall be expunged by the entity from all files and data bases, and it shall not be considered in determining any agency action." The term "governmental entity" is defined in Wyoming Statute § 1-39-103(a)(i) to include the state of Wyoming, the University of Wyoming, and any local government. Wyo. Stat.

_____

[4] Pursuant to Senate Enrolled Act 52, § 40-27-101 does not appear to include a subsection (e).

35

§ 1-39-103(a)(i). Wyoming Statute § 40-27-101(g) is crafted so as to prevent the specified

government entities from considering data that could allow those agencies to make

better informed, more accurate, and more scientifically sound decisions—even if, but

for the Data Censorship Laws, use of that data would be lawful.

76.     Wyoming Statute § 40-27-101(h)(i) defines "[c]ollect" to mean "take a

sample of material, acquire, gather, photograph, or otherwise preserve information in

any form and the recording of a legal description or geographical coordinates of the

location of the collection."

77.     Subject to three specified exceptions, Wyoming Statute § 40-27-101(h)(iii)

defines "[r]esource data" as "data relating to land or land use, including but not limited

to data regarding agriculture, minerals, geology, history, cultural artifacts, archeology,

air, water, soil, conservation, habitat, vegetation or animal species."

78.     As noted in the preceding paragraph, three kinds of data are excluded

from Wyoming Statute § 40-27-101's definition of "[r]esource data." The exclusions

encompass: (a) data "[f]or surveying to determine property boundaries of the location

of survey monuments"; (b) data "[u]sed by a state or local governmental entity to assess

property values"; and (c) data "[c]ollected or intended to be collected by a peace officer

while engaged in the lawful performance of his official duties." Wyo. Stat. § 40-27-101

(h)(iii). Data concerning land or land use that is reported by a private person *to* a peace

officer or another official is not itself excluded from the definition of "resource data"

36

under Wyoming Statute § 40-27-101 (h)(iii). Data concerning land or land use that is collected by a government official who is not a "peace officer" is likewise not excluded from the definition of "resource data," unless it falls within one of the other two exemptions. Wyo. Stat. § 40-27-101(h)(iii).

### The Data Censorship Laws Chill Otherwise-Lawful Citizen Science and Constitutionally Protected Expression

79.    Western Watersheds, NRDC, PETA, CFS, ALDF, and/or their members, collect resource data within Wyoming. These organizations engage in this work as part of their advocacy and to promote better informed government decisions regarding environmental and animal protection. Plaintiff NPPA's members collect resource data within Wyoming, and report data they collect in various publications, broadcasts and online media. Plaintiffs and their members would like to continue to collect such data—through, for example, photography, videography, sampling, and audio recording—but fear prosecution under Wyoming Statute § 6-3-414, and litigation and civil liability under § 40-27-101.

80.    The kinds of resource data that Plaintiffs or their members have collected in Wyoming in the past include, for instance, water quality data, information on the distribution of protected or potentially protected species, information documenting cruelty to animals, and information documenting the effects of climate change on

37

species. Federal and state agencies have often relied on data of this sort collected by Plaintiffs, their members, and other citizen scientists. For example:

        a.      Western Watersheds has collected water quality samples from numerous waterways on lands in Wyoming, to assess the impacts of livestock grazing on water quality. Plaintiff typically tests those samples for *e. coli*, fecal coliform, sediment levels, temperature, pH, dissolved oxygen, turbidity, and total dissolved solids and they record the GPS location for each water sample taken. Western Watersheds has submitted this data to the DEQ, the agency authorized to oversee implementation of the Clean Water Act's non-point-source pollution regulations in Wyoming. This has led the DEQ to list various streams as impaired under § 303(d) of the Clean Water Act, including Clark Draw, Pacific Creek, and Lander Creek. Based on WWP's data submissions, five other creeks were included in a draft list for 2014.

        b.      Western Watersheds has also collected data in Wyoming to measure the impact of livestock grazing on riparian zones, which are ecologically significant areas at the interface of land and rivers or streams. Plaintiff has used Multiple Indicator Monitoring (MIM), an agency-approved method of measuring riparian health parameters, to collect data concerning grazing impacts on stream width/depth ratios, riparian vegetation, woody plant utilization, and stream bank stability. Western Watersheds has measured MIM parameters alongside

BLM and Forest Service staff to ensure they are performing fair assessments. It has also collected and submitted MIM data to the BLM and the Forest Service to persuade them to improve livestock management on public lands as mandated by the Federal Land Policy Management Act, the National Forest Management Act, and the National Environmental Policy Act. Western Watersheds records GPS locations for the MIM data it collects.

c.      Western Watersheds has also collected data from lands in Wyoming to measure livestock grazing impacts on upland conditions. For example, Western Watersheds has measured vegetation composition (biodiversity) and utilization (forage removal by livestock measured as a percentage). Plaintiff has measured these parameters alongside BLM and Forest Service staff to ensure they are performing fair assessments. Plaintiff has also collected and submitted these data to the BLM and the Forest Service to persuade them to improve the management of livestock on public lands as mandated by the Federal Land Policy Management Act, the National Forest Management Act, and the National Environmental Policy Act. Western Watersheds records GPS locations for the data about grazing impacts and upland conditions that it collects.

d.      Western Watersheds has also undertaken riparian sediment core sampling on Wyoming lands, to measure the impact of livestock grazing on

39

sediment levels in native trout spawning streams. Livestock increase sediment

levels, and sediment decreases spawning success. Western Watersheds has

submitted such data to the BLM and the Forest Service to help them improve

fisheries management as mandated by the Federal Land Policy Management Act,

the National Forest Management Act, and the National Environmental Policy

Act. Western Watersheds records GPS locations for riparian sediment core

samples it collects.

       e.       Western Watersheds has also engaged in various types of photo

documentation of Wyoming lands, including documentation of erosion

processes, livestock counts, grazing permit compliance, and "trespass" livestock

(cattle or sheep that graze in parts of an allotment where they are not authorized

to graze). Plaintiff has undertaken this documentation alongside BLM and Forest

Service staff to ensure they are performing fair assessments. Plaintiff has also

collected these data and submitted them to the BLM and the Forest Service to

persuade those agencies to improve livestock management on public lands as

mandated by the Federal Land Policy Management Act, the National Forest

Management Act, and the National Environmental Policy Act. Many of the

photographic data collected by Western Watersheds includes GPS location

information.

40

f.      NPPA's members have photographed and recorded grizzly bear traps, wildfires, bat habitats, ranching, mineral rights issues, natural gas drilling weather emergencies, and environmental studies in places like Pinedale, the Medicine Bow River, the Snake River, the Sheridan and Tongue River area. Photographs and video recordings taken by NPPA's members have been part of the public conversation about development, land rights and environmental issues.

g.      NRDC has collected data concerning whitebark pine (*Pineus albicaulis*) on lands in Wyoming, including by partially funding a scientific study that included ground-level surveys of whitebark pine habitat. These surveys include photography that was geo-tagged using data collected from hand-held GPS units. NRDC provided data concerning whitebark pine, including the study it funded, to the U.S. Fish and Wildlife Service in support of listing whitebark pine as threatened or endangered under the Endangered Species Act, 16 U.S.C. § 1533. In response to NRDC's listing petition, the Fish and Wildlife Service determined that listing whitebark pine range-wide for protection under the Endangered Species Act was warranted, although the Service has not yet done so due to resource constraints. Dep't of the Interior, Fish & Wildlife Serv., *Endangered and Threatened Wildlife and Plants: 12-Month Finding on a Petition to List Pinus albicaulis as Endangered or Threatened with Critical Habitat*, 76 Fed. Reg.

41

42,631, 42,632, 42,647 (July 19, 2011). NRDC has also provided water quality data to state and federal agencies in support of their identification of waters as "impaired" under the Clean Water Act, and state and federal agencies have relied on that data in making impairment determinations.

h.    PETA has taken audio and video recordings, at ranches on unincorporated land in Wyoming, of individuals violating Wyoming's cruelty-to-animals statute, Wyoming Statute § 6-3-203, by kicking sheep; stomping on sheep's heads and necks; throwing sheep on the floor; denying appropriate care to a seriously ill or injured ram, resulting in the ram's death; and failing to provide appropriate care for injured sheep. PETA has provided these recordings to a Wyoming state agency. PETA records the GPS locations at which videos are recorded.

i.    CFS members monitor, document, and report information pertaining to hazardous releases and bacterial contamination from agricultural facilities on public land. CFS members have presented testimony of their findings to state agencies and legislatures to advocate for more oversight of the industrial agriculture industry.

81.    Much of Wyoming is comprised of undeveloped lands that include no visible demarcations that separate public and private lands. As a result, it is often difficult to determine whether a location is on public land or private land, and it is also

difficult to determine whether a road that appears open to the public, and which the

public routinely makes use of, crosses private land, and if it does so, whether a public

right of way exists over that road. This uncertainty, coupled with the fear that a literal

misstep could trigger the penalties of both the criminal and civil laws, significantly

chills Plaintiffs' ability to carry out their organizational activities and missions.

82.     Under the Data Censorship Laws, Plaintiffs, their staff, and their members

risk criminal prosecution and civil liability if, while collecting resource data from public

land, they step unintentionally onto private land for which they lack specific

authorization to collect resource data or they access public lands along a road that

unbeknownst to Plaintiffs or their staff, crosses private land across which there exists no

public right of way. The threat of prosecution and liability deters Plaintiffs, their staff,

and their members from engaging in such activity. For example:

a.      Prior to enactment of the Data Censorship Laws, a Western

Watersheds staff member usually spent three to five days per week during the

summer months, for the past twelve years, collecting data on BLM and Forest

Service lands in Wyoming from mid-June through mid-October. Normally, the

staff member would collect data that measured the impacts of livestock grazing

on riparian wildlife habitat, uplands, water quality, and other environmental

characteristics, while also alerting the BLM and Forest Service to instances of

43

noncompliance with grazing permits. This year, he has been unable to collect any such data due to fear of prosecution under the Data Censorship Laws.

        b.      Western Watersheds has routinely monitored water quality of waterways that occur on state and federal land. Western Watersheds has suspended such activities at dozens of sampling locations because Western Watersheds is unsure as to whether public rights of way exist along roads built and maintained by the BLM that provide access to BLM lands. Also, the fact that the boundary between public and private lands is often entirely unmarked in Wyoming has compelled Western Watersheds' decision to suspend such activities.

        c.      Members of NPPA regularly photograph and record information about land and land use within Wyoming, whether documenting weather emergencies, environmental issues, or wildlife. NPPA is reasonably concerned that its members could inadvertently run afoul of the Laws while reporting on matters of public concern.

        d.      In May 2015, an employee of plaintiff NRDC wished to visit land in Wyoming to observe, and potentially photograph, a restoration project. The NRDC employee was engaged in information collection related to a contested proceeding before the U.S. Environmental Protection Agency involving oil and gas development. The employee had received permission to visit the land from

an entity that asserted an ownership interest, but was told by another entity that

asserted an ownership interest that the NRDC employee did not have permission

to visit the site. Uncertain of the ownership of the land, and concerned about

prosecution or civil liability, the employee did not visit the site or take

photographs of it.

     e.    In April 2015, PETA staff were contacted by a whistleblower who

alleged that a Wyoming ranch allowed excess accumulations of manure in the

cattle pens, in some places three to four feet deep; had several cows with udders

so swollen that they were nearly dragging on the ground; and had failed to

remove dead cows from the feeding bunks. PETA employees wished to work

with the whistleblower to obtain photographic or video evidence of the

conditions on the ranch. However, after taking into account the Data Censorship

Laws, PETA did not seek to obtain such evidence.

**The Data Censorship Laws Impose Liability
Based on the Content and Viewpoint of Speech**

83.    The Data Censorship Laws make criminals and scofflaws of those who

collect information necessary to speak out about what they see and find on lands within

Wyoming. Although labeled as "anti-trespass" laws, the Data Censorship Laws prohibit

and punish conduct that would not violate Wyoming's longstanding trespass statute,

Wyoming Statute § 6-3-303, and make otherwise-lawful activity unlawful solely because

45

[A96]

it is associated with the collection of information that is a necessary prerequisite to advocacy about the condition and use of land. The Constitution does not permit such a prohibition.

84.     Laws that burden expression in support of public advocacy are subject to the Constitution's most "exacting scrutiny," and cannot survive judicial review unless "narrowly tailored to serve an overriding state interest." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995).

85.     The Laws are unconstitutional because they are content based. Governments have "'no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) (quoting *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)). In disregard of this fundamental constitutional principle, the Data Censorship Laws prohibit, punish, and deter speech of a particular kind and on a particular subject—targeting only members of the public who collect resource data, which is a necessary prerequisite to their advocacy.

86.     The protection afforded by the Free Speech Clause of the First Amendment extends not only to communication, but also to gathering information for the purpose of communication. That is because both "[t]he creation and dissemination of information are speech." *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667 (2011). The protection afforded speech necessarily encompasses the creation of information because

46

"[f]acts, after all, are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs." *Id.*

87.    The Laws are also viewpoint discriminatory, a particularly "egregious form of content discrimination." *Rosenberger v. Rectors & Visitors of University of Virginia*, 515 U.S. 819, 829 (1995). "[T]he government may not regulate [speech] based on hostility—or favoritism—towards the underlying message expressed." *R.A.V. v. St. Paul*, 505 U.S. 377, 386 (1992). The Data Censorship Laws violate this principle. They were enacted in an attempt to prevent the collection and communication of certain data to state and federal agencies, because the Wyoming Legislature did not want state and federal agencies to use that data to implement and effectively enforce duly enacted environmental protection statutes.

88.    Relatedly, because the Data Censorship Laws allow the landowner, lessee, or landowner's agent to authorize the data collection and thus exempt a person from the Laws' prohibitions, these laws effectively grant the landowner, lessee, or landowner's agent the power to authorize or prohibit who can gather information about land and land use for communication to the public or the government. The Laws thus allow a landowner to authorize collection of resource data by persons whose viewpoint the landowner supports, and to censor communications of resource data (by preventing its collection) by persons whose viewpoint a landowner does not support. In this way, the Laws are also viewpoint discriminatory by favoring the views that landowners wish

47

to express. As one Wyoming Senator explained during the debates on the original statutes, "Collecting data to be able to hold back certain organizations—I would tell you that's exactly what this bill's designed to do."

89.     Wyoming has no legitimate state interest in proscribing such expression, or indeed any of Plaintiffs' expression. The Data Censorship Laws are facially unconstitutional.

### The Extraordinary Breadth of the Data Censorship Laws

90.     The Data Censorship Laws are unconstitutional on their face and as applied to Plaintiffs' collection of resource data. They are also unconstitutional as applied to a host of other activities. Indeed, the Laws lack "any plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472 (2010) (internal quotation marks omitted).

91.     Read literally, Wyoming Statute § 6-3-414 makes a criminal out of a child who walks onto her neighbor's ranch with permission but then takes a photo on her cellphone of a hawk—without first obtaining her neighbor's express permission to take the photo. Jail time and civil liability could be imposed under the Laws on a rural traveler who hears a cry for help, unwittingly enters private land when venturing off the road without express permission to make observations, discovers an escalating wildfire, drops a "pin" on her GPS unit to record the location of the fire, and then provides that information to the fire department. The Law on its face appears even to

48

criminalize the conduct of a hiker who unintentionally crosses onto private land without authorization, observes an illegal drug growing operation, records her observations and the location of those observations on her cell phone, and reports those facts to a park ranger or county sheriff.

92.    Because modern cameras and video recording devices, including those built into cellphones, embed geographic information in the images they capture, virtually any person in Wyoming who records images of any landscape, whether for political, artistic, educational, or other reasons, risks violating the Data Censorship Laws. Such a person would be subject to civil and criminal liability if they recorded such images having entered—knowingly or inadvertently—private land without express permission to both enter that land and capture those images. Such a person would also be subject to civil and criminal liability if they recorded such images on any land, whether public or private, having crossed—knowingly or inadvertently—other private land without permission.

93.    Those individuals' actions would not be unlawful under the Data Censorship Laws simply because they entered private land without authorization. The Laws do not create liability for unauthorized entry alone. Instead, the school child, the driver, the hiker, and countless other individuals would have violated Wyoming law only because they recorded what they observed without first obtaining permission from the landowner to enter or cross the land to collect that specific information.

49

[A100]

94.     Wyoming has no legitimate state interest in proscribing such expression, or indeed any of the expression of Plaintiffs. The Data Censorship Laws are facially unconstitutional.

### The Data Censorship Laws Prohibit Agencies from Considering Truthful and Accurate Information

95.     The Data Censorship Laws also prohibit government agencies from using information gathered and communicated in violation of the Laws' terms. The Laws prohibit state or federal agencies from considering data on, for example, water quality violations, sage grouse habitat, animal cruelty, and illegal mining activity, if the data was collected on private land and then reported by a person who did not have authorization to both enter the land in question and to collect the data.

96.     In addition, certain government entities are required to expunge such data from their files or databases. Wyo. Stat. § 6-3-414(f) (incorporating definition of "government entity" from Wyo. Stat. § 40-27-101(f)). Thus, even if a person feels compelled, regardless of the criminal and civil consequences, to reveal to a government entity inhumane and illegal practices of a private landowner the person observed while on private property, the effect of these provisions is to force the government to act based on ignorance, rather than information.

50

## FIRST CAUSE OF ACTION

### FREE SPEECH

**[U.S. Const., amend. 1 (Freedom of Speech Clause) &
amend. 14 (Due Process Clause); 42 U.S.C. § 1983]**

97.    Plaintiffs re-allege and incorporate by reference all allegations set forth above.

98.    The Free Speech Clause of the First Amendment to the U.S. Constitution provides: "Congress shall make no law . . . abridging the freedom of speech, or of the press."

99.    The Free Speech Clause of the First Amendment is applicable to the States through the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

100.    Although the Free Speech Clause protects expression of many kinds, its strongest protections apply to core, political speech, including speech that solicits government action.

101.    The First Amendment protection for freedom of speech applies to the gathering of information for the purpose of engaging in speech. *See Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667 (2011).

102.    Wyoming already has other laws that prevent trespass. *See, e.g.*, Wyo. Stat. § 6-3-303; *see also Salisbury Livestock Co. v. Colorado Cent. Credit Union*, 793 P.2d 470, 473 (Wyo. 1990) (discussing trespass under Wyoming's common law). Trespass alone is not

51

an expressive act, and this suit does not challenge Wyoming's longstanding trespass laws. Unlike those laws, the Data Censorship Laws single out for punishment persons who collect information about land and land use, including information that is of grave public concern. Significantly, persons can be held liable under the Laws if, and only if, they collect resource data.

103.    The Data Censorship Laws differ dramatically from Wyoming's traditional trespass laws. They impose liability on individuals because they collect information about certain subjects of public concern, not just because they enter private property without permission. The Data Censorship Laws even apply to individuals who have permission to enter private property, if those individuals lack specific permission to collect data. And the Data Censorship Laws apply to individuals because they collect information—on *any* type of land, even if they have explicit permission to do so—if they incidentally crossed private lands without authorization along the way.

104.    Each Plaintiff has stopped data collection activities, some on public land and some on private land, for fear of prosecution or civil liability under the Data Censorship Laws. These activities would not have been subject to liability under Wyoming's traditional trespass laws.

105.    The Data Censorship Laws are not narrowly tailored to any legitimate, compelling, or overriding state interest. The Data Censorship Laws also do not serve a

substantial government interest while allowing reasonable alternative avenues for communication.

106.    The Data Censorship Laws are facially unconstitutional because they cannot be applied in any context without violating the First Amendment and, at the very least, "lack[] any plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472 (2010) (internal quotation marks omitted).

107.    The Data Censorship Laws are also unconstitutionally overbroad because, even if there were some constitutional application of the Laws' restrictions on speech, the Laws prohibit substantially more speech than the First Amendment permits. This is true because the Laws impermissibly apply to, among many others, every person who uses a cell phone to take a picture while inadvertently standing on private land; while on private land with landowner consent to be present, but without specific permission to take photos; and while on any land, including public land, after having inadvertently crossed private land en route.

108.    The Data Censorship Laws unconstitutionally discriminate against speech based on content and are thus facially invalid. The Data Censorship Laws' prohibitions apply only to persons who collect information about land and land use. By tying liability to the collection of information on certain subjects, the Data Censorship Laws regulate the ability of persons to communicate about specific matters of public concern.

53

109.    The Data Censorship Laws unconstitutionally discriminate against speech based on viewpoint and are thus facially invalid. The Data Censorship Laws' prohibitions apply only to persons who collect or intend to collect resource data from private land without authorization to do so, or who collect resource data on land after crossing private land without authorization for that crossing. Authorization may be given or denied by a landowner, lessee, or representative of the landowner. Speakers whose viewpoints are not shared by the landowner are unlikely to be able to obtain the landowner's authorization to collect resource data, giving landowners complete control over what "resource data" is and is not communicated to the public or to the government. "Viewpoint discrimination is censorship in its purest form and government regulation that discriminates among viewpoints threatens the continued vitality of free speech." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 62 (1983).

110.    The Data Censorship Laws also unconstitutionally discriminate against speech based on viewpoint because, as detailed at paragraphs 8, 117, and 118, the legislature enacted the laws for the purpose of silencing environmental and animal rights groups like the Plaintiffs.

111.    Plaintiffs and their members will suffer irreparable harm unless Defendants are enjoined from enforcing the Data Censorship Laws. Plaintiffs have no

54

adequate remedy at law and are entitled to injunctive and declaratory relief on this claim.

## SECOND CAUSE OF ACTION

### EQUAL PROTECTION

**[U.S. Constitution, amend. 14, sec. 1 (Equal Protection Clause); 42 U.S.C. § 1983]**

112.    Plaintiffs re-allege and incorporate by reference all allegations set forth above.

113.    The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution provides that "No State shall . . . deny any person within its jurisdiction the equal protection of the laws."

114.    The Data Censorship Laws make distinctions among persons who enter or cross private land. For example, the Laws distinguish between persons who collect resource data and those persons who collect other types of data. The Data Censorship Laws do not prohibit unauthorized entry onto private land *unless* a person collects or intends to collect resource data. The Data Censorship Laws also prohibit *authorized* entry onto private land if a person collects or intends to collect resource data and lacks specific authorization to collect that data.

115.    The Data Censorship Laws violate the Equal Protection Clause because they burden the fundamental right of freedom of speech.

116.    The Data Censorship Laws violate the Equal Protection Clause because

they do not advance any legitimate government interest, but rather, only serve to chill

constitutionally protected activities.

117.    The Data Censorship Laws also violate the Equal Protection Clause

because Wyoming's adoption of the Laws was motivated in substantial part by animus

toward environmental groups and their activities to collect data that the government

might use to make informed decisions in applying duly enacted laws and in protecting

the environment. While debating the Laws as originally enacted, Wyoming legislators:

(1) expressed a specific concern that government agencies would use resource data that

had been reported to them by concerned individuals to implement environmental laws

in ways that were contrary to the interests of certain private property owners; (2) stated

that the legislation was an "extraordinary measure" to prevent "egregious abuse of

collecting water quality data"; and (3) suggested that if private persons collected data

about sage grouse (a species that the federal government was considering for

protection), that data might be used by regulators to protect the species' habitat.

118.    During the legislative debates on the original Data Censorship Laws,

Wyoming legislators expressed open hostility toward the groups whose conduct the

law targeted, referring to them as "activists," "extremists," "nefarious," and "evil."

Wyoming legislators who supported the Data Censorship Laws indicated their

disapproval of persons, and the activities of persons, who gather and communicate

information to the government for use in the enforcement and implementation of environmental laws.

119.    Plaintiffs and their members will suffer irreparable harm unless Defendants are enjoined from enforcing Wyoming Statute § 6-3-414 and § 40-27-101. Plaintiffs have no adequate remedy at law and are entitled to injunctive and declaratory relief on this claim.

### Prayer for Relief

Plaintiffs respectfully request a judgment:

120.    Declaring that the challenged Laws, Wyoming Statutes § 6-3-414 and § 40-27-101, on their face and as applied to Plaintiffs, violate—

a.   the Free Speech Clause of the First Amendment of U.S. Constitution, as incorporated through the Fourteenth Amendment; and

b.   the Equal Protection Clause of Fourteenth Amendment to the U.S. Constitution.

121.    Permanently enjoining Defendants, as well as their officers, agents, employees, attorneys, and all other persons in active concert or participation with them, from enforcing the challenged statute;

122.    Permanently enjoining defendant Todd Parfitt, in his capacity as Director of the Wyoming Department of Environment Quality, from refusing to consider or to

admit in any proceeding any resource data collected contrary to the Data Censorship

Laws, and permanently enjoining any expungement of such resource data;

123.    Compelling Defendants to provide public notice, including in the official

and on-line editions of the Wyoming Statutes, that Wyoming Statutes § 6-3-414 and

§ 40-27-101 are unconstitutional and will not be enforced;

124.    Awarding Plaintiffs their reasonable attorneys' fees and costs pursuant to

42 U.S.C. § 1988; and

125.    Awarding such other and further relief as the Court may deem just and

proper.

April ___7___, 2016                        Respectfully submitted,

                                           Reed Zars
                                           Attorney at Law
                                           910 Kearney Street
                                           Laramie, WY 82070
                                           (307) 745-7979
                                           reed@zarslaw.com
                                           *Counsel for Plaintiffs*

                                           Justin R. Pidot
                                           University of Denver Sturm College of Law
                                           (for identification purposes only)
                                           2255 East Evans Ave.
                                           Denver, CO 80208
                                           (303) 871-6168
                                           jpidot@law.du.edu
                                           *Counsel for Western Watersheds Project and*
                                           *National Press Photographers Association*

                                           58

[A109]

Michael E. Wall, Margaret Hsieh,
Natural Resources Defense Council
111 Sutter Street, 20th Floor
San Francisco, CA 94104
(415) 875-6100
mwall@nrdc.org; mhsieh@nrdc.org
*Counsel for Natural Resources Defense Council,
Inc.*

Deepak Gupta,
Gupta Wessler PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
deepak@guptawessler.com
*Counsel for National Press Photographers
Association*

Leslie A. Brueckner, David Muraskin,
Public Justice
555 12th St., Suite 1230
Oakland, CA 94607
(510) 622-8205
lbrueckner@publicjustice.net
dmuraskin@publicjustice.net
*Counsel for Western Watersheds Project*

Justin Marceau
University of Denver Sturm College of Law
(for identification purposes only)
2255 East Evans Ave.
Denver, CO 80208
(303) 871-6000
jmarceau@law.du.edu
*Counsel for Western Watersheds Project,
National Press Photographers Association, and
Animal Legal Defense Fund*

59

Matthew Strugar,
PETA Foundation
2154 Sunset Blvd.
Los Angeles, CA 90026
(323) 210-2263
matthew-s@petaf.org
*Counsel for People for the Ethical Treatment of Animals, Inc.*

Paige M. Tomaselli, Cristina R. Stella,
Center for Food Safety
303 Sacramento Street, Second Floor,
San Francisco, CA 94111
(415) 826-2770 x303
ptomaselli@centerforfoodsafety.org
cstella@centerforfoodsafety.org
*Counsel for Center for Food Safety*

60

[A111]

Matt Gaffney
Wyoming Bar No. 6-4045
Sublette County Attorney's Office
17 South Fremont Street
P.O. Box 1010
Pinedale, Wyoming 82941
307.367.2300
*Attorney for Defendant Clayton Kainer*

## IN THE UNITES STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT; NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION; NATURAL RESOURCES DEFENSE COUNCIL, INC; PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.; and CENTER FOR FOOD SAFETY, | ) ) ) ) ) ) | |
| *Plaintiffs* | ) ) | |
| v. | ) ) | |
| PETER MICHAEL, in his official capacity as Attorney General of Wyoming; TODD PARFITT, in his official capacity as Director of the Wyoming Department of Environmental Quality; PATRICK L. LEBRUN, in his official capacity as County Attorney of Fremont County, Wyoming; JOSHUA SMITH, in his official capacity as County Attorney of Lincoln County, Wyoming; CLAY KAINER, in his official capacity as County Attorney of Sublette County, Wyoming; MATT MEAD, in his official capacity as Governor of Wyoming, | ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil No. 15-CV-169-s |
| *Defendants.* | ) ) | |

## ANSWER OF DEFENDANT CLAYTON KAINER TO PLAINTIFF'S FIRST AMENDED COMPLAINT

1

**COMES NOW,** Defendant Clayton Kainer, County and Prosecuting Attorney for Sublette County, Wyoming, by and through his undersigned counsel, and hereby responds to the allegations contained in Plaintiffs' *First Amended Complaint* as follows:

Defendant Kainer reasserts all denials and defenses from his original *Answer*, filed in October 2015 with this Court. Furthermore, to the extent that new or different information and/or claims are asserted by Plaintiffs in their *First Amended Complaint*, all new or different allegations and/or claims are denied as well.

### <u>AFFIRMATIVE DEFENSES</u>

1. Plaintiffs fail to state a case against Defendant Kainer upon which relief can be granted. Defendant Kainer is the duly elected Prosecuting and County Attorney of Sublette County, Wyoming and is mandated by Wyoming Statute §18-3-302 to prosecute all crimes in the County on behalf of the State of Wyoming. Defendant Kainer has no discretion as to the legitimacy or utility of laws passed by the Wyoming Legislature and signed by the Governor. Therefore, Defendant Kainer is not a proper or necessary party to this action and all claims and allegations against him should be dismissed.

2. The allegations by Plaintiff against Defendant Kainer are not ripe for judicial review as no enforcement of statutes at issue have occurred in Sublette County.

3. Defendant Kainer is entitled to qualified immunity as Sublette County and Prosecuting Attorney as a defense to civil liability and/or monetary damages.

4. Defendant Kainer reserves the right to list any additional defenses as they become known.

**WHEREFORE,** Defendant Kainer again requests the Court to dismiss all allegations against him with prejudice. Further, Defendant Kainer again requests that Plaintiff take nothing against

[A113]

him by way of their Complaint, attorneys' fees, costs of suit, and such other and further relief as the court may deem just and equitable.

Dated this _21st_ day of April, 2016

                Matt Gaffney
                Wyoming Bar No. 6-4045
                Sublette County Attorney's Office
                17 South Fremont Street
                P.O. Box 1010
                Pinedale, Wyoming 82941
                307.367.2300
                *Attorney for Defendant Clayton Kainer*

## CERTIFICATE OF SERVICE

This is to certify that on the _21st_ day of April, 2016, the undersigned served the forgoing **Answer of Defendant Clayton Kainer** upon the following registered filing user(s) pursuant to the CM/ECF System:

Reed Zars
Attorney at Law
910 Kearney Street
Laramie, Wyoming 82070

                Matt Gaffney
                Wyoming Bar No. 6-4045
                Sublette County Attorney's Office
                17 South Fremont Street
                Pinedale, Wyoming 82941
                307.367.2300
                *Attorney for Defendant Clayton Kainer*

[A114]

Richard Rideout, Esq. # 5-1564
Law Offices of Richard Rideout, PC
211 West 19th Street, Suite 100
P.O. Box 389
Cheyenne, Wyoming 82003-0389
307.632.1901
rsrideout@qwestoffice.net

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT; *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 15-CV-00169-SWS |
| PETER K. MICHAEL, in his official capacity as Attorney General of Wyoming; *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS', PATRICK J. LEBRUN AND JOSHUA SMITH, IN THEIR
OFFICIAL CAPACITIES, ANSWER AND ASSERTION OF AFFIRMATIVE
DEFENSES TO THE PLAINTIFFS' FIRST AMENDED COMPLAINT**

COME NOW the Defendants, Patrick LeBrun and Joshua Smith, in their

official capacities, ("Defendants" or as individually identified) by and through their

counsel, Richard Rideout, Esq., of the Law Offices of Richard Rideout, PC,

Cheyenne, Wyoming, and for their Answer And Assertion Of Affirmative Defenses

to the Complaint of Western Watersheds Project, National Press Photographers

Association, Natural Resources Defense Council, Inc., People for the Ethical

Treatment of Animals, Inc., and Center for Food Safety, ("Plaintiffs" or as

individually identified) state and allege as follows.

[A115]

1.     The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 1 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

2.     As to the allegations contained in paragraph 2 of the Plaintiff's Complaint, the Defendants assert that the Court's December 28, 2015, Order speaks for itself.  As to the remaining allegations, they are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the remaining allegations attempt to allege operative facts as opposed to conclusions of law, the Defendants deny each and every other allegation contained therein.

3.     The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 3 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

4.     The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 4 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

5.     The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 5 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

6.     The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 6 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

7.      Paragraph 7 of the Plaintiffs' First Amended Complaint does not appear to implicate Defendants Patrick LeBrun and Joshua Smith, and therefore no response is needed; however, to the extent the paragraph applies to the Defendants, the Defendants deny each and every allegation contained therein.

8.      Paragraph 8 of the Plaintiffs' First Amended Complaint does not appear to implicate Defendants Patrick LeBrun and Joshua Smith, and therefore no response is needed; however, to the extent the paragraph applies to the Defendants, the Defendants deny each and every allegation contained therein.

9.      The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 9 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

10.      The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 10 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

11.      The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 11 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

12.      The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 12 of the Plaintiffs' First

Amended Complaint and therefore, deny each and every allegation contained therein.

13.    The allegations contained in paragraph 13 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

14.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 14 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

15.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 15 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

16.    The allegations contained in paragraph 16 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

17.     As to the allegations contained in paragraph 17 of the Plaintiffs' First Amended Complaint the Defendants allege that they are not proper parties in this lawsuit and therefore deny that the Court has jurisdiction over the subject matter.

18.     As to the allegations contained in paragraph 18 of the Plaintiffs' First Amended Complaint the Defendants allege that they are not proper parties in this lawsuit and therefore deny that the Court has jurisdiction over the subject matter.

19.     The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 19 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

20.     The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 20 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

21.     The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 21 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

22.     The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 22 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

23.     The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 23 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

24.     The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 24 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

25.     The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 25 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

26.     The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 26 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

27.     The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 27 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

28.     The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 28 of the Plaintiffs' First

Amended Complaint and therefore, deny each and every allegation contained therein.

29.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 29 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

30.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 30 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

31.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 31 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

32.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 32 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

33.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 33 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

[A121]

34.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 34 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

35.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 35 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

36.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 36 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

37.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 37 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

38.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 38 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

39.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 39 of the Plaintiffs' First

Amended Complaint and therefore, deny each and every allegation contained therein.

40.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 40 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

41.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 41 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

42.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 42 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

43.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 43 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

44.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 44 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

45.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 45 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

46.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 46 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

47.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 47 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

48.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 48 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

49.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 49 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

50.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 50 of the Plaintiffs' First

Amended Complaint and therefore, deny each and every allegation contained therein.

51.     The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 51 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

52.     The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 52 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

53.     The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 53 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

54.     Paragraph 54 of the Plaintiffs' Complaint does not appear to implicate Defendants Patrick LeBrun and Joshua Smith, and therefore no response is needed; however, to the extent the paragraph applies to the Defendants, the Defendants deny each and every allegation contained therein.

55.     Paragraph 55 of the Plaintiffs' Complaint does not appear to implicate Defendants Patrick LeBrun and Joshua Smith, and therefore no response is needed; however, to the extent the paragraph applies to the Defendants, the Defendants deny each and every allegation contained therein.

56.     As to the allegations contained in paragraph 56 of the Plaintiffs' First Amended Complaint, the Defendants admit that Patrick LeBrun is the Fremont County Attorney and is being sued in his official capacity.  As to the remaining allegations, they are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that they attempt to allege operative facts as opposed to conclusions of law, the Defendants deny each and every other allegation contained therein.

57.     The Defendants deny the allegations contained in paragraph 57 of the Plaintiff's Complaint.

58.     Paragraph 58 of the Plaintiffs' Complaint does not appear to implicate Defendants Patrick LeBrun and Joshua Smith, and therefore no response is needed; however, to the extent the paragraph applies to the Defendants, the Defendants deny each and every allegation contained therein.

59.     The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 59 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

60.     The allegations contained in paragraph 60 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

[A126]

61.    The allegations contained in paragraph 61 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

62.    The allegations contained in paragraph 62 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

63.    The allegations contained in paragraph 63 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

64.    The allegations contained in paragraph 64 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

65.    The allegations contained in paragraph 65 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the

Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

66.     The allegations contained in paragraph 66 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

67.     The allegations contained in paragraph 67 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

68.     The allegations contained in paragraph 68 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

69.     The allegations contained in paragraph 69 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph

attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

70.    The allegations contained in paragraph 70 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

71.    The allegations contained in paragraph 71 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

72.    The allegations contained in paragraph 72 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

73.    The allegations contained in paragraph 73 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

74.     The allegations contained in paragraph 74 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

75.     The allegations contained in paragraph 75 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

76.     The allegations contained in paragraph 76 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

77.     The allegations contained in paragraph 77 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

78.     The allegations contained in paragraph 78 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the

Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

79.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 79 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

80.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 80 and subparagraphs "a" through "i" of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

81.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 81 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

82.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 82 and subparagraphs "a" through "e" of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

83.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 83 of the Plaintiffs' First

Amended Complaint and therefore, deny each and every allegation contained therein.

84.     The allegations contained in paragraph 84 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

85.     The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 85 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

86.     The allegations contained in paragraph 86 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

87.     The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 87 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

88.     The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 88 of the Plaintiffs' First

Amended Complaint and therefore, deny each and every allegation contained therein.

89.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 89 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

90.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 90 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

91.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 91 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

92.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 92 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

93.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 93 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

94.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 94 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

95.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 95 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

96.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 96 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

97.    The Defendants re-state and re-allege each and every response previously set forth and incorporates those responses in response to the allegations contained in paragraph 97 of the Plaintiffs' First Amended Complaint.

98.    The allegations contained in paragraph 98 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

99.    The allegations contained in paragraph 99 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the

Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

100.    The allegations contained in paragraph 100 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

101.    The allegations contained in paragraph 101 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

102.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 102 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

103.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 103 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

104.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 104 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

105.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 105 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

106.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 106 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

107.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 107 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

108.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 108 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

109.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 109 of the Plaintiffs' First

Amended Complaint and therefore, deny each and every allegation contained therein.

110.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 110 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

111.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 111 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

112.    The Defendants re-state and re-allege each and every response previously set forth and incorporates those responses in response to the allegations contained in paragraph 112 of the Plaintiffs' First Amended Complaint.

113.    The allegations contained in paragraph 113 of the Plaintiffs' First Amended Complaint are purportedly conclusions of law that do not require the Defendants to either admit or deny the same, but to the extent that the paragraph attempts to allege operative facts as opposed to conclusions of law, the Defendants deny each and every allegation contained therein.

114.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 114 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

115.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 115 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

116.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 116 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

117.    Paragraph 117 of the Plaintiffs' First Amended Complaint does not appear to implicate Defendants Patrick LeBrun and Joshua Smith, and therefore no response is needed; however, to the extent the paragraph applies to the Defendants, the Defendants deny each and every allegation contained therein.

118.    Paragraph 118 of the Plaintiffs' First Amended Complaint does not appear to implicate Defendants Patrick LeBrun and Joshua Smith, and therefore no response is needed; however, to the extent the paragraph applies to the Defendants, the Defendants deny each and every allegation contained therein.

119.    The Defendants are without sufficient knowledge, information, or belief as to the allegations contained in paragraph 119 of the Plaintiffs' First Amended Complaint and therefore, deny each and every allegation contained therein.

[A138]

120.   The Defendants deny each and every other allegation, however captioned or entitled, contained in the Plaintiffs' First Amended Complaint that has not specifically been admitted.

## AFFIRMATIVE DEFENSES

1.   As a further and separate defense to the Plaintiffs' First Amended Complaint, the Defendants assert that the pleading fails to state a claim upon which relief can be granted.

2.   As a further and separate defense to the Plaintiffs' First Amended Complaint, the Defendants assert that, to the extent any of the claims asserted are state law claims, the Plaintiffs have failed to comply with the Wyoming Governmental Claims Act, Wyo. Stat. §§1-39-101, *et seq.* (WGCA), to the extent that it applies to this action or to any of the claims or causes of action asserted therein, including, but not limited to the Plaintiffs' failure to file a proper or timely notice of claim as a condition precedent to the filing of this action and failure to properly plead compliance with the WGCA and the Wyoming Constitution.

3.   As a further and separate defense to the Plaintiffs' First Amended Complaint, the Defendants assert that the Plaintiffs' claims or causes of action are barred as a matter of fact and law by the Wyoming Governmental Claims Act.

4.   As a further and separate defense to the Plaintiffs' First Amended Complaint, the Defendants assert that the Plaintiffs have failed to mitigate any damages they may have incurred or suffered as the result of any action or conduct of the Defendants.

5.      As a further and separate defense to the Plaintiffs' First Amended Complaint, the Defendants assert that the Plaintiffs are estopped by their conduct to assert any of the claims or causes of actions asserted therein.

6.      As a further and separate defense to the Plaintiffs' First Amended Complaint, the Defendants assert that the Plaintiffs, by their conduct, have waived the right to assert any of the claims or causes of action asserted therein.

7.      As a further and separate defense to the Plaintiffs' First Amended Complaint, the Defendants assert that their conduct was not the proximate cause of any of the alleged injuries or damages suffered by the Plaintiffs.

8.      As a further and separate defense to the Plaintiffs' First Amended Complaint, the Defendants assert that the Plaintiffs have failed to exhaust their administrative remedies and thereby are barred from asserting any of their claims or causes of action.

9.      As a further and separate defense to the Plaintiffs' First Amended Complaint, the Defendants assert that the relief requested is inappropriate, improper, and contrary to law.

10.      As a further and separate defense to the Plaintiffs' First Amended Complaint, the Defendants assert that the Plaintiffs' First Amended Complaint is barred by the doctrines of laches and estoppel.

11.      As a further and separate defense to the Plaintiffs' First Amended Complaint, the Defendants assert that they are not proper parties to this lawsuit.

12.    As a further and separate defense to the Plaintiffs' First Amended Complaint, the Defendants assert that Joshua Smith does not have an official capacity.

13.    As a further and separate defense to the Plaintiffs' First Amended Complaint, the Defendants assert that the Plaintiffs do not have standing to bring this lawsuit.

The Defendants reserve the right to amend these pleadings to assert any further or additional affirmative defenses that discovery in this case discloses.

WHEREFORE, the Defendants respectfully request that the Plaintiffs' First Amended Complaint be dismissed with prejudice, that they be awarded their attorney's fees, costs, and expenses of this action, and for such other and further relief as the Court deems just and proper under the circumstances.

Dated this 3rd day of May 2016.

Patrick J. LeBrun and Joshua Smith,
Defendants,


By:    /s/ Richard Rideout
       RICHARD RIDEOUT, ESQ.
       Law Offices of Richard Rideout, PC
       211 West 19th Street, Suite 100
       P.O. Box 389
       Cheyenne, Wyoming 82003-0389
       307.632.1901
       rsrideout@qwestoffice.net

       ATTORNEY FOR THE DEFENDANTS

[A141]

## CERTIFICATE OF SERVICE

I, RICHARD RIDEOUT, do hereby certify that a true and correct copy of the foregoing **DEFENDANTS', PATRICK J. LEBRUN AND JOSHUA SMITH, IN THEIR OFFICIAL CAPACITIES, ANSWER AND ASSERTION OF AFFIRMATIVE DEFENSES TO THE PLAINTIFFS' FIRST AMENDED COMPLAINT** was served by electronic filing, this 3rd day of May 2016, to the following:

Reed Zars, Esq.
910 Kearney Street
Laramie, Wyoming 82070
307.745.7979
reed@zarslaw.com

Justin R. Pido, Esq.
Justin F. Marceau, Esq.
Univ. of Denver Sturm College of Law
2255 East Evans Avenue
Denver, Colorado 80208
303.871.6000
jpidot@law.du.edu
jmarceau@law.du.edu

Michael E. Wall, Esq.
Margaret Hsieh, Esq.
Natural Resources Defense Council
111 Sutter Street, 20th Floor
San Francisco, California 94104
415.875.6100
mwall@nrdc.org
mhsieh@nrdc.org

Paige M. Tomaselli, Esq.
Cristina R. Stella, Esq.
Center for Food Safety
303 Sacramento Street, Second Floor
San Francisco, California 94111
415.826.2770
ptomaselli@centerforfoodsafety.org
cstella@centerforfoodsafety.org

Leslie A. Brueckner, Esq.
Public Justice
555 12th Street, Suite 1230
Oakland, California 94607
510.622.8205
lbrueckner@publicjustice.net

Matthew Strugar
PETA Foundation
2154 Sunset Boulevard
Los Angeles, California 90026
323.210.2263
matthew-s@petaf.org

Deepak Gupta, Esq.
Gupta Wellser PLLC
1735 20th Street, Northwest
Washington, DC 20009
202.888.1741
deepak@guptawessler.com

Matt Gaffney, Esq.
Sublette County Attorney's Office
17 South Fremont Street
P.O. Box 1010
Pinedale, Wyoming 82941
307.367.2300
matt.gaffney@sublettewyo.com

[A142]

James Kaste, Esq.
Erik E. Petersen, Esq.
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, Wyoming 82002
307.777.6946
307.777.3542 fax
james.kaste@wyo.gov
erik.petersen@wyo.gov

/s/ Richard Rideout
RICHARD RIDEOUT, ESQ.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2016 JUL -6  PM 1:39

STEPHAN HARRIS, CLERK
CASPER

---

|  |  |
|---|---|
| WESTERN WATERSHEDS PROJECT; NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION; NATURAL RESOURCES DEFENSE COUNCIL, INC., PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.; and CENTER FOR FOOD SAFETY, <br><br> Plaintiffs, <br><br> vs. <br><br> PETER K. MICHAEL, in his official capacity as Attorney General of Wyoming; TODD PARFITT, in his official capacity as Director of the Wyoming Department of Environmental Quality; PATRICK J. LEBRUN, in his official capacity as County Attorney of Fremont County, Wyoming; JOSHUA SMITH, in his official capacity as County Attorney of Lincoln County, Wyoming; CLAY KAINER, in his official capacity as County and Prosecuting Attorney of Sublette County, Wyoming, <br><br> Defendants. | Case No.  15-CV-00169-SWS |

---

## ORDER GRANTING MOTION TO DISMISS

The above-captioned matter comes before the Court on Defendants' Motion to Dismiss Plaintiffs' Amended Complaint for failure to state a claim upon which relief may be granted.  (ECF No. 58).  For those reasons set forth below the Court finds Defendants' Motion should be granted.

## I.    BACKGROUND

Plaintiffs Western Watersheds Project (Western Watersheds), National Press

Photographers Association (NPPA), National Resource Defense Council (NRDC), People

for the Ethical Treatment of Animals (PETA), and, Center for Food Safety (CFS), are

interest groups aimed at protecting and advocating for animals, wildlife, and the

environment. Plaintiffs initiated this action last fall, challenging the constitutionality of a

pair of trespass statutes passed by the Wyoming legislature prohibiting the collection of

"resource data" on "open lands" without express permission or authorization. Defendants

Michael, Parfitt, and Governor Matt Mead moved to dismiss Plaintiffs' complaint,

arguing, *inter alia*, it failed to state any plausible claims. After briefing and oral

arguments, this Court granted in part and denied in part the motion to dismiss, noting its

concern as to the validity of at least certain portions of the statutes. (Ord. on MTD, ECF

No. 40). Subsequently, the Wyoming legislature amended the statutes. Plaintiffs then

amended their complaint, which Defendants Michael and Parfitt now move to dismiss.

### A. 2015 Statutes

In 2015, the Wyoming legislature enacted a pair of statutes, WYO. STAT. §§ 6-3-

414; 40-27-10[1] (2015), addressing "Trespass to Collect Resource Data." The statutes

prohibited unauthorized entrants on "open land"[2] from collecting or recording

information relating to land and land use[3] and then submitting that information to a

---

[1] The civil statute was originally codified at §40-26-101. It was recodified at § 40-27-101.
[2] "Open land" was defined as land outside the exterior boundaries of a city, town, or state-approved subdivision. WYO. STAT. § 6-3-414(d)(ii) (2015).
[3] "Resource data" was defined as "data relating to land or land use, including but not limited to data regarding agriculture, minerals, geology, history, cultural artifacts, archeology, air, water, soil, conservation, habitat,

2

governmental agency. One statute imposed criminal penalties including fines and possible jail time, WYO. STAT. § 6-3-414 (2015), while the other imposed civil liability for consequential and economic damages caused by the trespass, WYO. STAT. §40-27-101 (2015). One subsection of the statutes appeared to relate to *public* lands, WYO. STAT. §§ 6-3-414(a); 40-27-101(a)[4], while another subsection related to *private* lands, WYO. STAT. §§ 6-3-414(b); 40-27-101(b).[5] "Collect" was defined as "to take a sample of material, acquire, gather, photograph or otherwise preserve information in any form from open land which is submitted or intended to be submitted to any agency of the state or federal government." WYO. STAT. § 6-3-414(d)(i) (2015).

Thus, to violate the 2015 statutes, an individual would have had to: (1) enter "open land" (private or public) to collect resource data without an ownership interest, authorization, or permission to enter *or* to collect such data; (2) somehow record or

---

vegetation or animal species," excepting from the definition various information collected by governments or law enforcement. WYO. STAT. § 6-3-414(d)(iv) (2015).

[4] A person would be subjected to criminal and/or civil liability under this subsection "if he:
    (i) Enter[ed] onto open land for the purpose of collecting resource data; and
    (ii) D[id] not have:
        (A) An ownership interest in the real property or statutory, contractual or other
        legal authorization to enter or access the land to collect resource data; or
        (B) Written or verbal permission of the owner, lessee or agent of the owner to
        enter or access the land to collect the specified resource data."

    WYO. STAT. §§ 6-3-414(a); 40-27-101(a) (2015).

[5] A person would be criminally and/or civilly liable under this section "if he enter[ed] onto private open land and collects resource data without:
    (i) An ownership interest in the real property or, statutory, contractual or other legal authorization
    to enter the private land to collect the specified resource data; or
    (ii) Written or verbal permission of the owner, lessee or agent of the owner to enter the land to
    collect the specified resource data."

    WYO. STAT. §§ 6-3-414(b); 40-27-101(b) (2015).

3

preserve data about the land or land use, and; (3) intend to submit, or actually submit,

such data to a governmental agency. Any information obtained in violation of the statutes

could not be used in any civil, criminal, or administrative proceedings (unless it was a

civil action or criminal prosecution under the statutes), and such information which had

been submitted to a governmental entity had to be expunged. WYO. STAT. §§ 6-3-414(e),

(f); 40-27-101(d), (e), (f) (2015).

In their original complaint, Plaintiffs argued the 2015 statutes: (1) violated the

Petition Clause of the First Amendment; (2) violated the Free Speech Clause of the First

Amendment; (3) were preempted by federal laws; and (4) violated the Equal Protection

Clause of the Fourteenth Amendment. Defendants Peter K. Michael, Todd Parfitt, and

Matthew Mead moved to dismiss Plaintiffs' claims, arguing Plaintiffs lacked standing to

challenge the civil statute and failed to state a claim as to all causes of action.

Additionally, the State Defendants argued Governor Matthew Mead was an improper

party.

After hearing oral arguments, the Court issued a written order, wherein it held

Plaintiffs: (1) had standing to challenge the civil statute; (2) stated a plausible First

Amendment Free Speech and Petition claim; (3) stated a plausible Equal Protection

claim; (4) failed to state a Supremacy Clause or preemption claim, and; (5) failed to state

a claim against Defendant Governor Matthew Mead. The Court was primarily concerned

about the statutes' application to activities on public lands, as restricting the public's

activities on such lands was unrelated to deterring trespassing. Also concerning was the

4

fact that the 2015 statutes targeted the submission, or intended submission, of data to governmental agencies.

### B. 2016 Statutes

In 2016, the Wyoming legislature amended the two previously challenged statutes. As with the 2015 versions, the revised statutes are nearly identical, with one still imposing criminal punishment, WYO. STAT. § 6-3-414 (2016), and the other, civil liability, WYO. STAT. § 40-27-101 (2016). The revised statutes still define "resource data" as "data relating to land or land use, including but not limited to data regarding agriculture, minerals, geology, history, cultural artifacts, archeology, air, water, soil, conservation, habitat, vegetation or animal species," with certain exceptions for certain governmental and law enforcement matters. WYO. STAT. §§ 6-3-414 (e)(iv); 40-27-101(h)(iii) (2016).[6] The new statutes clarify they apply only to entry onto private lands (eliminating any reference to "open lands"), and no longer require data be submitted or intended to be submitted to a governmental agency. The definition of "collect" has been modified to mean "to take a sample of material, acquire, gather, photograph or otherwise preserve information in any form and the recording of a legal description or geographical coordinates of the location of the collection." WYO. STAT. §§ 6-3-414(e)(i); 40-27-101(h)(i) (2016).

The revised statutes contain three proscriptive subsections:

---

[6] The revised civil statute added a definition subsection, WYO. STAT. § 40-27-101(h) (2016). The 2015 version did not contain a definition subsection. This amendment is not consequential, however, as the Court held in its previous order that the definitions from the criminal statute, WYO. STAT. § 6-3-414(d) (2015), applied equally to the civil statute. (Ord. on Mot. to Dis., ECF No. 40, at p. 3, n. 2).

(a) A person [is guilty of trespassing/commits a civil trespass] to unlawfully collect resource data from private land if he:

> (i) Enters onto private land for the purpose of collecting resource data; and

> (ii) Does not have:
>> (A) An ownership interest in the real property or statutory, contractual or other legal authorization to enter the private land to collect the specified resource data; or
>>
>> (B) Written or verbal permission of the owner, lessee or agent of the owner to enter the private land to collect the specified resource data.

(b) A person [is guilty/commits a civil trespass] of unlawfully collecting resource data if he enters onto private land and collects resource data from private land without:

> (i) An ownership interest in the real property or, statutory, contractual or other legal authorization to enter the private land to collect the specified resource data; or

> (ii) Written or verbal permission of the owner, lessee or agent of the owner to enter the private land to collect the specified resource data.

(c) A person [is guilty of trespassing/commits a civil trespass] to access adjacent or proximate land if he:

> (i) Crosses private land to access adjacent or proximate land where he collects resource data; and

> (ii) Does not have:
>> (A) An ownership interest in the real property or, statutory, contractual or other legal authorization to cross the private land; or
>>
>> (B) Written or verbal permission of the owner, lessee or agent of the owner to cross the private land.

6

WYO. STAT. §§ 6-3-414(a)-(c); 40-27-101(a)-(c) (2016).

Thus, a person can violate the revised statutes in one of three ways: (1) if he enters private land with the purpose of collecting resource data and without authorization or permission to enter the land or specific permission to collect resource data; (2) if he enters private land and actually collects resource data without authorization or permission to enter the land or specific permission to collect resource data, or; (3) if he crosses private land without authorization or permission to do so and collects resource data.[7]

As with the 2015 versions of the statutes, an individual must have permission not only to enter private lands, but enter them for the purpose of collecting specific resource data. A first-time offender under the revised criminal statute faces imprisonment for not more than one (1) year, a fine of not more than $1,000, or both. WYO. STAT. § 6-3-414(d)(i) (2016). A repeat offender of subsections (a) or (b) of the criminal statute faces imprisonment for not less than ten (10) days, but not more than one (1) year, a fine of not more than $5,000, or both.[8] Under the civil statute, one who violates the statute is liable in a civil action by the owner or lessee of the land for all consequential and economic damages proximately caused by the trespass. WYO. STAT. § 40-27-101(d) (2016). The violator will also be liable for litigation costs, reasonable attorney fees and costs. *Id.*

The revised statutes prohibit the use of resource data collected in violation of the

---

[7] The Court refers to "authorization or permission," noting, however, the relevant statutory provisions read:
> "An ownership interest in the real property or statutory, contractual or other legal authorization to enter the private land to collect the specified resource data; or
> Written or verbal permission of the owner, lessee or agent of the owner to enter the private land to collect the specified resource data."

WYO. STAT. §§ 6-3-414(a)(ii)(A)-(B), (b)(i)-(ii), (c)(ii)(A)-(B); 40-27-101((a)(ii)(A)-(B), (b)(i)-(ii), (c)(ii)(A)-(B).
[8] This provision excludes a heightened punishment for repeat offenders under subsection (c) of the statute, wherein a person is guilty of crossing private property without authorization to collect resource data on adjacent lands.

7

statutes in any civil, criminal, or administrative proceeding, other than to prosecute a
person under either statute. WYO. STAT. §§ 6-3-414(f); 40-27-101(f) (2016). Also, any
data in possession of any Wyoming governmental entity which was collected in violation
of the statutes must be expunged by the entity. WYO. STAT. §§ 6-3-414(g); 40-27-101(g)
(2016).

### C. Amended Complaint

On April 11, 2016, Plaintiffs amended their complaint, arguing even as revised,
the statutes are unconstitutional as applied to them, as well as on their face. (Amend.
Compl. ECF No. 54). Plaintiffs' amended complaint presents two constitutional causes of
action: Free Speech and Equal Protection.

#### i.    *Free Speech*

Plaintiffs assert the revised statutes infringe upon their First Amendment rights
and are "unconstitutional on their face and as applied to Plaintiffs' collection of resource
data" as well "as applied to a host of other activities." (*Id.* at ¶ 90).

Plaintiffs provide numerous examples of desired data-collection activities that
they, their members, and other "whistleblowers" and "citizen scientists," have refrained
from engaging in out of fear of criminal prosecution or civil liability under the revised
statutes. Plaintiffs assert "it is difficult to determine whether a road that appears open to
the public, and which the pubic routinely makes use of, crosses private land, and if it does
so, whether a public right of way exists over that road." (*Id.* at ¶ 81). Plaintiffs and their
members argue they are chilled from engaging in their data collection activities, even on
public lands, out of fear of unintentionally stepping onto private lands, or using a road

8

which "unbeknownst to Plaintiffs or their staff, crosses private land across which there exists no public right of way." (*Id.* at ¶ 82). Western Watersheds asserts "the fact that the boundary between public and private lands is often entirely unmarked in Wyoming has compelled [it] to suspend such activities." (*Id.* at ¶ 82(b)). Plaintiffs also assert they are chilled because it is uncertain who must grant them permission when land has multiple owners with different ownership interests. (*Id.* at ¶ 82(d)).

Plaintiffs argue the statutes are content and viewpoint based and discriminate against speech (or the creation of speech) which is critical of land use with no legitimate state interest or justification for doing so. They assert the laws are content-based because they only seek to punish the collection of certain types of information, i.e., resource data. Plaintiffs also argue the statutes are viewpoint-based, as they "effectively grant the landowner, lessee, or landowner's agent the power to authorize or prohibit who can gather information about land and land use for communication to the public or government." (*Id.* at ¶ 88).

Plaintiffs also argue the statutes are unconstitutionally overbroad, lacking "any plainly legitimate sweep." (*Id.* at ¶ 90 (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010))). Plaintiffs provide three examples to support their overbreadth argument: a child taking a picture with her cellphone on her neighbor's property, which she has permission to be upon; a traveler, who enters private land in response to a cry for help, discovers a fire, and records the location using GPS on her phone, and; the hiker who records and reports illegal activities occurring on private property. (*Id.* at ¶ 91). They claim any person who takes a picture with his cell phone after entering or crossing private

9

land, knowingly or inadvertently, without express permission to do so, would be liable and subject to criminal charges.

Finally, Plaintiffs assert the statute prohibit governmental agencies from using and considering truthful information. (*Id*. at ¶¶ 95-96). They claim because the statutes still contain an expungement provision, even if a person is willing to risk criminal prosecution or civil liability and violate the statutes in order to provide data to governmental agencies, the agency is still precluded from considering it.

### ii.   *Equal Protection*

Plaintiffs assert the revised statutes violate their Equal Protection rights by distinguishing between the purposes and intent of entrants on private property, punishing only those seeking to collect resource data. (*Id*. at ¶ 114). They also argue the statutes violate their Equal protection rights by burdening the fundamental right of freedom of speech without serving any legitimate government interest. (*Id*. at ¶¶ 115-16). Finally, Plaintiffs maintain the statutes violate their Equal Protection rights because they were promulgated out of animus. They argue the statutes are aimed at chilling the efforts of those persons who disapprove of various land-uses and gather and communicate information to governmental agencies to further the implementation of environmental laws. (*Id*. at ¶ 118).

### D. Motion to Dismiss

Defendants Peter Michael and Todd Parfitt (State Defendants) now move to dismiss the Amended Complaint, asserting Plaintiffs fail to state either a First Amendment Free Speech or Fourteenth Amendment Equal Protection claim. (Mot. to.

Dismiss, ECF No. 58). State Defendants assert the revised statutes do not regulate protected expressive activity and therefore do not trigger the First Amendment. Alternatively, State Defendants argue even if the Court were to find the statutes regulated protected activity, the statutes only implicate private lands, upon which Plaintiffs have no right to exercise expressive activities. State Defendants assert to the extent the Court finds the statutes *do* implicate lands other than private lands, an evaluation of the constitutionality of the statutes as applied to such lands is impossible to consider in the abstract.

State Defendants assert Plaintiffs fail to state an Equal Protections claim, as the revised statutes do not target a suspect class or burden a fundamental right, and can survive rational basis scrutiny. Additionally, they argue the statutes were not promulgated out of animus, or alternatively, that any animus related to the 2015 statutes has been cured.

## I.    STANDARD OF REVIEW

Faced with a motion to dismiss a claim under F.R.C.P. 12(b)(6), the Court accepts as true all well-pleaded facts in the complaint, and draws all reasonable inferences therefrom in the light most favorable to the plaintiffs. *Leverington v. City of Colorado Springs*, 643 F.3d 719, 723 (10th Cir. 2011) (citation omitted). The Court disregards any conclusory statements or conclusions of law. *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). The "complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

11

[A154]

(2007)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kansas Penn*, 656 F.3d at 1215.

## II.    DISCUSSION

### A. First Amendment

The threshold question in a First Amendment Free Speech analysis is to ask whether the challenged governmental action regulates protected activity: if not, the Court "need go no further." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 797 (1985). Here, Plaintiffs assert that because the revised statutes restrict their ability to "create" speech, i.e., gather data, the statutes regulate protected activity and are subject to at least some level of scrutiny. The Supreme Court has recognized "creation and dissemination of speech" may be "speech" within the meaning of the First Amendment. *Sorrell v. IMS Health Inc.*, 131 S.Ct. 2653, 2667 (2011). Even so, it has refused recognize *all* "creation" of speech as protected expressive activity for purposes of the First Amendment. *See, Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978) (holding plaintiffs did not have First Amendment right to unrestricted access to prisoners, noting the right to gather news does not compel private persons or governments to supply such information); *Zemel v. Rusk*, 381 U.S. 1, 16-17 (1965) (holding a First Amendment right was not involved based upon a travel ban which restricted the plaintiff's ability to visit Cuba and collect information, noting "[t]here are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow."). The court does not view "creation" of speech in a vacuum; the right to "create" speech via access to

12

[A155]

information is protected activity only if conducted "by means within the law." *Branzburg v. Hayes*, 408 U.S. 665, 681-82 (1972).[9]

In this case, Plaintiffs challenge the statutes based upon their restriction of creation of speech by illegal means. Plaintiffs' First Amendment right to create speech does not carry with it an exemption from other principles of law, or the legal rights of others. Plaintiffs' desire to access certain information, no matter how important or sacrosanct they believe the information to be, does not compel a private landowner to yield his property rights and right to privacy.

Plaintiffs' asserted inability to determine their location and land ownership during data collection creates somewhat of a conundrum. The Amended Complaint presents an exhaustive list of data collection activities they have engaged in in the past, and have recently refrained from engaging in. (Amend. Compl. ECF No. 54, at ¶¶ 19-53, 79-83). These activities involve collecting water samples, recording locations of purported environmental or permitting violations, photographing and recording the location of wildlife, monitoring air-quality near oil and gas developments and recording locations of violations, etc. Each of these activities involves Plaintiffs and their members determining and recording the locations (by GPS or other means) of purported environmental violations or data findings. The ability to pinpoint and record the location of alleged environmental violations is essential to Plaintiffs' mission and goals. Coincidentally, the

---

[9] Plaintiffs gain no support from *Sorrell*, as that case did not involve obtaining the information through illegal means. 131 S.Ct. 2653. The provider of information was aware, and willing. In this case, private landowners may grant permission, but until such permission or authorization is obtained, they are not a willing provider of the information Plaintiffs' seek.

13

same information would be essential to a successful prosecution or civil action brought under these statutes.

To say Plaintiffs are incapable of utilizing the same GPS tools, methods, and research to determine their own location during, and en route to, such data collection activities is borderline disingenuous. Plaintiffs acknowledge they have had to conduct surveys in the past to determine boundaries or rights-of-way. (Amend. Compl. ECF No. 54, at ¶ 13). To the extent the government does not have, or is uncertain of, public right-of-ways on particular routes or roads, it has the ability to clarify and obtain such rights.[10] In any event, any perceived burden or hardship associated with determining property rights does not translate into a First Amendment right to go upon lands, blissfully ignorant of their ownership.

The lack of public First Amendment rights upon private property is not new or novel. The Supreme Court has repeatedly cognized the *absence* of a First Amendment right to engage in speech on the private property of another. *See e.g., Lloyd Corp., LTD. v. Tanner*, 407 U.S. 551, 567-68 (holding First Amendment did not require a private corporation to allow handbill distribution on its private property); *Hudgens v. NLRB*, 424 U.S. 507, 509 (1976) (holding employer was not required to permit workers to picket on company property); *Cornelius*, 473 U.S. at 801 ("[A] speaker must seek access to public property or to private property dedicated to public use to evoke First Amendment

---

[10] This logic applies equally to Plaintiffs' argument that they are uncertain whose authorization or permission they are required to obtain to collect resource data on private lands. It is not uncommon for multiple individuals to have property interests in a parcel of land. A real property interest holder cannot convey a greater interest than he owns. To the extent Plaintiffs or others seek to engage in an activity upon a parcel of land, they must determine who holds what rights in order to have adequate authorization.

14

concerns . . . ."). Contrary to Plaintiffs' assertion, the fact the state promulgated the restriction in this instance, as opposed to the private landowners in *Lloyd* or *Hudgens*, is of no consequence. The source of the restriction does not change the fact a person has no First Amendment right to engage in speech on the private property of another. The statutes leave it to the private landowner whether to grant permission to others to collect resource data upon his land.[11] To the extent such permission or authorization is granted, the state imposes no restriction.

In short, there is no First Amendment right to trespass upon private property for the purpose of collecting resource data. This does not end the Court's analysis, however. As noted above, the revised statutes contain three proscriptive subsections, two of which apply strictly to collection of resource data on private lands. *See* WYO. STAT. §§ 6-3-414(a), (b); 40-27-101(a), (b). These subsections, therefore, do not warrant any further First Amendment analysis. The third subsection, however, arguably involves collection of resource data from public lands, or lands upon which an individual may rightfully engage in resource data collection. WYO. STAT. §§ 6-3-414(c); 40-27-101(c). Even so, to subject this subsection of the statutes to First Amendment scrutiny is premature.

To say a regulation restricts activity presupposes that one has the right to engage in such activity in a particular manner. Certainly Plaintiffs and other members of the

---

[11] Plaintiffs cite *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 160 (2002) to support their position that the Supreme Court has applied First Amendment analysis to regulations of the public's right to engage in speech on private property. That case is distinguishable, however, as it dealt with door-to-door canvassing and pamphleting of religious materials. The Supreme Court has found hand distribution of religious literature to occupy "the same high estate under the First Amendment as [ ] worship in the churches and preaching from the pulpits." *Murdock v. Pennsylvania*, 319 U.S. 105, 108-09 (1943). No such elevated protection has been afforded collection of "resource data."

public are entitled to be upon public lands for various purposes, some arguably including
"collecting resource data." However, the public does *not* have the right to cross private
lands (trespass) to engage in such activities. The Supreme Court "has never held that a
trespasser or uninvited guest may exercise general rights of free speech on property
privately owned and used nondiscriminatorily for private purposes only." *Lloyd*, 407 U.S.
at 568. Likewise, it has never held a trespasser has the right to cross private property to
engage in such activities. The revised statutes do nothing to the legal rights of members
of the public; they only emphasize and increase punishment for the unlawful entry of
private lands en route to engage in protected activity. This "restriction" is already in place
by virtue of principles of real property ownership and existing concepts of trespass. The
statutes are not "time, place, or manner" restrictions as that term is contemplated by First
Amendment precedent. Therefore, the Court need not engage in further scrutiny of
subsection (c), as it does not "restrict" or "regulate" a protected First Amendment activity
as contemplated by the line of Free Speech precedent addressing "time, place, and
manner" restrictions.

Plaintiffs' Amended Complaint also asserts a facial overbreadth First Amendment
challenge. To assert a facial overbreadth claim, a plaintiff must demonstrate that the
challenged law (1) "could never be applied in a valid manner," or (2) that even though it
may be validly applied to some, "it nevertheless is so broad that it may inhibit the
constitutionally protected speech of third parties." *N.Y. State Club Ass'n, Inc. v. City of
New York*, 487 U.S. 1, 11 (1988) (citations omitted). Plaintiffs' overbreadth challenge
appears to fall under the latter category, providing the three above-mentioned examples

16

of third parties who would be liable under the statutes, notwithstanding the apparent innocence or justification of their activities.

"The 'mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.'" *United States v. Williams*, 553 U.S. 285, 301 (2008) (quoting *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984)). The court must find "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *N.Y. State Club Ass'n, Inc.*, 487 U.S. at 11 (citation omitted). The claimant bears the burden of demonstrating the law's application to protected speech is substantially overbroad, not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications. *Virginia v. Hicks*, 539 U.S. 113, 119-120 (2003) (citations omitted). The overbreadth doctrine is "strong medicine," used "sparingly" and applied only as "a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). Such medicine is not warranted in this case.

When a statute is aimed at regulating conduct—as opposed to "pure speech"—the court's overbreadth inquiry must account for the state's legitimate interest in enforcing its "otherwise valid criminal law." *Id.* at 615. A statute regulating conduct, "if too broadly worded, may deter protected speech to some unknown extent." *Id.* Even so, "there comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe." *Id.* "Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically

17

addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." *Virginia v. Hicks*, 539 U.S. 113, 124 (2003).

Here, the revised statutes are aimed at regulating the conduct of trespass by imposing the burden upon an entrant to know the ownership interests of the land he enters or crosses. Plaintiffs' three examples are predictions at best, which do not justify invalidating the statutes on their face. As to Plaintiffs' first example, logically a neighbor who permits a child to enter his property would also permit the child to take a picture. To the extent the neighbor does not wish to grant the child permission to take pictures, that is his prerogative. A basic concept of property law taught to first year law students is that property rights are like a bundle of sticks and can be divided in terms of dimension, duration, and scope. If a landowner wishes to grant access or use of his property for a limited purpose, he has every right to do so. As noted by the Supreme Court in *PruneYard Shopping Center v. Robins*, one of the essential sticks in the bundle of property rights is the right to exclude others. 447 U.S. 74, 82 (1980) (citing *Kaiser Aetna v. United States*, 444 U.S. 164, 179-80 (1979)).

As to Plaintiffs' second and third examples, nothing indicates a reasonable person would refrain from reporting an emergency or illegal activity by virtue of the new statutes. In fact, as noted by State Defendants in their Reply Brief (ECF No. 63, at n. 4), either of the individuals in Plaintiffs' second and third examples could report their findings without violating the revised statutes. The definition of "collect" is "to take a sample of material, acquire, gather, photograph or otherwise preserve information in any form and the recording of a legal description or geographical coordinates of the location

18

of the collection." WYO. STAT. §§ 6-3-414(e)(i); 40-27-101(h)(i) (2016). Simply calling emergency personnel, or verbally reporting findings to law enforcement, even providing geographical coordinates, would not violate the revised statutes.

When interpreting statutory language, the court relies upon the principle of *noscitur a sociis*—a word is known by the company it keeps—to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words. *Yates v. United States*, 135 S.Ct. 1074, 1085 (2015). Under the canon *ejusdem generis*, "[w]here general words follow specific words in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Washington State Dept. of Social and Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003) (citations omitted).

In this instance, the general phrase "otherwise preserve information" must be read in connection with the specific preceding words. The specific verbs used in the definition of "collect" require some form of physical or tangible recording. Making a mental note is not similar enough to be encompassed by "otherwise preserve." Therefore, merely reporting what one witnessed is not prohibited by the revised statutes. This interpretation of the statutes likewise weakens any argument that the statutes completely preclude whistleblowers from reporting what they witness or find based upon memory.[12]

---

[12] Plaintiffs assert the creation of an audiovisual recording is protected speech, citing *Animal Legal Defense Fund v. Otter*, 118 F. Supp. 3d 1195, 1205 (D. Idaho 2015) (*ALDF II*) (finding the restriction of audiovisual recording in agricultural facilities to be an impermissible restriction on speech of whistleblowers). The Court respectfully disagrees. There is no precedent to support the premise that whistleblowers somehow have an elevated First Amendment right to make audiovisual recordings on private property without permission. No matter how virtuous or important one may view a whistleblower's motives or actions, the ends do not justify the means of trespass.

19

In sum, Plaintiffs fall far short of demonstrating a realistic danger of a substantial suppression of speech. Even more importantly, the fact the statutes are aimed at conduct, rather than speech itself, the Court cannot, with confidence, justify invalidating the statute on their face, prohibiting the State of Wyoming from enforcing the statute against conduct (i.e., trespassing) which it is entitled to proscribe. *Broadrick*, 413 U.S. at 615.

Plaintiffs' assert the revised statutes expungement provisions (WYO. STAT. §§ 6-3-414(g); 40-27-101(g)), violate the First Amendment because they prevent agencies from considering truthful and accurate information. The Supreme Court has repeatedly refused to define what protections should be afforded the publication of truthful information. *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001). The Supreme Court's practice has been to only analyze restrictions of the publication of truthful information on a case-by-case "as-applied" basis. *See, e.g., id.*; *Landmark Comm., Inc. v. Virginia*, 435 U.S. 829, 838 (1978); *Florida Star v. B.J.F.*, 491 U.S. 524, 532-33 (1989). Because this Court is not faced with an "as-applied" challenge to the expungement provisions of the revised statutes, it will follow the Supreme Court's lead and declines to engage in further First Amendment analysis.

In conclusion, the revised statutes do not regulate protected First Amendment activity and therefore are not subject to further scrutiny. There is no constitutionally protected First Amendment right to enter upon the private lands of another for the purposes of collecting data. Plaintiffs fail to demonstrate the statutes are facially overbroad. The Court, following Supreme Court precedent, declines to conduct a facial analysis of the statutes' expungement provisions. Therefore, Plaintiffs cannot maintain a

Free Speech First Amendment challenge and State Defendants' motion to dismiss must be granted.

### B.  Equal Protection

Plaintiffs assert the revised statutes violate the Equal Protection Clause by: (1) targeting persons entering open land seeking to collect resource data rather than entering land for other purposes; (2) burdening a fundamental right without serving a legitimate government interest, and; (3) also because they were promulgated out of animus.

The Equal Protection Clause of the Fourteenth Amendment states "No State shall . . . deny any person within its jurisdiction the equal protection of the laws." U.S. CONST., amend. 14, sec. 1. "The Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, 517 U.S. 620, 631 (1996) (citations omitted). Unless a classification burdens a fundamental right or "proceed[s] along suspect lines," it is presumptively valid, subject only to rational basis scrutiny. *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993). A classification is not impermissible simply because it "is not made with mathematical nicety or because in practice it results in some inequality." *Romer*, 517 U.S. at 631 (citations omitted). Under the rational basis test, a legislative classification will be upheld if it "advance[s] a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *Id.* at 632. The law must be "narrow enough in scope and grounded

21

in a sufficient factual context" for the court "to ascertain some relation between the classification and the purpose served." *Id.* at 632-33.

If the law burdens a fundamental right or targets a suspect class, however, it is subject to strict scrutiny. *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 313 n. 3 (1976). Strict scrutiny requires laws to be suitably tailored to serve a compelling state interest. *Reno v. Flores*, 507 U.S. 292, 302 (1993). Free speech is a recognized fundamental right, which, in part, Plaintiffs base their Equal Protection challenge upon. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 336, n. 1 (1995).

The revised statutes "classify" entrants of private property based upon the actual or intended conduct the entrant engages in. As noted above, subsections (a) and (b) of the statutes clearly do not involve a First Amendment right, and therefore do not burden Plaintiffs' fundamental right of Free Speech. Similarly, subsection (c) (relating to crossing of private land to collect resource data on adjacent lands) does not "burden" Plaintiffs' First Amendment rights as that word is intended by the Supreme Court. Therefore, the revised statutes are not subject to strict scrutiny by virtue of the rights burdened.

The Court does not find the statutes were promulgated out of animus toward Plaintiffs' groups or members. First, although some comments during the legislative session for the 2015 versions of WYO. STAT. §§ 6-3-414 and 40-27-101 expressed frustrations or outright dislike for environmental groups, or other particular interest groups or viewpoints, such comments cannot be said to taint the motivations of all legislators. "What motivates one legislator to make a speech about a statute is not

22

necessarily what motivates scores of others to enact it, and the stakes are sufficient high for [the court] to eschew guesswork." *United States v. O'Brien*, 391 U.S. 367, 383-84 (1968). Additionally, these comments were made during the promulgation of the 2015 versions of the statutes. In any event, legislatures may "cure" a law originally enacted with unconstitutional animus. *See e.g., Hayden v. Paterson*, 594 F.3d 150, 162-69 (2d Cir. 2010); *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1223 (11th Cir. 2005) (en banc), *cert. denied*, 546 U.S. 1015 (2005) ("Florida's felon disenfranchisement provision is constitutional because it was substantively altered and reenacted in 1968 in the absence of any evidence of racial bias.").

As noted in this Court's prior order, the Supreme Court has held when a law purports to protect an interest already protected by existing law, courts have reason to be suspicious of the legislature's actual intent. *U.S. Dept. of Agriculture v. Moreno*, 413 U.S. 528, 536-37 (1973). Upon further review of Wyoming's trespass laws, as well as taking into consideration the amendments to the statutes (removing its application to public lands), the Court no longer has "considerable doubt" as to the purposes of the revised statutes. As clarified by State Defendants in the latest Motion to Dismiss, the revised statutes are distinguishable from Wyoming's preexisting criminal trespass statute and common law trespass. Although the statutes may aim to prevent trespassing, they operate in a different manner than existing law, and seek to provide a more effective deterrent to protect private property rights. To violate Wyoming's existing criminal trespass statute, WYO. STAT. §6-3-303, an entrant must enter or remain on the land of another, with knowledge that he has no right to do so, or after being notified to leave or not trespass.

23

[A166]

Notice can be given through personal communication or postage of signs. Constituents raised the issue to legislators that individuals seeking to collect resource data were trespassing upon their private lands, but could not be charged under the existing criminal statutes. In other words, the existing criminal trespass statutes were not adequate deterrents for these trespassers. "If the sanctions that presently attach to a violation [of a law] do not provide sufficient deterrence, perhaps those sanctions should be made more severe." *Bartnicki v. Vopper*, 532 US. 514, 529 (2001). That is what the Wyoming Legislature has done in this case.

This is not the first time Wyoming has enacted a statute to prevent a particular problematic sort of trespass. Wyoming's anti-trespass hunting statute provides, "[n]o person shall enter upon the private property of any person to hunt, fish, or trap without permission of the owner or person in charge of the property." WYO. STAT. § 23-3-305(b). Similar to Plaintiffs and their members,

> Hunters may unintentionally stray off public lands onto private lands. Anglers, due to a lack of skill in reading maps or GPS units, may think they are on public land but soon find they are not when a rancher confronts them in a field. Regardless of intent, there are only two elements that must be shown in a violation of this statute—that the hunter, angler or trapper was on the private land in question without permission and that he was hunting, fishing or trapping.

Bruce Scigliano, *Trespass to Hunt, Fish or Trap: An Example of a Strict Liability Law*, WYO. LAWYER, June 2016.  While Plaintiffs may disagree that their trespassing is problematic, that is a policy choice the Wyoming Legislature has made.

Although the Court expressed concerns with the 2015 versions of the statutes, those concerns have been resolved by the recent amendments. First, the revised statutes

24

eliminate any reference to "open lands," which the Court found imposed liability for

conduct engaged in while completely on public lands. Secondly, the revised statutes

eliminate any requirement that the data be submitted or intended to be submitted to a

governmental agency. As revised, the statutes are aimed completely at deterring

trespassing. The instant case is distinguishable from *Moreno*, as the targeted individuals

by the amendment to the statute in that case would not be further deterred. 413 U.S. at

536-37. In that case, there was no evidence the existing provisions in the statute,

purportedly aimed at preventing the same abuses, were inadequate. Here, there is strong

evidence, based upon Plaintiffs' own admissions, that existing trespass laws do not deter

them from entering private lands to collect data or to access other lands to collect data.

Therefore, the Court finds the "doubt" which plagued the amendment in *Moreno* does not

plague the revised statutes in this case. Finally, unlike in *Animal Defense Fund v. Otter*,

118 F. Supp. 3d 1195 (D. Idaho, Aug. 3, 2015), Wyoming's revised statutes preclude

trespassing to collect any resource data, regardless of whether that data is favorable or

unfavorable to the owner.

    The revised statutes were not promulgated out of animus toward a particular

group, and do not burden a fundamental right. Therefore, the statutes must rationally

further some legitimate governmental interest. *Romer*, 517 U.S. at 632. As previously

noted, protecting private property rights is a legitimate government interest. Current

trespass statutes were not adequately deterring those, such as Plaintiffs, seeking to collect

resource data, from entering or crossing (trespassing upon) private property. Under the

revised statutes, those wishing to collect resource data are charged with knowing where

they are while engaging in data collection. Thus, the statutes rationally relate to the interest of protecting private property rights. The statutes pass the rational basis test and therefore do not violate the Equal Protections Clause of the Fourteenth Amendment. Accordingly, Plaintiffs' second cause of action must also be dismissed.

### III.   CONCLUSION

Plaintiffs' claims are erroneously premised upon their perceived First Amendment right to trespass upon private property to collect resource data.  No such constitutional right exists. To the contrary, the United States Supreme Court "has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned." *Lloyd Corp., Limited, supra* at 568. The ends, no matter how critical or important to a public concern, do not justify the means, violating private property rights. Accordingly, Plaintiffs' Amended Complaint fails to state a claim upon which relief can be granted. Therefore, Defendants' Motion to Dismiss is hereby GRANTED.

Dated this _6th_ day of July, 2016.

Scott W. Skavdahl
United States District Judge

26

Reed Zars
Wyo. Bar No. 6-3224
Attorney At Law
910 Kearney Street
Laramie, WY 82070
(307) 745-7979
*Attorney for Plaintiffs*

[Additional counsel listed on signature page]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT; et al., | ) |
| | ) |
| Plaintiffs | ) |
| | ) Civil No. 15-cv-169-SWS |
| v. | ) |
| | ) |
| PETER K. MICHAEL, in his official capacity as | ) |
| Attorney General of Wyoming; et al., | ) |
| | ) |
| Defendants. | ) |

---

## PLAINTIFFS WESTERN WATERSHEDS PROJECT, NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, AND NATURAL RESOURCES DEFENSE COUNCIL, INC.'S NOTICE OF APPEAL

---

Plaintiffs Western Watersheds Project, National Press Photographers Association, and

Natural Resources Defense Council, Inc., hereby give notice that they appeal to the United States

Court of Appeals for the Tenth Circuit this Court's final judgment dismissing their claim that

Wyo. Stat. Ann. § 6-3-414(c) (2016) and Wyo. Stat. Ann. § 40-27-101(c) (2016)—the provisions

this Court described as making it unlawful to "cross[] private land without authorization or

permission to do so and collect[] resource data"—violate the Free Speech Clause of the First

Amendment of the United States Constitution and the Due Process Clause of the Fourteenth

[A170]

Amendment of the United States Constitution.  *See* Dkt. Nos. 64 & 65 (both entered on July 6, 2016).

Respectfully submitted this August 2, 2016.


_s/ Reed Zars____

Reed Zars
Attorney at Law
910 Kearney Street
Laramie, WY 82070
(307) 745-7979
reed@zarslaw.com
*Counsel for Plaintiffs*

David S. Muraskin
Public Justice, P.C.
1620 L St. NW, Suite 630
Washington, DC 20036
dmuraskin@publicjustice.net
*Counsel for Western Watersheds Project and*
*National Press Photographers Association*

Leslie A. Brueckner
Public Justice, P.C.
555 12th St., Suite 1230
Oakland, CA 94607
(510) 622-8205
lbrueckner@publicjustice.net
*Counsel for Western Watersheds Project and*
*National Press Photographers Association*

Justin Marceau
University of Denver Sturm College of Law
(for identification purposes only)
2255 East Evans Ave.
Denver, CO 80208
(303) 871-6000
jmarceau@law.du.edu
*Counsel for Western Watersheds Project and*
*National Press Photographers Association*

-2-

Deepak Gupta,
Gupta Wessler PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
deepak@guptawessler.com
*Counsel for National Press Photographers
Association*


Michael E. Wall,
Margaret Hsieh,
Natural Resources Defense Council
111 Sutter Street, 20th Floor
San Francisco, CA 94104
(415) 875-6100
mwall@nrdc.org; mhsieh@nrdc.org
*Counsel for Natural Resources Defense Council, Inc.*

[A172]

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the August 2, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

James Caste                     james.kaste@wyo.gov
Erik Petersen                   erik.petersen@wyo.gov
*Attorneys for State Defendants*

Richard Rideout                 rsrideout@qwestoffice.net
*Attorney for County Attorneys of Fremont and Lincoln County*

Matt Gaffney                    matt.gaffney@sublettewyo.com
*Attorney for County and Prosecuting Attorney of Sublette Count*

DATED this August 2, 2016.

                                s/ Reed Zars
                                Reed Zars
                                Attorney at Law
                                910 Kearney Street
                                Laramie, WY 82070
                                (307) 745-7979
                                reed@zarslaw.com
                                *Counsel for Plaintiffs*

-4-

West's Wyoming Statutes Annotated
    Title 6. Crimes and Offenses
       Chapter 3. Offenses Against Property
          Article 4. Larceny and Related Offenses (Refs & Annos)

W.S.1977 § 6-3-414

§ 6-3-414. Trespassing to unlawfully collect resource data; unlawful collection of resource data

Currentness

(a) A person is guilty of trespassing to unlawfully collect resource data from private land if he:

    (i) Enters onto private land for the purpose of collecting resource data; and

    (ii) Does not have:

        (A) An ownership interest in the real property or, statutory, contractual or other legal authorization to enter the private land to collect the specified resource data; or

        (B) Written or verbal permission of the owner, lessee or agent of the owner to enter the private land to collect the specified resource data.

(b) A person is guilty of unlawfully collecting resource data if he enters onto private land and collects resource data from private land without:

    (i) An ownership interest in the real property or, statutory, contractual or other legal authorization to enter the private land to collect the specified resource data; or

    (ii) Written or verbal permission of the owner, lessee or agent of the owner to enter the private land to collect the specified resource data.

(c) A person is guilty of trespassing to access adjacent or proximate land if he:

    (i) Crosses private land to access adjacent or proximate land where he collects resource data; and

    (ii) Does not have:

        (A) An ownership interest in the real property or, statutory, contractual or other legal authorization to cross the private land; or

[A174]

(B) Written or verbal permission of the owner, lessee or agent of the owner to cross the private land.

(d) Crimes committed under subsection (a), (b) or (c) of this section are punishable as follows:

(i) By imprisonment for not more than one (1) year, a fine of not more than one thousand dollars ($1,000.00), or both;

(ii) By imprisonment for not less than ten (10) days nor more than one (1) year, a fine of not more than five thousand dollars ($5,000.00), or both, if the person has previously been convicted of trespassing to unlawfully collect resource data or unlawfully collecting resource data.

(e) As used in this section:

(i) "Collect" means to take a sample of material, acquire, gather, photograph or otherwise preserve information in any form and the recording of a legal description or geographical coordinates of the location of the collection;

(ii) Repealed by Laws 2016, ch. 117, § 2, eff. March 15, 2016.

(iii) "Peace officer" means as defined by W.S. 7-2-101;

(iv) "Resource data" means data relating to land or land use, including but not limited to data regarding agriculture, minerals, geology, history, cultural artifacts, archeology, air, water, soil, conservation, habitat, vegetation or animal species. "Resource data" does not include data:

(A) For surveying to determine property boundaries or the location of survey monuments;

(B) Used by a state or local governmental entity to assess property values;

(C) Collected or intended to be collected by a peace officer while engaged in the lawful performance of his official duties.

(f) No resource data collected on private land in violation of this section is admissible in evidence in any civil, criminal or administrative proceeding, other than a prosecution for violation of this section or a civil action against the violator.

(g) Resource data collected on private land in violation of this section in the possession of any governmental entity as defined by W.S. 1-39-103(a)(i) shall be expunged by the entity from all files and data bases, and it shall not be considered in determining any agency action.

**Credits**

Laws 2015, ch. 146, § 1, eff. March 5, 2015; Laws 2016, ch. 117, §§ 1, 2, eff. March 15, 2016.

Notes of Decisions (4)

W. S. 1977 § 6-3-414, WY ST § 6-3-414
Current through the 2016 Budget Session

**End of Document**                                   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

[A176]

2016 Wyoming Laws Ch. 117 (S.F. 75)

WYOMING 2016 SESSION LAWS

BUDGET SESSION OF THE 63RD LEGISLATURE

Additions are indicated by **Text**; deletions by
~~Text~~ .
Vetoes are indicated by ~~Text~~ ;
stricken material by ~~Text~~ .

Ch. 117
S.F. No. 75
CRIMES AND OFFENSES—TRESPASS—COLLECTIONS

ENROLLED ACT NO. 55, SENATE

AN ACT relating to crimes and offenses; amending provisions related to the crimes of trespassing to unlawfully collect resource data and unlawful collection of resource data; creating the crime of trespassing to access adjacent or proximate land; repealing the definition of "open land"; and providing for an effective date.

Be It Enacted by the Legislature of the State of Wyoming:

**Section 1.** W.S. 6–3–414(a)(intro), (i), (ii)(A), (B), (b)(intro), (ii), by creating a new subsection (c) and by amending and renumbering (c) through (f) as (d) through (g) is amended to read:

<< WY ST § 6–3–414 >>

**§ 6–3–414. Trespassing to unlawfully collect resource data; unlawful collection of resource data**

(a) A person is guilty of trespassing to unlawfully collect resource data **from private land** if he:

(i) Enters onto ~~open~~ **private** land for the purpose of collecting resource data; and

(ii) Does not have:

(A) An ownership interest in the real property or, statutory, contractual or other legal authorization to enter ~~or access~~ the **private** land to collect **the specified** resource data; or

(B) Written or verbal permission of the owner, lessee or agent of the owner to enter ~~or access~~ the **private** land to collect the specified resource data.

(b) A person is guilty of unlawfully collecting resource data if he enters onto private ~~open~~ land and collects resource data **from private land** without:

(ii) Written or verbal permission of the owner, lessee or agent of the owner to enter the **private** land to collect the specified resource data.

**(c) A person is guilty of trespassing to access adjacent or proximate land if he:**

[A177]

**(i) Crosses private land to access adjacent or proximate land where he collects resource data; and**

**(ii) Does not have:**

**(A) An ownership interest in the real property or, statutory, contractual or other legal authorization to cross the private land; or**

**(B) Written or verbal permission of the owner, lessee or agent of the owner to cross the private land.**

~~(c)~~ **(d)** ~~Trespassing to unlawfully collect resource data and unlawfully collecting resource data~~ **Crimes committed under subsection (a), (b) or (c) of this section** are punishable as follows:

(i) By imprisonment for not more than one (1) year, a fine of not more than one thousand dollars ($1,000.00), or both;

(ii) By imprisonment for not less than ten (10) days nor more than one (1) year, a fine of not more than five thousand dollars ($5,000.00), or both, if the person has previously been convicted of trespassing to unlawfully collect resource data or unlawfully collecting resource data.

~~(d)~~ **(e)** As used in this section:

(i) "Collect" means to take a sample of material, acquire, gather, photograph or otherwise preserve information in any form ~~from open land which is submitted or intended to be submitted to any agency of the state or federal government~~ **and the recording of a legal description or geographical coordinates of the location of the collection**;

(iii) "Peace officer" means as defined by W.S. 7–2–101;

(iv) "Resource data" means data relating to land or land use, including but not limited to data regarding agriculture, minerals, geology, history, cultural artifacts, archeology, air, water, soil, conservation, habitat, vegetation or animal species. "Resource data" does not include data:

(A) For surveying to determine property boundaries or the location of survey monuments;

(B) Used by a state or local governmental entity to assess property values;

(C) Collected or intended to be collected by a peace officer while engaged in the lawful performance of his official duties.

~~(e)~~ **(f)** No resource data collected **on private land** in violation of this section is admissible in evidence in any civil, criminal or administrative proceeding, other than a prosecution for violation of this section or a civil action against the violator.

~~(f)~~ **(g)** Resource data collected **on private land** in violation of this section in the possession of any governmental entity as defined by W.S. 1–39–103(a)(i) shall be expunged by the entity from all files and data bases, and it shall not be considered in determining any agency action.

<< WY ST § 6–3–414 >>

**Section 2.** W.S. 6–3–414(e)(ii) is repealed.

**Section 3.** This act is effective immediately upon completion of all acts necessary for a bill to become law as provided by Article 4, Section 8 of the Wyoming Constitution.

Approved March 15, 2016.

[A178]

W.S.1977 § 40-27-101

§ 40-27-101. Trespass to unlawfully collect resource data; unlawful collection of resource data

Currentness

(a) A person commits a civil trespass to unlawfully collect resource data from private land if he:

(i) Enters onto private land for the purpose of collecting resource data; and

(ii) Does not have:

(A) An ownership interest in the real property or statutory, contractual or other legal authorization to enter the private land to collect the specified resource data; or

(B) Written or verbal permission of the owner, lessee or agent of the owner to enter the private land to collect the specified resource data.

(b) A person commits a civil trespass of unlawfully collecting resource data if he enters onto private land and collects resource data from private land without:

(i) An ownership interest in the real property or, statutory, contractual or other legal authorization to enter the private land to collect the specified resource data; or

(ii) Written or verbal permission of the owner, lessee or agent of the owner to enter the private land to collect the specified resource data.

(c) A person commits a civil trespass to access adjacent or proximate land if he:

(i) Crosses private land to access adjacent or proximate land where he collects resource data; and

(ii) Does not have:

(A) An ownership interest in the real property or, statutory, contractual or other legal authorization to cross the private land; or

(B) Written or verbal permission of the owner, lessee or agent of the owner to cross the private land.

(d) A person who trespasses to unlawfully collect resource data, a person who unlawfully collects resource data or a person who trespasses to access adjacent or proximate land under this section shall be liable in a civil action by the owner or lessee of the land for all consequential and economic damages proximately caused by the trespass. In a civil action brought under this section, in addition to damages, a successful claimant shall be awarded litigation costs. For purposes of this subsection, "litigation costs" shall include, but is not limited to, court costs, expert witness fees, other witness fees, costs associated with depositions and discovery, reasonable attorney fees and the reasonably necessary costs of identifying the trespasser, of obtaining effective service of process on the trespasser and of successfully effecting the collection of any judgment against the trespasser.

(e) Repealed by Laws 2016, ch. 115, § 2, eff. March 15, 2016.

(f) Resource data unlawfully collected on private land under this section is not admissible in evidence in any civil, criminal or administrative proceeding, other than a civil action for trespassing under this section or a criminal prosecution for trespassing under W.S. 6-3-414.

(g) Resource data unlawfully collected on private land under this section in the possession of any governmental entity as defined by W.S. 1-39-103(a)(i) shall be expunged by the entity from all files and data bases, and it shall not be considered in determining any agency action.

(h) As used in this section:

(i) "Collect" means to take a sample of material, acquire, gather, photograph or otherwise preserve information in any form and the recording of a legal description or geographical coordinates of the location of the collection;

(ii) "Peace officer" means as defined by W.S. 7-2-101;

(iii) "Resource data" means data relating to land or land use, including but not limited to data regarding agriculture, minerals, geology, history, cultural artifacts, archeology, air, water, soil, conservation, habitat, vegetation or animal species. "Resource data" does not include data:

(A) For surveying to determine property boundaries or the location of survey monuments;

(B) Used by a state or local governmental entity to assess property values;

(C) Collected or intended to be collected by a peace officer while engaged in the lawful performance of his official duties.

[A180]

**Credits**

Laws 2015, ch. 183, §§ 1, 2, eff. July 1, 2015; Laws 2016, ch. 115, §§ 1, 2, eff. March 15, 2016.

Notes of Decisions (4)

W. S. 1977 § 40-27-101, WY ST § 40-27-101
Current through the 2016 Budget Session

**End of Document**                                        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

[A181]

2016 Wyoming Laws Ch. 115 (S.F. 76)

WYOMING 2016 SESSION LAWS

BUDGET SESSION OF THE 63RD LEGISLATURE

Additions are indicated by **Text**; deletions by
~~Text~~ .
Vetoes are indicated by ~~Text~~ ;
stricken material by ~~Text~~ .

Ch. 115
S.F. No. 76
ACTIONS AND PROCEEDINGS—TRESPASS—COLLECTIONS

ENROLLED ACT NO. 52, SENATE

AN ACT relating to trade and commerce; amending provisions related to the civil causes of action for trespass to unlawfully collect resource data and unlawful collection of resource data; creating the civil trespass to access adjacent or proximate land; providing definitions; repealing a duplicative provision; and providing for an effective date.

Be It Enacted by the Legislature of the State of Wyoming:

**Section 1.** W.S. 40–27–101(a)(intro), (i), (ii)(A), (B), (b)(intro), (ii), by creating a new subsection (c), by amending and renumbering (c) as (d), by amending and renumbering (d) and (f) as (f) and (g) and by creating a new subsection (h) is amended to read:

<< WY ST § 40–27–101 >>

### § 40–27–101. Trespass to unlawfully collect resource data; unlawful collection of resource data

(a) A person commits a civil trespass to unlawfully collect resource data **from private land** if he:

(i) Enters onto ~~open~~ **private** land for the purpose of collecting resource data; and

(ii) Does not have:

(A) An ownership interest in the real property or statutory, contractual or other legal authorization to enter ~~or access~~ the **private** land to collect **the specified** resource data; or

(B) Written or verbal permission of the owner, lessee or agent of the owner to enter ~~or access~~ the **private** land to collect the specified resource data.

(b) A person commits a civil trespass of unlawfully collecting resource data if he enters onto private ~~open~~ land and collects resource data **from private land** without:

(ii) Written or verbal permission of the owner, lessee or agent of the owner to enter the **private** land to collect the specified resource data.

[A182]

**(c)** A person commits a civil trespass to access adjacent or proximate land if he:

    **(i)** Crosses private land to access adjacent or proximate land where he collects resource data; and

    **(ii)** Does not have:

        **(A)** An ownership interest in the real property or, statutory, contractual or other legal authorization to cross the private land; or

        **(B)** Written or verbal permission of the owner, lessee or agent of the owner to cross the private land.

(c) **(d)** A person who trespasses to unlawfully collect resource data, or a person who unlawfully collects resource data **or a person who trespasses to access adjacent or proximate land** under this section shall be liable in a civil action by the owner or lessee of the land for all consequential and economic damages proximately caused by the trespass. In a civil action brought under this section, in addition to damages, a successful claimant shall be awarded litigation costs. For purposes of this subsection, "litigation costs" shall include, but is not limited to, court costs, expert witness fees, other witness fees, costs associated with depositions and discovery, reasonable attorney fees and the reasonably necessary costs of identifying the trespasser, of obtaining effective service of process on the trespasser and of successfully effecting the collection of any judgment against the trespasser.

(d) **(f)** Resource data unlawfully collected **on private land** under this section is not admissible in evidence in any civil, criminal or administrative proceeding, other than a civil action for trespassing under this section or a criminal prosecution for trespassing under W.S. 6–3–414.

(f) **(g)** Resource data unlawfully collected **on private land** under this section in the possession of any governmental entity as defined by W.S. 1–39–103(a)(i) shall be expunged by the entity from all files and data bases, and it shall not be considered in determining any agency action.

**(h)** As used in this section:

    **(i)** "Collect" means to take a sample of material, acquire, gather, photograph or otherwise preserve information in any form and the recording of a legal description or geographical coordinates of the location of the collection;

    **(ii)** "Peace officer" means as defined by W.S. 7–2–101;

    **(iii)** "Resource data" means data relating to land or land use, including but not limited to data regarding agriculture, minerals, geology, history, cultural artifacts, archeology, air, water, soil, conservation, habitat, vegetation or animal species. "Resource data" does not include data:

        **(A)** For surveying to determine property boundaries or the location of survey monuments;

        **(B)** Used by a state or local governmental entity to assess property values;

        **(C)** Collected or intended to be collected by a peace officer while engaged in the lawful performance of his official duties.

<< WY ST § 40–27–101 >>

**Section 2.** W.S. 40–27–101(e) is repealed.

[A183]

**Section 3.** This act is effective immediately upon completion of all acts necessary for a bill to become law as provided by Article 4, Section 8 of the Wyoming Constitution.

Approved March 15, 2016.

---

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

[A184]

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

> (1) all required privacy redactions have been made per 10th Cir. R. 25.5;
>
> (2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;
>
> (3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, AVG 2013, and according to the program are free of viruses.

/s/ David S. Muraskin

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the November 14, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

James Kaste                    james.kaste@wyo.gov
Erik Petersen                  erik.petersen@wyo.gov
Attorneys for State Defendants

Richard Rideout                rsrideout@qwestoffice.net
Attorney for County Attorneys of Fremont and Lincoln County

Matt Gaffney                   matt.gaffney@sublettewyo.com
Attorney for County and Prosecuting Attorney of Sublette Count

DATED this November 14, 2016.

/s/ David S. Muraskin
David S. Muraskin
Public Justice, P.C.
1620 L St. NW, Suite 630
Washington, DC 20036
(202) 861-5245
dmuraskin@publicjustice.net
*Counsel for Western Watersheds Project and*
*National Press Photographers Association*
